**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br>               Plaintiff, <br><br>       v. <br><br> NEOGEN CORPORATION, JOHN ADENT, and DAVID NAEMURA, <br><br>               Defendants. | <u>CLASS ACTION</u> <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Plaintiff" or "Operating Engineers"), by and through its undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, lawsuits, reports, and other public statements issued by or concerning Neogen Corporation ("Neogen" or the "Company"); (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Neogen with the United States Securities and Exchange Commission ("SEC"); and (iv) other available materials relating to Neogen.[1]  Plaintiff believes that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Neogen common stock from January 5, 2023 through June 3, 2025, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Neogen, John Adent and David Naemura, all of whom are collectively referred to as the "Defendants."

2.      Neogen is a food safety company that manufactures and markets products and services dedicated to food and animal safety.  Neogen operates through two main business segments: Food Safety and Animal Safety.  The Food Safety segment provides diagnostic test kits and other products to test for dangerous substances in human and animal food.  The Animal Safety segment develops and supplies pharmaceuticals and medical instruments in the veterinary market.

---

[1] A Certification by Plaintiff is attached hereto as Exhibit 1.

3.      In December 2021, it was announced that Neogen would merge with the Food Safety Division of the 3M Company ("3M").  The deal closed in September 2022.  Upon closing, Neogen commenced what would become a lengthy and complicated integration process.  During the Class Period, Defendants issued a series of materially false and misleading statements which led investors to believe that the integration was progressing much better that it actually was.  In addition, even when the Company was forced to reveal that certain "inefficiencies" arose as a result of the integration, Defendants downplayed them and assured investors that they were fully aware and committed to resolving them quickly.

4.      Investors slowly learned the truth through a series of disclosures beginning on January 10, 2025.  That day, the Company revealed, among other things, that GAAP net income in the second quarter was significantly negative due to a $461 million non-cash goodwill impairment charge related to the 3M acquisition.  Neogen also updated its full year outlook, cutting its fiscal year 2025 ("FY25") revenue and EBITDA guidance.  In addition, the Company revealed that, as of November 30, 2024, the Company had material weaknesses in its internal control over financial reporting.  On this news, the price of the Company's common stock declined 5% to close at $12.36 per share.

5.      One financial quarter later, on April 9, 2025, Neogen announced that quarterly revenue fell 3.4% to $221 million, in part, due to integration issues.  Neogen again cut its FY25 revenue and EBITDA outlook and noted that capital expenditures were expected to be $100 million as a result of lowered adjusted EBITDA and a pull-forward of integration-related capital expenditures into FY25.  Moreover, Neogen revealed that the Company's CEO would be stepping down.  On this news, the price of the Company's common stock plummeted 28% to close at $5.02 per share, on a volume spike of 47 million shares.

6.       Finally, on June 4, 2025, Neogen shocked investors when it revealed that it expected "EBITDA margin to probably be around the high-teens" which represented a considerable drop from the previous quarter's profit margin of 22%.  On this news, the price of the Company's common stock fell an additional 17%, to close at $4.96 per share.  Overall, during the Class Period, from the Company's August 15, 2023 high of $23.84 per share through its June 4, 2025 closing price of $4.96 per share, Neogen's stock price dropped an astonishing $18.88 per share, or 79%, erasing more than $4 billion of the Company's market capitalization.

7.       As a result of Defendants' wrongful acts and omissions, and the large decline in the market value of the Company's common stock, Plaintiff and other class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

8.       The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

9.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.       Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Neogen is headquartered this District and conducts substantial business here.  In addition, many of the acts alleged herein occurred in this District.

11.       In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

### III.    PARTIES

12.    Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund is a multi-employer pension fund based in Pittsburgh, Pennsylvania that administers benefits on behalf of construction equipment engineers and manages hundreds of millions of dollars in assets.  Plaintiff Operating Engineers purchased or otherwise acquired Neogen common stock during the Class Period, as set forth in the attached certification, and suffered damages as a result of the conduct alleged herein.

13.    Defendant Neogen Corporation is a Michigan company that develops, manufactures, and markets products and services geared to food and animal safety.  Neogen is based in Lansing, Michigan, and its common stock trades on the NASDAQ under the ticker symbol "NEOG".

14.    Defendant John Adent ("Adent") served, at all relevant times, as Neogen's President and Chief Executive Officer ("CEO"), as well as member of the Board of Directors (the "Board").

15.    Defendant David Naemura ("Naemura") served, at all relevant times, as the Company's Chief Operating Officer ("COO") and Chief Financial Officer ("CFO").

16.    Defendants Adent and Naemura are collectively referred to as the "Individual Defendants." During the Class Period, the Individual Defendants actively managed the Company, overseeing its operations as well as finances, and made the materially false and misleading statements described below. The Individual Defendants, by virtue of their positions, had extensive knowledge about the core aspects of Neogen's financial and business operations. They were also deeply involved in deciding which disclosures would be made by the Company to its investors.

Because of their positions and access to material non-public information available to them, the Individual Defendants knew that adverse facts had not been disclosed to the public and were being concealed, and that the positive representations being made were materially false and/or misleading at the time they were made.

## IV.    SUBSTANTIVE ALLEGATIONS

17.    Neogen and its subsidiaries develop, manufacture, and market a diverse line of products and services dedicated to food and animal safety.  The Company's Food Safety segment consists primarily of diagnostic test kits and complementary products sold to food producers and processors to detect dangerous or unintended substances in human food and animal feed, such as foodborne pathogens, spoilage organisms, food allergens, pesticide residues, and general sanitation concerns.  The majority of the test kits are consumables, single-use, culture, immunoassay and DNA detection products that rely on proprietary antibodies and RNA and DNA testing methodologies to produce rapid test results.  Neogen's Animal Safety segment develops, manufactures, markets, and distributes a variety of products including veterinary instruments, pharmaceuticals, parasiticides, and disinfectants, as well as genomics testing services for the worldwide animal safety market.

18.    Neogen historically has pursued growth through acquisitions.  On September 1, 2022, Neogen, 3M, and Neogen Food Safety Corporation, a subsidiary created to carve out 3M's Food Safety Division, closed on a $5.3 billion transaction combining 3M's Food Safety Division with Neogen.  Upon closing, Neogen Food Safety Corporation became a wholly owned subsidiary of Neogen.  Analysts hailed the combination as a "great decision" but Defendants hid from investors the true nature and extent of the challenges Neogen faced while integrating 3M with its business.

19.     Throughout the Class Period, Defendants issued a series of false and misleading statements which led investors to believe that the integration was progressing smoothly when the opposite was true.  As detailed below, at the beginning of the Class Period, Defendants touted that the integration process was "*off to a great start*"[2] and that the Company "*delivered solid core growth in both of our segments and, notably, a level of profitability well ahead of where the company was prior to the acquisition.*"

20.     Later, Defendants highlighted that Neogen "*continue[s] to make good progress on the integration activities*" and has "*seen significant growth in the sales pipeline over the last few months and are excited about the potential ahead.*"  In addition, while the Company admitted that certain "inefficiencies" arose as a result of the integration process, Defendants downplayed them assuring investors, "*we have our arms around the key issues and are fully committed to resolving them in the near future.*"

21.     Moreover, in late-2024, Defendants touted the "*huge strides [Neogen had made] in 2024*" which allowed the Company to now "*refocus that energy and time from integration efforts to efficiency and growth efforts, which is what I'm really excited to see the team do.*"

22.     These statements, as detailed below, were false and misleading as Defendants misrepresented the status of the integration and failed to disclose the negative impact of significant integration issues on the financial health of Neogen.

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS

23.     The Class Period begins on January 5, 2023.  That day, Neogen announced its second quarter of fiscal year 2023 ("2Q23") financial results, its first (full) quarter as a combined

---

[2] All emphasis in bold and italics is added unless otherwise noted.

Company with 3M. During the earnings call later that day, CEO Adent commented on the

transaction stating, in relevant part:

> *We're pleased to be with you today to provide the first view of the company's performance since the completion of the Food Safety acquisition from 3M. We've delivered solid core growth in both of our segments and, notably, a level of profitability well ahead of where the company was prior to the acquisition. The former 3M Food Safety business is a great business and highly complementary and we're excited about what we've seen in the first four months of our ownership.*
>
> Clearly, we have still got a number of things to do, and we're early days in the integration, but *we're off to a great start and we have numerous work streams fully underway across the organization to integrate our systems, products, processes and people.*
>
> \* \* \* \* \*
>
> Neogen is a resilient business, having grown now in 122 of the last 128 quarters, due largely to the consumable nature of our products, which play critical roles throughout the food supply chain. *After the acquisition of the Food Safety division of 3M, approximately 95% of our total revenues come from consumable products, which we believe positions us to continue to grow despite the current level of macro uncertainty.*

24.    Adent further noted that Neogen had worked hard "to identify and prioritize the

highest potential revenue and synergy opportunities."  Following the release of the 2Q23 results, an

analyst at William Blair commented, "we were encouraged by a solid first quarter out of the gate

that gives an early glimpse of the company's earnings potential."

25.    The statements in ¶¶23–24 were materially false and misleading because the

integration with 3M was not in fact off to a "great start."  The integration was plagued with

inefficiencies from day one that Defendants knew would necessitate a goodwill impairment and

would impact capital expenditures, revenues, and EBITDA margins.  Defendants touted revenue

potential and synergy opportunities while failing to disclose complications immediately

encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls.

26.     On March 30, 2023, Neogen reported its 3Q23 financial results.  During the earnings call, CEO Adent provided an update on the integration stating, in pertinent part:

> *[W]e continue to make good progress on the integration activities.* Commercially, our teams have been combined and cross trained and we are navigating the tighter market conditions focused on a prioritized set of opportunities globally. *We've seen significant growth in the sales pipeline over the last few months and are excited about the potential ahead.*

27.     CFO Naemura also commented on Neogen's financial performance stating, "[a]djust[ed] EBITDA was $51 million representing growth of 106% from the prior year quarter driven by the merger with the former 3M Food Safety business."

28.     The statements in ¶¶26–27 were materially false and misleading because Neogen was not making "good progress on the integration activities with 3M."  To the contrary, the integration was plagued with inefficiencies from the outset—inefficiencies Defendants knew would trigger a goodwill impairment and negatively impact capital expenditures, revenues, and EBITDA margins.  Defendants touted growth in the sales pipeline and short-term EBITDA increases while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls.

29.     As the Class Period progressed, Neogen continued to provide investors with positive updates on the 3M integration.  For example, on January 9, 2024, Neogen announced its 2Q24 financial results.  During the earnings call, Defendants stated, in relevant part:

> This is an exciting time at Neogen as we're approaching several near-term milestones on the journey of integrating the former 3M Food Safety business. Following the launch of our new ERP system in September, *we made further progress by initiating the exit of several transition service agreements that we*

*have with 3M, while continuing to ramp up our internal capabilities. On the manufacturing front, we also successfully completed the first phase of the relocation of the former 3M pathogen and sample handling product lines into Neogen facilities.* The final relocation of the sample handling production we now expect to complete in Q4, *but otherwise remain on track to exit all transition agreements outside of Petrifilm manufacturing by the end of the third quarter.*

30.     The statements in ¶29 were materially false and misleading because Neogen was not successfully eliminating overlap created by the combination of the two food safety divisions, including significant overlap in manufacturing facilities.  Contrary to Defendants' representations, the integration was immediately plagued with inefficiencies that Defendants knew would necessitate a goodwill impairment and would impact capital expenditures, revenues, and EBITDA margins.  Defendants touted the purported "milestones" and "progress" on its integration efforts while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls.

31.     On April 9, 2024, Neogen announced its 3Q24 financial results.  During the earnings call, the Company provided further updates regarding integration:

*We completed the relocation of the former 3M pathogen detection product line and are now manufacturing in one of our Lansing facilities.*

*We also completed the first-two of our four phase relocation of a former 3M sample handling product line to one of our facilities in Lexington. With the remaining two phases expected to be completed by the end of the fiscal year and production beginning in Q1.*

32.     Notwithstanding the purported progress, Neogen noted the existence of certain "inefficiencies" that had developed as a result of the integration.  Yet, the Company largely downplayed these inefficiencies and reassured investors, "*we have our arms around the key issues and are fully committed to resolving them in the near future*."  Additionally, with respect to

capital expenditures, Neogen noted, "[t]he integration process we've made has also come a substantial investment in working capital or CapEx this year, which we expect will reduce significantly in 2025."

33.    The statements in ¶¶31–32 were materially false and misleading because Neogen was did not "have its arms around key issues" with respect to the integration and was not successfully eliminating overlap created by the combination of the two food safety divisions, including significant overlap in manufacturing facilities.  In reality, the integration was plagued with inefficiencies from day one that Defendants knew would necessitate a goodwill impairment and negatively impact capital expenditures, revenues, and EBITDA margins.  Defendants further had no reasonable basis for stating that capital expenditures would lessen "significantly in 2025" in light of the integration challenges already facing the Company.

34.    On July 30, 2024, Neogen announced its 4Q24 and FY24 financial results.  During the earnings call, the Company highlighted additional positive facts about the integration:

> ***After crossing multiple significant integration milestones in the third quarter, progress continued on multiple fronts in the fourth quarter.***
>
> \* \* \* \* \*
>
> ***With respect to capital expenditures, we are anticipating a sizable decrease as we move past the peak integration spend of fiscal '24.  For fiscal '25, we expect capital expenditures of approximately $85 million with approximately $55 million, specifically related to integration items.***
> ***The last couple of quarters have seen a tremendous amount of integration progress*** as we extricated ourselves from the services previously provided by our transition partner. ***This progress came with the inefficiencies in our distribution center that we discussed and have now resolved.*** … ***Outside of the new facility we're building, the 3M food safety operations have now been combined with Neogen and we're able to shift a significant portion of our operational focus towards driving improvements in these combined operations.***

35.     That same day, the Company issued FY25 revenue guidance of $925 million to $955 million and adjusted EBITDA guidance to $215 million to $235 million.  The Company also expected capital expenditures of $85 million, including $55 million related to the integration.

36.     The statements in ¶34 were materially false and misleading because Neogen had not seen "a tremendous amount of integration progress" and the inefficiencies previously acknowledged were not "now resolved." To the contrary, Neogen continued to face worsening integration issues that Defendants knew would necessitate a goodwill impairment and would impact capital expenditures, revenues, and EBITDA margins.  Defendants touted the purported "milestones" and "progress" with respect to their integration efforts while failing to disclose complications immediately encountered and the issues with integrating a deal of this magnitude, especially with respect to manufacturing, shipping, production overlap, and internal controls. Defendants further had no reasonable basis for predicting a "sizeable decrease" in capital expenditures in light of the integration challenges continuing to plague the Company.

37.     On October 10, 2024, Neogen announced its 1Q25 financial results.  During the earnings call, Adent emphasized that Neogen had made "huge strides in 2024" and that the Company could now "refocus that energy and time from integration efforts to efficiency and growth efforts, which is what I'm really excited to see the team do."

38.     Adent's statement was false and misleading.  As of October 2024, Neogen had not made "huge strides" in its integration of 3M and the Company was not in fact in a position to "refocus that energy and time integration efforts" to moving forward effectively and efficiently.  As would soon be confirmed, the integration was not complete and the Company remained unable to refocus its time and energy into moving forward and growing.  At this time, Neogen continued to

be plagued with acquisition-related complications and inefficiencies, including with respect to manufacturing, shipping, production overlap, and internal controls.

## VI.    THE TRUTH IS REVEALED

39.    On January 10, 2025, after many quarters of touring the success of its integration of 3M, Neogen announced its preliminary 2Q25 financial results.  That day, the Company revealed, among other things, that GAAP net income in the quarter was significantly negative due to a $461 million non-cash goodwill impairment charge related to the 3M acquisition.  Neogen also updated its full year outlook, cutting its FY25 revenue and EBITDA guidance.  In addition, the Company concluded that, as of November 30, 2024, the Company had material weaknesses in its internal control over financial reporting.

40.    An analyst at Guggenheim Securities commented: "The Bad: Revenue and EBITDA guidance was cut, integration frustrations persist, and a long road still remains for driving positive market share gains after losing customers."  Similarly, an analyst at William Blair found the updates "somewhat surprising" and noted that "the stock is in the penalty box until management shows more durable execution in the coming quarters."  On this news, the price of the Company's common stock declined $0.71 per share, or 5%, to close at $12.36 per share.

41.    The truth was further revealed on April 9, 2025 when Neogen announced its 3Q25 financial results, reporting a loss of $11 million, or $0.05 per share, compared with a loss of $2 million, or $0.01 per share, a year earlier.  Revenue fell 3.4% to $221 million which had been negatively impacted by integration issues.  Neogen again cut its FY25 revenue and EBITDA outlook.  The Company also noted that capital expenditures were expected to be $100 million as a result of lowered adjusted EBITDA and a "pull-forward of integration capex into fiscal 2025."  Notably, Neogen also revealed that CEO Adent would be stepping down.  On this news, the price

of the Company's common stock plummeted $2.02 per share, or 28%, to close at $5.02 per share, on a volume spike of 47 million shares.

42.    Finally, on June 4, 2025, Neogen shocked investors when it revealed that the Company expected "EBITDA margin to probably be around the high-teens" which represented a considerable drop from the previous quarter's profit margin of 22%. Neogen blamed the expected shortfall on "elevated inventory write-offs." On this news, the price of the Company's common stock declined $1.04 per share, or 17%, to close at $4.96 per share.

43.    From the Company's August 15, 2023 stock price high of $23.84 per share through its June 4, 2025 closing price of $4.96 per share, Neogen's stock price dropped an astonishing $18.88 per share, or 79%, erasing more than $4 billion of the Company's market capitalization.

## VII. SCIENTER

44.    Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as well as actions intended to manipulate the market price of Neogen common stock, as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Neogen, their control over, receipt, and/or modification of Neogen's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

45.    Defendants knew or recklessly disregarded the false and misleading nature of the information regarding the 3M integration they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period

without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their positions with Neogen, the Individual Defendants controlled the contents of Neogen's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability as well as the opportunity to prevent their issuance or cause them to be corrected.

46.     Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Neogen's corporate statements, and is, therefore, responsible and liable for the representations contained therein.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

47.     Plaintiff and other class members were damaged as a result of Defendants' fraudulent conduct as alleged herein.  During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations, and omitting material facts and uncertainties required to be disclosed, relating to Neogen's operations, business, financial performance, and future prospects.

48.     As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Neogen's common stock was artificially inflated throughout the Class Period.

49.     Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Neogen common stock at artificially inflated

prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other class members would not have purchased Neogen common stock at the artificially inflated prices at which it traded during the Class Period.

50.     The truth regarding Defendants' fraud was revealed through corrective disclosures made between January 10, 2025 and June 4, 2025.  In response to these corrective disclosures, the price of Neogen's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Neogen's stock price.

51.     This decline in Neogen's stock price following the corrective disclosures is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

52.     Plaintiff and other class members suffered economic losses as the price of Neogen's stock fell in response to the corrective disclosures.  It was foreseeable that such disclosures would cause Neogen's stock price to decline.  Thus, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and other class members.

## IX.    PLAINTIFF IS ENTITLED TO A PRESUMPTION OF RELIANCE

53.     At all relevant times, the market for shares of Neogen common stock was an efficient market by virtue of the following reasons, among others: (i) shares of Neogen common stock met the requirements for listing, was actually listed, and actively traded on the NASDAQ; (ii) according to the Company's Form 10-K for the fiscal year ended May 31, 2024, Neogen had 216,694,486 outstanding shares of common stock as of June 30, 2024, demonstrating a broad market for Neogen common stock; (iii) as a registered and regulated issuer of securities, Neogen filed periodic reports with the SEC and NASDAQ, in addition to the Company's frequent voluntary dissemination of information; (iv) Neogen regularly communicated with investors via established market

communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, the internet, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (v) Neogen was followed by securities analysts employed by major brokerage firms, who wrote reports that were distributed to the customers of their respective brokerage firms and made such reports publicly available; (vi) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Neogen common stock; and (vii) without knowledge of the misrepresented or omitted facts, Plaintiff and the members of the class purchased or otherwise acquired Neogen common stock between the time Defendants made the material misrepresentations and omissions and the time the truth was revealed, during which period the price of Neogen's common stock was artificially inflated as a result thereof.

54.     The market for Neogen common stock promptly digested current information regarding Neogen from all publicly available sources and reflected such information in the price of the Company's common stock.  Under these circumstances, all purchasers of Neogen common stock during the Class Period who relied upon the integrity of the market price of Neogen common stock, including Plaintiff, suffered similar injury through their purchase of Neogen common stock at artificially inflated prices, and a presumption of reliance under the fraud-on-the-market doctrine applies.

## X.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

55.     The Private Securities Litigation Reform Act's statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

56.     None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

57.     To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As set forth above, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants do not insulate Defendants from liability for their materially false or misleading statements or omissions.

**58.**     To the extent that the statutory safe harbor applies to any materially false or misleading statement alleged herein, or any portion thereof, Defendants are liable for any such materially false or misleading forward-looking statement because at the time such statement was made the speaker knew the statement was materially false or misleading, or the statement was authorized and approved by an executive officer of Neogen who knew that the forward-looking statement was materially false or misleading.

## XI.   CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Neogen between January 5, 2023 through June 3, 2025.

60.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Neogen, members of Neogen's Board, and members of their immediate families (as defined in

17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Neogen.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Neogen's securities were actively traded on the NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class.  Class members may be identified from records maintained by Neogen or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

62.    Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

64.    Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Neogen's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

65.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  Furthermore, as the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act**
**Against All Defendants**

66.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

67.    During the Class Period, Defendants used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities exchange to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including Plaintiff; (ii) cause the market price of Neogen common stock to trade above its true value; and (iii) cause Plaintiff as well as other class members to purchase or otherwise acquire Neogen common stock at artificially inflated prices that did not reflect the stock's true value during the Class Period.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

68.    While in possession of material adverse non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of

material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Neogen common stock, in violation of Section 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

69.     Defendants acted with knowledge or a reckless disregard for the truth of the materially misrepresented and omitted facts alleged herein in that they failed to disclose such facts even though such facts were readily available to them, if not known.  Defendants' material misrepresentations and omissions were made knowingly and/or recklessly for the purpose and effect of concealing the truth regarding the issues with the 3M integration specifically and Neogen's operations, business, performance, and future prospects generally from the investing public and supporting the artificially inflated price of its common stock.

70.     As set forth above, the dissemination of the materially false or misleading information and failure to disclose material facts artificially inflated or maintained artificial inflation already incorporated in the market price of Neogen common stock during the Class Period. Plaintiff and other class members purchased or otherwise acquired Neogen common stock during the Class Period at artificially inflated prices in direct or indirect reliance on: (i) the materially false or misleading statements made by Defendants; (ii) the efficiency and integrity of the market in which the Company's common stock trades; and (iii) the absence of material adverse information that Defendants knew of or recklessly disregarded but did not publicly disclose.  As the previously misrepresented and/or concealed material facts eventually emerged, the price of Neogen common stock substantially declined, causing losses to Plaintiff and other class members.

71.    At the time of the material misrepresentations and omissions alleged herein, Plaintiff and other class members were not aware of their falsity and believed them to be true.  Had Plaintiff and other class members known the relevant truth regarding Neogen's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, Plaintiff and other class members would not have purchased or otherwise acquired Neogen common stock at artificially inflated prices.

72.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other class members suffered damages in connection with their transactions in the Company's common stock during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

73.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. This claim is brought against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

74.    Prior to and during the Class Period, the Individual Defendants, by virtue of their high-level positions, were privy to, and monitored, confidential and proprietary information concerning Neogen, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.

75.    In their respective roles, the Individual Defendants had regular access to non-public information about Neogen's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other of Neogen's corporate officers and employees, attendance at management meetings and meetings of

21

the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

76.    Each of the Individual Defendants was a controlling person of Neogen within the meaning of Section 20(a), as alleged herein. By virtue of their high-level positions, their participation in or awareness of the Company's day-to-day operations and finances, and/or knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff alleges were materially false and misleading.

77.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Neogen common stock during the Class Period, which included the dissemination of materially false or misleading financial statements and statements (both affirmative statements and statements rendered misleading because of material omissions) set forth above. The scheme: (i) deceived the investing public regarding Neogen's operations and the true value of Neogen's common stock; and (ii) caused Plaintiff and other class members to purchase Neogen common stock at artificially inflated prices, which plummeted in value when the truth concerning Neogen's business, operations, performance, and future prospects was revealed.

78.    The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements Plaintiff alleges were materially misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of these statements or cause these statements to be

corrected.  In particular, the Individual Defendants maintained direct and supervisory involvement in the day-to-day operations of the Company and therefore had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein and exercised the same.

79.    As set forth above, Defendants violated Sections 10(b) and Rule 10b-5 by their acts and omissions as alleged herein.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, the Individual Defendants are liable under Section 20(a).  As a direct and proximate result of the Individual Defendants' culpable conduct, Plaintiff and other class members suffered damages in connection with their transactions in Neogen's common stock during the Class Period.

## XIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, including:

1.    Certification of this action as a class action;

2.    Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

3.    Awarding Plaintiff costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

4.    Awarding such other and further relief as may be just and proper.

## XIV.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 18, 2025                    Respectfully submitted,

*/s/ Marc L. Newman*
Marc L. Newman (P51393)
Dennis A. Lienhardt (P81118)
Gregory A. Mitchell (P68723)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Tel: (248) 841-2200
mln@millerlawpc.com
dal@millerlawpc.com
gam@millerlawpc.com

**GRANT & EISENHOFER P.A.**
Karin E. Fisch (admission forthcoming)
Vincent J. Pontrello (admission forthcoming)
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (610) 722-8500
kfisch@gelaw.com
vpontrello@gelaw.com

*Counsel for Plaintiff and the Proposed Class*