# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NEOGEN CORPORATION, JOHN ADENT, and DAVID NAEMURA,<br><br>Defendants. | No. 1:25-cv-00802-HYJ-RSK<br><br>Hon. Hala Y. Jarbou<br><br><u>CLASS ACTION</u><br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.    INTRODUCTION ............................................................................................. 2

II.   JURISDICTION AND VENUE ....................................................................... 9

III.  PARTIES ...................................................................................................... 10

      A.    Lead Plaintiffs ................................................................................... 10

      B.    Defendants ......................................................................................... 12

IV.   RELEVANT FORMER EMPLOYEES ......................................................... 13

V.    DEFENDANTS' FRAUDULENT SCHEME ................................................. 14

      A.    Neogen Buys 3M's Food Safety Business In A Play To Double Its
            Revenues And Profit And Become A "Global Leader in Food Security"............ 14

      B.    To Achieve The Promised Benefits Of The Merger, It Was Critically
            Important For Neogen To Successfully Integrate 3M's Manufacturing,
            Distribution, And Back Office Functions ................................................ 17

      C.    Leading Up To The Class Period, Defendants Assured Investors That
            Neogen Was Making Significant Progress On The Integration ........................ 20

      D.    Throughout the Class Period, Defendants Made A Series of Materially
            False And Misleading Statements About The Integration, CRM System,
            And ERP System Implementation ........................................................ 22

      E.    In October 2023, Neogen Announces Its ERP System—The "Most Critical
            Component" Of The Integration—Is "Up And Running" And "Fully
            Operational"................................................................................... 25

      F.    As A Result Of The Supposedly Successful ERP Integration, By January
            2024, Neogen Claimed To Be Fully Ready To Exit The Transition Services
            Agreements And Take Over All Manufacturing And Distribution Of All
            3M Products Other Than Petrifilm ....................................................... 27

      G.    April 2024: Defendants Disclose "Operational Inefficiencies," But
            Downplay Any Integration Setbacks As Temporary And Under Control............ 28

      H.    During The Second Half Of 2024, Defendants Repeatedly Assured
            Investors That Any Integration Setbacks Were "Resolved" And "Behind
            Us" ............................................................................................... 30

      I.    The Full Truth Is Revealed: The Integration Had Failed, The Integration
            Problems Were Nowhere Near "Resolved," The ERP Was Dysfunctional,
            And Neogen Was Unable To Manufacture Key Product Lines ...................... 35

            1.    April 9, 2025: Neogen Reveals That The ERP Implementation Is
                  Far From Complete And Fires Adent As A Result.................................. 36

i

2.      June 4, 2025: The Full Truth Comes Out, As Defendants Reveal That The Company's ERP System Was Entirely Dysfunctional, And The Integration Is Nowhere Near Complete ..................................... 38

J.      Defendants' Fraud Is Confirmed By Numerous Former High-Level Neogen Executives, Who Confirmed That The CRM System Was Not Combined "On Day Two," The ERP System Was Not "Fully Operational," And Neogen Was Unequipped For In-House Manufacturing And Distribution Of 3M Products ..................................................... 42

1.      The Integration Was A "Colossal Failure," The Company's IT Systems Were Never "Fully Integrated," And Neogen's ERP Was Never "Up And Running," Or "Fully Operational" ................................. 42

2.      Defendants' Manufacturing Transition Was Disastrous, And The Problems Were Never "Resolved" During The Class Period .................. 52

3.      Neogen's Financial Planning Processes Also Were Flawed .................... 55

K.      Post Class Period Events Further Confirm Defendants' Fraud ............................ 57

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................... 60

A.      The January 5, 2023 Earnings Call ................................................................ 61

B.      The January 11, 2023 JPMorgan Healthcare Conference ................................ 62

C.      The March 30, 2023 Earnings Call And Presentation ..................................... 63

D.      The June 6, 2023 William Blair Growth Stock Conference Call And Presentation ................................................................................................... 64

E.      The July 27, 2023 Earnings Call, Presentation, And Press Release .................... 66

F.      The October 10, 2023 Earnings Call And Presentation ........................................ 67

G.      The January 9, 2024 Earnings Call And Press Release ......................................... 70

H.      The January 11, 2024 JPMorgan Healthcare Conference Call ............................ 71

I.      The April 9, 2024 Earnings Call, Presentation, And Press Release ..................... 72

J.      The June 4, 2024 William Blair Growth Stock Conference Call And Presentation ................................................................................................... 74

K.      The July 30, 2024 Earnings Call, Presentation, And Press Release .................... 77

L.      The September 5, 2024 Wells Fargo Healthcare Conference Call And Presentation ................................................................................................... 80

M.      The October 10, 2024 Earnings Call, Presentation, And Press Release .............. 81

N.      The December 4, 2024 Piper Sandler Healthcare Conference Call And Presentation ................................................................................................... 83

O.      The January 10, 2025 Earnings Call ........................................................ 84

P.      The January 15, 2025 JPMorgan Healthcare Conference Call ........................... 85

Q.      The April 9, 2025 Earnings Press Release ............................................. 86

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER .......................................... 87

VIII.   LOSS CAUSATION ......................................................................... 93

IX.     PRESUMPTION OF RELIANCE ........................................................ 97

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ............................................... 99

XI.     CLASS ACTION ALLEGATIONS ....................................................... 99

XII.    CLAIMS FOR RELIEF ................................................................ 101

XIII.   PRAYER FOR RELIEF ................................................................ 106

XIV.    JURY DEMAND ...................................................................... 106

Lead Plaintiffs Operating Engineers Construction Industry and Miscellaneous Pension Fund, the City of Miami Fire Fighters' and Police Officers' Retirement Trust, Metropolitan Employee Benefit System, the City of Orlando Firefighters' Pension Fund, the City of Orlando Police Officers' Pension Fund, the City of Orlando General Employees' Pension Fund, and West Palm Beach Firefighters' Pension Fund ("Plaintiffs" or "Lead Plaintiffs"), by and through the undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Neogen Corporation ("Neogen" or the "Company") and certain of its officers (collectively, "Defendants").  Lead Plaintiffs bring these claims on behalf of all purchasers of Neogen common stock from January 5, 2023 through June 3, 2025, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things, the investigation of Lead Plaintiffs and their counsel, which includes, without limitation: (a) review and analysis of public filings made by Neogen with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, investor communications, conference calls, and postings on Neogen's website concerning Defendants' public statements; (d) interviews with former employees of Neogen; and (e) review of other publicly available information concerning the Company and the Individual Defendants.

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within

their custody or control.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a securities fraud class action in which Defendants made a series of false and misleading statements about the single most important transaction in Neogen's history: the Company's $5.3 billion merger (the "Merger") with 3M Corporation's food safety business ("3M Food Safety"), which was touted as a "transformative" transaction that was a "massive step forward" for Neogen, enabling it to become a "global leader in food security."  Indeed, following the Merger, Neogen was set to *double* in size, with Defendants promising $1 billion in combined revenues and 30% profit margins due to the Merger's massive "synergies."

2.    To realize the promised benefits of the Merger, a smooth integration of the two businesses was essential—to the extent that in announcing the transaction on December 14, 2021, Neogen CEO John Adent ("Adent") stated: "***the success and growth of the combined company hinges on a seamless integration***."  Specifically, Neogen would have to integrate 3M Food Safety's complex and global "back-office" IT and logistics functions, including: (i) the Customer Resource Management ("CRM") system, which managed sales and customer communications; and (ii) the Enterprise Resource Planning ("ERP") system, which Defendants themselves called the integration's most "***critical component***" given that the ERP system centrally managed everything from multi-national supply chains to demand forecasting to ordering to fulfillment to accounting.  Significantly, any delays to the integration would materially impact Neogen's profitability because until Neogen took over these functions, it would have to pay 3M hefty fees to manage them under a series of "Transition Services Agreements" that would gradually increase as time passed.  Accordingly, from the moment the Merger closed on September 1, 2022, investors were laser-focused on whether the integration was progressing "seamlessly."

3.     From the outset of the Class Period, Defendants assured investors that the integration of 3M Food Safety was progressing rapidly and successfully, such that the Company would soon be fully ready to take over all functions from 3M.  For example, on January 5, 2023—the first day of the Class Period, and more than four months after the Merger was completed—Adent announced that the Company's "***significant progress to date in the realignment and coordination of our commercial efforts***" was so successful that the two companies had "***combined CRM systems on day two***."  Similarly, just a few days later, during an investor conference on January 11, 2023, Adent boasted that it was "***a big deal***" that by "***[t]he second day of integration, we had combined our CRM systems***."  As a result, the two businesses were now operating under "***one common platform***" that allowed Defendants to "***kn[o]w who the common customers were, what they were buying, who was calling on them***."

4.     As the Class Period progressed, Defendants continued to represent to investors that Neogen had accomplished key integration milestones that would ensure the successful combination of the two companies.  Significantly, on October 10, 2023—more than a year after the Merger's close—Defendants announced that they had achieved a mission-critical milestone in the integration: the "go-live" of Neogen's new and purportedly fully integrated ERP system (also known as "SAP").  Adent boasted that the implementation and integration of the ERP system was a "***significant step to have behind us***," and made clear that the Company's ERP system was fully and completely operational, stating that "***we are fully operational on the new system, processing orders and shipping products***," and that Neogen's "***business was up and running, we were able to do all the functions, [and] nothing stopped***."

5.     Three months later, on January 9, 2024, Neogen announced that another key milestone had been reached: the integration had purportedly progressed so successfully that

3

Neogen was now ready to take over the 3M-managed functions and exit its costly Transition Services Agreements, enabling the Company to begin selling the 3M products it acquired in the Merger at higher profit margins.  Specifically, Adent announced that, "*[f]ollowing the launch of our new ERP system in September, we made further progress by initiating the exit of several transition service agreements that we have with 3M*," and further stated that Neogen would be manufacturing virtually all of 3M Food Safety products in-house within a few months.

6.     On April 9, 2024, Neogen announced financial results for Q3 of FY 2024 that fell below expectations, disclosing that it was experiencing certain "*operational inefficiencies*" that were "*affecting our order fulfillment rates and preventing us from meeting the end-market demand*."  Consequently, Defendants acknowledged that they had lost business because of these issues, with Adent admitting that "*there are clearly some customers we're going to have to win back*."  In response, Neogen's stock price fell approximately 9%.

7.     But, following this disclosure, Defendants continually assured investors that any issues with the integration were only "temporary" and had been fully resolved, and that Neogen remained on track to realize the Merger's benefits.  For example, on June 4, 2024, Adent publicly stated at an investor conference that Defendants were entirely "*comfortable*" with the progress of the integration, and that Neogen was "*through the majority*" of those temporary issues.  Then, on July 30, 2024, Defendants asserted that the integration problems were fully and completely resolved, unequivocally stating that any past order fulfillment issues were "*no longer a constraint*" and the integration issues had "*now effectively been resolved*."  Indeed, Defendants emphatically lauded Neogen's "*tremendous amount of integration progress*" and the "*significant amount of work that's behind us*," even going so far as to state in no uncertain terms: "*[T]he 3M Food Safety operations have now been combined with Neogen*."

8.      As 2024 progressed, Defendants continued to assure investors that any and all issues with the integration had been resolved.  Thus, on September 5, 2024, Defendants triumphantly proclaimed that the "*challenges that [plagued us] in 2024 are behind us*."  Similarly, during an October 10, 2024 earnings presentation, Defendants highlighted to investors that "*[r]ecent integration challenges [were] resolved*[.]"  And on January 10, 2025, when the Company issued its results for the second quarter of fiscal 2025, Adent reiterated that the issues that had impacted Neogen in 2024 had been fully resolved and the ERP system implementation was fully "complete," stating: "*[o]ur ERP implementation*, *which allowed us to exit the transition service agreements with 3M*, *is complete*, *and all the related shipping delays that we had three quarters ago are behind us*."  Analysts relied heavily on these representations, quoting them verbatim in concluding that integration issues were "*no longer a growth constraint*" and "*company-specific headwinds from the past two years seem to be largely behind us*."

9.      Accordingly, the market was stunned when, on April 9, 2025, Defendants revealed material new information that established that—in direct contrast to their numerous prior statements—the integration was *nowhere* near complete, and the problems that had been affecting Neogen were *not* "behind us."  On that date, Defendants reported that Neogen's financial results for the quarter had been negatively "*impacted by the challenges we've discussed with our sample collection product line*," resulting in "*a $25 million headwind for the year*," and reduced financial guidance for FY 2025.  Additionally, the Company had experienced a "*carryover impact from last year's shipping delays*," which resulted in declining revenues for "*most [of Neogen's] food safety product categories*."  The integration problems plaguing Neogen's business were so severe and self-inflicted that the Company's Board of Directors (the "Board") decided to terminate Adent as CEO precisely because of these significant operational failures.  According to the Company's April

9, 2025 press release, "***the Board determined that now is the time to begin a leadership transition and identify the Company's next CEO***."

10.    In response to Defendants' April 9, 2025 disclosures, Neogen's stock price plummeted nearly 30% in a single day, from $7.04 per share on April 8, 2025 to a close of $5.02 per share on April 9, 2025, on extraordinarily high trading volume.  In the wake of these disclosures, analysts excoriated Defendants for their lack of candor, with William Blair directly questioning "***management's credibility and ability to execute***" and highlighting that investor "***sentiment is probably at its lowest level in years***."

11.    Finally, on June 4, 2025, the full truth was revealed.  On that date, Neogen CFO David Naemura ("Naemura") announced preliminary financial results for Q4 and FY 2025 at an investor conference, and explicitly admitted that the implementation and integration of the ERP system had been, in reality, a complete and utter failure.  Indeed, the ERP system was so dysfunctional that it lacked even the most basic protocols to ensure that it could ship the right amount of product to the right customers.  Moreover, the problems were so severe that, as Neogen would subsequently disclose, the Company could not use automated processes to assemble its products, and it resorted to assembling products *by hand*—an obviously extraordinarily inefficient process that caused enormous delays in getting products to customers.  As a result of these issues, Neogen incurred massive inventory write-offs as products expired before they could be sold.

12.    Specifically, as Naemura admitted, "***the underlying processes to get the right inventory in the right place need to be improved***," and "***the result [of the integration problems] has been an elevated level of inventory write-offs that we've seen beginning in Q3 and then actually being a little larger in Q4***."  As Naemura ultimately admitted on a call held the following month, these integration problems were so significant that they forced Neogen to assemble

products *by hand*: "*[Neogen] continue[d] to struggle with sustaining consistent uptime of the automated processes, which is causing us to produce a significant amount of products manually*."  And underscoring these fundamental failures in the integration, Naemura further admitted that—*three years* after the Merger closed—Neogen was still nowhere close to solving these integration problems, as the Company was forced to adopt a new *nine-step* improvement plan to address these issues that would require as much as *two years* to complete.

13.     In response to these disclosures, Neogen's stock price fell an additional 17% in a single day, closing at just $4.96 per share on June 4, 2025.  In total, Neogen's stock price fell a staggering 79% from its Class Period high, wiping out more than $4 billion of shareholder value.

14.     Analysts again excoriated Defendants for their repeated lack of candor, openly questioning, in remarkably frank language, how there could still be so many problems with the integration given Defendants' past representations.  Significantly, William Blair expressed incredulity that Neogen's supposedly integrated ERP system still suffered from some of the most basic and fundamental deficiencies that a company can experience, specifically highlighting "*protocols that were not properly established to ensure the right products were shipped at the right time*."  William Blair also directly questioned management's credibility given the "*uncertainty about whether the company truly is on the cusp of emerging from integration issues*," pointedly noting that despite Defendants' repeated assurances regarding the integration, the Company's "*current leadership team (i.e., CFO and global operations) keeps uncovering legacy Neogen issues that need to be fixed . . . begging the question, what else needs to be fixed?*"  Similarly, Guggenheim Partners also placed the blame for these "self-inflicted wounds" squarely on Neogen management, emphasizing that "*[m]anagement is in the penalty box due to a series of self-inflicted issues since the 3M deal*."  Given that "*the latest self-inflicted wound following*

*the 3M systems integration*" would negatively impact Neogen "*for the foreseeable future*," Guggenheim Partners opined that "*management needs to* '*own the problem*'" and "*get clean*."

15.    Lead Plaintiffs' independent investigation has further confirmed that Defendants' positive statements during the Class Period regarding the integration of 3M Food Safety were materially false and misleading.  Indeed, numerous former high-level Neogen executives who worked directly on the 3M Food Safety integration, and who were interviewed as part of Lead Plaintiffs' investigation, confirmed in explicit detail that the *exact opposite* was true: the integration was an unmitigated disaster from the outset of the Merger.  For example, a sales executive who worked with Neogen's CRM system stated that it was "*[a]bsolutely 100% false*" that the two companies' CRM systems were combined "on day two," and that "*I never saw it and no one else ever saw it.  It didn't happen while I was there*" (through the end of 2023).  Similarly, Neogen's former Director of Supply Chain Management confirmed that the ERP system was never "fully operational" and able to "do all the functions," as Defendants claimed.  Instead, the ERP system go-live was a "*colossal failure*," as from the moment it went live in September 2023, "*it was such a disaster that we could not ship product, we could not fulfill orders, we had no idea where product was in the warehouse*."  According to these former executives, "*customers got product sent to them but were never billed or customers got billed ten times what they should have paid*."

16.    Other former executives and employees similarly corroborated these undisclosed material deficiencies in the integration.  For example, a former VP who managed a customer success team recalled that due to the ERP system's dysfunction, "*[o]rders would come in and wouldn't be able to be fulfilled [], so we had to fulfill the orders manually*," leading to months-long delays.  Another sales executive recalled that, due to the ERP system failures, Neogen lost

customers because orders went unfulfilled: "*[w]e lost sales and customers because these customers needed the [test] kits for their companies*."  Similarly, another sales representative described the ERP rollout as "*chaos*," causing his products to take "*up to 2, 3, 4 months to deliver after the [purchase order] was created*," leading customers to defect to competitors.  These issues were so pervasive that Neogen's former Senior Director of Global Marketing and Operations stated that the Company was operating "*in crisis mode*" throughout the integration, with "*a lot of hair on fire, frankly, regarding transaction activities [and] ERP deployment*."

17.    Since the end of the Class Period, the fallout from Defendants' fraud has only continued.  On July 29, 2025, Neogen was forced to take a massive goodwill write-down of nearly $600 million due to its integration failures.  On September 15, 2025, Neogen announced that Naemura was resigning without any planned successor.  One month later, on October 10, 2025, William Blair reported that the Company's management exodus was expanding, with Neogen "now also looking for a new C[hief] C[ommercial] O[fficer] and new leadership in the U.S. & Canada and Europe regions."  Just days before this complaint was filed, at an investor conference on January 15, 2026, Neogen's new CEO—who had taken the helm just months earlier—admitted that even then, the integration was still a disaster, and Neogen still remained "*in the early stages of the turnaround*."

## II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Neogen is headquartered in Lansing, and many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

21.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiffs

22.      Lead Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Local 66") is a multi-employer pension fund that provides pension and retirement benefits to operating engineers and their beneficiaries in Western Pennsylvania and three counties in Ohio.  As reflected in its PSLRA certification (ECF No. 12-2), Local 66 purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

23.      Lead Plaintiff the City of Miami Fire Fighters' and Police Officers' Retirement Trust ("Miami FIPO") provides pension and other benefits for current and retired firefighters and police officers, and their beneficiaries.  As reflected in its PSLRA certification (ECF No. 12-2), Miami FIPO purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

10

24.     Lead Plaintiff Metropolitan Employee Benefit System ("Nashville") is a public employee defined-benefit plan that manages assets for the benefit of approximately 25,000 active and retired participants and their beneficiaries.  As reflected in its PSLRA certification (ECF No. 12-2), Nashville purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

25.     Lead Plaintiff the City of Orlando Firefighters' Pension Fund ("Orlando Fire") is a defined-benefit public pension fund that manages assets for the benefit of approximately 1,700 active and retired participants and their beneficiaries.  As reflected in its PSLRA certification (ECF No. 12-2), Orlando Fire purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

26.     Lead Plaintiff the City of Orlando Police Officers' Pension Fund ("Orlando Police") is a defined-benefit public pension fund that manages assets for the benefit of approximately 1,000 active and retired participants and their beneficiaries.  As reflected in its PSLRA certification (ECF No. 12-2), Orlando Police purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Lead Plaintiff the City of Orlando General Employees' Pension Fund ("Orlando General") is a defined-benefit public pension fund that manages assets for the benefit of approximately 7500 active and retired participants and their beneficiaries.  As reflected in its PSLRA certification (ECF No. 12-2), Orlando General purchased Neogen common stock during

the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

28.     Lead Plaintiff West Palm Beach Firefighters' Pension Fund ("WPB Fire") is a public pension fund that provides pension, death, and disability benefits to firefighters in the City of West Palm Beach, Florida.  As reflected in its PSLRA certification (ECF No. 12-2), WPB Fire purchased Neogen common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

**B.     Defendants**

29.     Defendant Neogen is a Michigan corporation that develops, manufactures, and markets products and services geared to food and animal safety.  Neogen is based in Lansing, Michigan, and its common stock trades on the NASDAQ under the ticker symbol "NEOG."

30.     Defendant Adent served as Neogen's President and Chief Executive Officer ("CEO"), as well as member of the Board, from 2017 to April 9, 2025, when Neogen disclosed that Adent would be stepping down upon the Board's selection of a replacement CEO.

31.     Defendant Naemura served as the Company's Chief Financial Officer ("CFO") from November 2022 to September 15, 2025, when Neogen announced that Naemura intended to leave the Company by no later than the end of 2025.  Naemura also served as the Company's COO from March 2025 (when the former COO Douglas Jones ("Jones") resigned) until he left the Company.

32.     Defendants Adent and Naemura are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Neogen, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and

institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    RELEVANT FORMER EMPLOYEES

33.    FE-1[1] is a former employee of Neogen who worked at a Company facility in Lansing, Michigan from May 2021 through June 2023.  FE-1 was initially hired as a Manufacturing Specialist/Production Scheduler and was later promoted to Production Planning Analyst in December 2022.  During his tenure, FE-1 reported to two different Production Planning Managers.

34.    FE-2 is a former employee of Neogen who worked both remotely and at Company facilities in Lansing, Michigan, first, as a Technical Sales Representative and then as a Sales Representative from February 2022 through January 2024.  As a Sales Representative, FE-2 reported to Neogen's then Inside Sales Manager Jennifer Evans.

35.    FE-3 is a former employee of Neogen who worked at a Company facility in Lansing, Michigan as a Sales Development Executive from November 2021 through November 2023.  In this role, FE-3 reported to Neogen's then Inside Sales Manager, Jennifer Evans.

---

[1] Individuals referred to herein as "FE-#" are former employees of Neogen, some of whom also are former employees of 3M.  All FEs provided the information described herein to counsel for use in this complaint, with the exception of one FE specified as interviewed by a third-party service known as AlphaSense (described further below).  In order to help preserve the anonymity of the FEs, male gender pronouns are used in connection with all FEs regardless of their gender.

36.     FE-4 is a former employee of Neogen who worked remotely as the Vice President of Software and Product Engineering from February 2023 through April 2024.  In this role, FE-4 reported to Joseph Heinzelmann, the Senior Director Food Safety Digital Solutions, who in turn reported directly to Neogen's then-COO Jones.

37.     FE-5 is a former employee of Neogen who worked at a Company remotely from September 2022 through August of 2024 as the U.S. Director of Supply Chain Planning.  During his first three months of employment with Neogen FE-5 reported to Neogen's then Vice President of Manufacturing, Jerome Hagedorn.   Thereafter, FE-5 reported directly to Neogen's Vice President of Supply Chain, Melody Alford, who in turn reported to then-COO Jones.

38.     FE-6[2] is a former employee of Neogen who worked at a Company facility in Lansing, Michigan as the Senior Director of Global Marketing, Food Safety Division from January 2022 through January 2024.  FE-6 reported directly to then-COO Jones.

39.     FE-7 is a former employee of Neogen who worked at a Company facility in Lansing, Michigan as the Senior Director of Capital Global Capex Projects, Engineering and Facilities from January 2022 through December 2024.  FE-7 initially reported directly to Adent and later to a Senior Vice President of Manufacturing who in turn reported to Adent.

## V.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Neogen Buys 3M's Food Safety Business In A Play To Double Its Revenues And Profit And Become A "Global Leader in Food Security"

40.     Neogen's food safety segment makes and sells diagnostic test kits designed to detect unwanted organisms or substances (such as pathogens, pesticides, and chemicals), as well

---

[2] FE-6's quotes are taken from two interviews done by AlphaSense Expert Insights analysts and published on the AlphaSense platform on October 29, 2024 and November 29, 2024.  As noted above, AlphaSense is a platform that provides access to proprietary research, earnings transcripts, and other documents, including interviews with industry professionals.  AlphaSense Expert Insights interviews are recorded, and transcripts of the interviews are published on the AlphaSense platform.

as devices and software systems to help customers analyze the results of these tests.  In FY 2021—the fiscal year preceding the announcement of the Merger—the food safety segment accounted for roughly half of the Company's $468 million in revenue.[3]

41.     Neogen's food safety customers are food processors, food manufacturers, restaurants, hotels, hospitals, and other companies that have to test regularly and frequently in order to ensure a clean, sanitary, and uncontaminated environment.  Neogen's customers rely on a steady supply of large quantities of the Company's testing products, and it is critical that their supply does not face any disruption.

42.     On December 14, 2021, Neogen announced the Merger as a "transformative" transaction, whereby Neogen's $5.3 billion acquisition of 3M Food Safety would double the size of Neogen's business and make food safety the vast majority of the Company's revenue.  To effectuate the transaction, 3M would spin off 3M Food Safety, and 3M shareholders would then be given the option to tender some of their shares in exchange for shares in Neogen.  Neogen would finance the transaction by issuing approximately 108 million new shares of its common stock, and by taking on $1 billion in new debt.

43.     Adent extolled the benefits of the Merger during a December 14, 2021 special investor call where he proclaimed that the Merger was "***creating a global leader in food security*** and establishing a platform from which ***we are well positioned to accelerate growth*** and drive significant additional value for customers, employees, and shareholders."

44.     By acquiring 3M Food Safety, Neogen would take over several key 3M product lines that, Neogen claimed, would complement its own products and provide massive "cross-

---

[3] Neogen operated on a fiscal year that ended May 31 of the named year.  As such: Q1 of FY 2023 ran from June 1 to August 31, 2022; Q2 of FY 2023 ran from September 1, 2022 to November 30 2022; Q3 of FY 2022 ran from December 1, 2022 to February 29, 2023; and Q4 of FY 2023 ran from March 1, 2023 to May 31, 2023.

selling opportunities." First, Neogen would acquire 3M's hygiene monitoring line—tests specifically designed to determine whether a required hygienic cleaning process (such as for a surface or piece of food processing equipment) was sufficiently achieving its goal. These products were low-cost and designed for high-volume, high-frequency use—*e.g.*, a single large customer might use dozens or even hundreds of tests in a single day.

45. Second, Neogen would acquire 3M's pathogen detection product line, which was designed to more specifically test food products for the presence of pathogens such as salmonella, listeria, and e. coli, often for purposes of satisfying regulatory and legal requirements. These tests were higher priced but lower in use frequency.

46. Third, Neogen would acquire 3M's line of "sample handling" or "sample collection" products—consumables used to collect, preserve, transport and prepare samples for testing—such as swabs, sponge sticks, and sample collection bags. These products were particularly significant to Neogen's business plans because they could be used with—and often were designed specifically for use with—products from other product lines, and thus afforded significant "cross selling" opportunities.

47. Finally, Neogen would acquire 3M's "indicator testing" line of low-cost tests designed to be used in high volume by customers such as large food and beverage processors and manufacturers to monitor the overall environment for organisms and contaminants. Most significantly, the indicator testing line included Petrifilm—a ready-to-use culture plate used as a rapid test for bacteria, mold, and other pathogens and contaminants.

48. In announcing the Merger, Adent promised that the combination would supercharge the Company's revenue and profits, with the combined Company projected to bring in $1 billion in revenue per year, 10% annual revenue growth, $300 million in Adjusted EBITDA, and 30%

16

Adjusted EBITDA margins.  Additionally, the Merger would provide Neogen with cost savings and growth synergies that would contribute $30 million in additional EBITDA annually.

49.     Due to these promised benefits, Adent on December 21, 2021 called the Merger a "***massive step forward***" and "***major milestone for Neogen***."

**B.     To Achieve The Promised Benefits Of The Merger, It Was Critically Important For Neogen To Successfully Integrate 3M's Manufacturing, Distribution, And Back Office Functions**

50.     Prior to the Merger, 3M Food Safety was a complex, global business, with a multi-national supply chain, manufacturing, and distribution system.  For the Merger to be successful, the integration of the two complex and global businesses needed to be smooth and successful.  Adent acknowledged during the Company's December 14, 2021 call with investors announcing the Merger that "***we know the success and growth of the combined company hinges on a seamless integration***, ***which is why we have a detailed integration plan in place***."

51.     For Neogen to fully integrate 3M Food Safety, it would have to integrate the entirety of that global business with its own.  This transition would require Neogen to take over all "back office" functions from 3M—including sales, supply chain, demand forecasting, inventory management, order processing, shipping, and accounting.  Additionally, Neogen would ultimately have to move production and distribution of all 3M Food Safety products into its own facilities.

52.     The most critical step in achieving a seamless integration involved combining the IT systems of both companies.  Specifically, two primary IT systems needed to be successfully integrated.  First, the customer relationship management system, or "CRM" system, which managed customer sales and communications.  As Adent explained during an earnings call on September 27, 2022, the CRM system would enable the Neogen and 3M sales "teams to align targets across the groups and ensure that the targeted benefits associated with the merger are clearly defined and tracked."

53.     Second, the enterprise resource planning system, or "ERP" system, which managed all aspects of the combined companies' multi-national supply chains, demand forecasting, ordering, fulfillment and accounting, essentially operating as the brain for all of Neogen's operations.[4]  Thus, successfully integrating the ERP system was the mission-critical step in the integration process that would allow Neogen to take over back-office functions, manufacturing, and distribution of 3M Food Safety products from 3M.  As Naemura explained during an investor conference on November 30, 2023, successfully integrating and implementing a common ERP system was "*the most critical component for us to bring in [3M Food Safety's] businesses*[.]"

54.     In the interim period between the closing of the Merger and Neogen's completion of the integration, the Merger agreement included a series of Transition Services Agreements as short-term measures whereby 3M would continue to  (a) manage back office functions for 3M Food Safety until Neogen was ready to take them over, and (b) continue to manufacture and distribute most 3M Food Safety products on behalf of Neogen until Neogen was ready to produce and distribute those products in its own facilities.  However, the Transition Services Agreements were immensely costly for Neogen and severely eroded the Company's bottom line.

55.     First, Neogen's back-office Transition Services Agreement required Neogen to pay 3M a fixed monthly fee for managing back-office services, and after the 18-month initial term of the agreement expired at the end of March 2024, the monthly fee would increase with each six month term extension.  This created immense pressure for Neogen to rapidly set up its own IT

---

[4] Neogen's new ERP system was created by SAP SE ("SAP") a German software company that is the largest vendor of ERP systems.  As SAP states, a common ERP System "helps organizations streamline their core business processes—including finance, HR, manufacturing, supply chain sales, and procurement—with a unified view of activity and provides a single source of the truth."  Neogen's ERP system is sometimes referred to in Neogen's investor communications, and herein, as "SAP."

systems (and especially its new ERP system, known as SAP) that could manage these functions, so that it could exit the back-office Transition Services Agreement by April 2024.

56.     Second, under the distribution Transition Services Agreement, Neogen would pay 3M "a fee calculated based on a fixed percentage of net sales" for products distributed by 3M. This fee created additional pressure for Neogen to quickly bring 3M product distribution in-house.

57.     Third, under the manufacturing Transition Services Agreements, Neogen would pay additional fees for any products 3M continued to manufacture for Neogen, including a variety of costs related to the production of the relevant product plus a "mark-up percentage" that would gradually escalate each year.  Thus, Neogen was under massive time pressure to bring all 3M Food Safety product lines into its own manufacturing facilities, since the longer Neogen stayed on the Transition Services Agreement, the lower its profits would fall.

58.     To extract itself from these Transition Services Agreements, Neogen would need to implement its own integrated CRM and ERP systems for the entire global food safety business. Getting Neogen's CRM and ERP systems functioning properly was a prerequisite to Neogen being able to take over manufacturing and distribution of 3M Food Safety products from 3M.  And further, as part of its manufacturing transition, Neogen would need to build or modify new facilities for manufacturing and distribution, as well as importing 3M equipment and manufacturing processes into its existing facilities.[5]

59.     Investors were keenly aware of the importance of Neogen's IT integration and its takeover of manufacturing and distribution from 3M.  For example, a November 22, 2022 William

---

[5] Because Neogen needed to construct an entire new manufacturing plant in Lansing, Michigan in order to take over manufacturing of 3M's Petrifilm product, Petrifilm was subject to a separate Transition Services Agreement that had a much longer term.  As such, Neogen was not expected to take over manufacturing of Petrifilm during the Class Period.  However, as discussed further below, Neogen assured investors it would be ready to take over manufacturing of all other 3M Food Safety products by early to mid-2024.

Blair analyst report explained that "*[t]he progress for … IT/ERP integration will be key to watch*," and a December 14, 2022 Piper Sandler report emphasized the importance of the fact that "this acquisition will require ERP integrations as well as an eventual moving of manufacturing."

      C.    **Leading Up To The Class Period, Defendants Assured Investors That Neogen Was Making Significant Progress On The Integration**

60.    Because it was critical that Neogen integrate 3M Food Safety quickly and seamlessly, in the months leading up to the Class Period, Adent took pains to assure investors that the integration was already progressing apace according to the Company's "detailed integration plan." For example, during the Company's December 14, 2021 call announcing the Merger, Adent explained "[a]n integration team will be responsible for managing and coordinating integration efforts … [o]ur near-term focus will be a phase one plan, which will drive *day one readiness* pre-signing up until close. Following close, we will move to phase two, which focuses on implementation and execution of the integration." Later in the call, Adent again emphasized, "*we've got a very good detailed integration plan on how we're going to put these businesses together*," and stated that "*our focus throughout the integration will be to minimize disruption*." Adent further emphasized the "world-class" organization that the integration would produce, explaining "[a]s part of the integration, we're expecting $150 million to $175 million of net capital expenditures over three years, *which will build a world-class manufacturing and IT footprint, setting up NEOGEN [] for long-term profitable growth*."

61.    Similarly, Defendants made clear how important the 3M Food Safety integration was to Neogen, and assured investors that Neogen's most senior executive officers were closely involved and intensely focused on the integration. Indeed, during the Company's Q2 FY 2022 earnings call on December 21, 2021, Adent emphasized that:

> *[O]n the integration, we know how important this is*. We've got a really strong team. We've got some really strong team built and put together. We've already

started on the integration plan Phase 1, which is now to close.  We've got that lined out.  We know who's responsible for what.  We've got the team members on each.  We've got the goals and objectives.  We've really started pushing that already even before the start of the calendar – start of the new calendar year.  ***And we know that it's extremely important to do that right***.  And then once we finish Phase 1, we move right into Phase 2 on integration and working through fully bringing those facilities and people onboard into the Neogen team.

62.    Following the close of the Merger on September 1, 2022, Defendants continued to speak positively about the progress they were making on integrating 3M Food Safety.  For example, on September 27, 2022, during Neogen's Q1 FY 2023 earnings call (the Company's first public investor call following the Merger closing), Adent stated that the Company was already "***well on our way to integrating the new [3M] business*** and providing customers with new products and solutions to enhance their food safety systems."  Indeed, Adent insisted that Neogen's "IT team has been working diligently to integrate our systems with the former 3M Food Safety systems and evaluating efficiencies as we manage a lot of new data and work to share it with each other."  Adent explained that the IT team had already "deployed a global CRM instance to support harmonization between our conveying sales teams and our existing sales teams," and further noted that "[t]he former 3M Food Safety commercial software and […] capabilities are being migrated to the Neogen cloud, and both groups have pulled together to accelerate our commercial data and analytics road map."

63.    On November 30, 2022, at the Piper Sandler Healthcare Conference, Adent told investors that Neogen was not only progressing well with its integration of 3M Food Safety, but the Company was already seeing tangible benefits from that integration.  For example, Adent touted that Neogen was "***seeing cross-selling opportunities already***," and that "***this really transformative merger has really strengthened our position*** ..."  In particular, Adent emphasized that, just two days after the Merger closed, Neogen had already successfully integrated the two

21

companies into one "consolidated CRM system" with the ability to "track sales and customer interaction in one database"—an achievement he claimed was "*a big accomplishment*":

> … one of the things I'm really proud of was 3M was using Salesforce as their CRM program.  We said, look, best idea wins, we're going to go – Neogen is going to go to Salesforce.  We started working on it … *By the time we closed the second day, the second day after close, we had a consolidated CRM system with all the customers in one database and able to track sales and customer interaction in one database by day two.  Now that's a big accomplishment, right?*

64.     Adent added that this immediate integration of CRM systems had "allowed people to start selling the new portfolio really quick."

65.     Adent reiterated that these purported successes would allow the Company to quickly achieve its Merger goals of 30% EBITDA margins and $1 billion in revenue, explaining that, "what we're saying is by mid or by fiscal 2025 [*i.e.*, the fiscal year beginning June 1, 2024] we'll be 30% EBITDA margins on that $1 billion."

**D.     Throughout the Class Period, Defendants Made A Series of Materially False And Misleading Statements About The Integration, CRM System, And ERP System Implementation**

66.     The Class Period begins on January 5, 2023, four months after the Merger closed, when Neogen reported financial results for Q2 of FY 2023.  During the earnings call that day, Adent insisted that the integration of 3M was making strong progress, explaining that "[t]he former 3M Food Safety business is a great business and highly complementary and we're excited about what we've seen in the first four months of our ownership."  Adent further emphasized that the integration was "off to a great start" with "numerous work streams fully underway across the organization to integrate our systems, products, processes and people."

67.     Significantly, Adent reiterated that Neogen had already successfully integrated the CRM system, stating that the Company had "*combined CRM systems on day two*, modified geographic coverage areas and worked together to identify and prioritize the highest potential

revenue and synergy opportunities."  Adent made clear that this was a critical step toward achieving the stated cross-selling goals of the Merger, because the CRM was supposed to provide a unified, integrated database system of all customer information and communication from both legacy Neogen and 3M Food Safety.  Consequently, Adent said Neogen had "had successes within the marketplace, with customers responding positively to the new products and solutions available to them."

68.     Several days later, at the January 11, 2023 JPMorgan Healthcare Conference, Adent again emphasized that the Company had done an immense amount of preparatory work even before the Merger closed and was thus able to hit the ground running.  For example, Adent stated "[o]ur integration is underway and we did a tremendous amount of work pre-close.  We already knew the markets.  We knew the customer base.  . . . we know how to grow the business."  Once again, Adent emphasized that the CRM systems had been successfully integrated from the outset, and made clear this was a "big deal" because it meant that the Company now had "one common platform" that allowed the sales teams to know precisely who the common customers were, what they were purchasing, and who was responsible for selling to them:

> *The second day of integration, we had combined our CRM systems.  That's a big deal, right, because in one common platform, we knew who the common customers were, what they were buying, who was calling on them*.  So what allowed us to do was in this first quarter is *we have all the sales teams realigned. Everybody knows who their customers are, everybody knows who they're calling on*.  We've done all the cross training and we've identified what are the biggest opportunities for cross-selling within those customer bases.

69.     Throughout 2023, Defendants continued to assure investors that the integration of 3M Food Safety was proceeding smoothly.  For example, on March 30, 2023, Neogen released an investor presentation which claimed that "[i]ntegration activities [were] progressing well," and emphasized that the "*ERP upgrade [remained] on track*."  During the earnings call that day, Adent represented that "we continue to make good progress on the integration activities," and assured

investors that "***our ERP implementation for the combined business is well underway***."  Adent further described progress toward Neogen exiting its expensive Transition Services Agreements with 3M, explaining that "we continue to add critical personnel in the quarter with additions to our back-office and related support teams, which play a key role in enabling our exit from the transition services agreements currently in place."

70.     On June 6, 2023, at the William Blair Growth Stock Conference, Adent and Naemura gave a presentation detailing further progress that Neogen had made in the integration. Indeed, the presentation emphasized that the "[i]ntegration remains on track," and expressly noted that manufacturing of 3M's hygiene monitoring product line was now "***[f]ully integrated***" into Neogen's manufacturing and distribution facilities, with the manufacturing transitions for the sample handling and pathogen detection product lines well "underway."  And during the investor conference, Adent emphasized the Company's progress on bringing those two additional product lines in house, explaining, "[o]n the sample handling, we are continuing to move that business forward. … So, within nine months, we will have three of the four manufacturing lines of the key product lines in-house at Neogen, right.  So sample handling will be in-house, pathogen detection is in-house, and today, hygiene monitoring is already in-house."

71.     According to Adent, the Merger integration was going so well that Neogen had actually "sped up the timeline" to bring those manufacturing lines in-house, which would in turn enable Neogen to exit most of its Transition Services Agreements—a "significant accomplishment that we'll have done in nine months[.]"  Adent concluded by reiterating that, as a result of how successful the integration had been, the combined company was poised for success, stating: "[c]ombining those two businesses, we're approaching $1 billion in revenue.  We expect to take two businesses that were growing at high-single-digit, low-double-digit and continue to grow at

that double digit growth rate.  And it's really improved the financial profile of the business, right, all the blocks.  We will be approaching $300 million in adjusted EBITDA in our 2025 fiscal year. So very excited about the combination of the two businesses."

    **E.**    **In October 2023, Neogen Announces Its ERP System—The "Most Critical Component" Of The Integration—Is "Up And Running" And "Fully Operational"**

    72.    It was absolutely essential for Neogen to successfully integrate and implement a new ERP system for the Merger to succeed.  A functional ERP system would manage—in a single, unified network—the combined companies' global raw materials ordering, supply chain management, manufacturing, order processing, sales, inventory management, distribution, shipping, and finances, among other functions.  This was critical not only to avoid costly and extensive disruptions to Neogen's supply chain, but it was also a key step to enable Neogen to exit the Transition Services Agreements and take over back-office functions, product manufacturing, and distribution activities from 3M.  For these reasons, Naemura explicitly characterized the successful implementation of the ERP system as "***the most critical component***" of the integration.

    73.    On October 10, 2023, Neogen reported financial results for Q1 of FY 2024.  During the earnings call that day, Adent announced that Neogen had now completed the mission-critical milestone for the integration: getting the Company's integrated ERP system "***up and running***" and "***fully operational***," thereby enabling Neogen's IT systems to integrate all ordering, shipping, inventory management, invoicing, supply chain, and other functions into a single system—the essential step in realizing the goals of the Merger.

    74.    Adent emphasized throughout the earnings call that the new ERP system was "***up and running***" and a "***significant step to have behind us***":

> [W]e believe we're making solid progress on the integration of the former 3M business and are on track to be completely independent from 3M in the third quarter.

… ***Our new ERP system is up and running after the Phase 1 launch which is a significant step to have behind us***.

75.    Adent stated that implementation of the ERP system had "***gone well and that we are fully operational on the new system, processing orders and shipping products***."  Adent also emphasized that "all the functions" of the ERP system were working properly, with nothing malfunctioning, explaining that "***the good news was the business was up and running, we were able to do all the functions, nothing stopped***."  Adent even took pains to note that while a dysfunctional ERP implementation "could derail organizations," he was "really proud" that no such derailment had occurred at Neogen, because Neogen's SAP implementation had gone smoothly, such that the system could "immediately" handle all functions from "order to cash":

> I'm really proud of the team on what we've been able to do.  And an SAP conversion, you hear all the horror stories but you don't hear the good stories; ***this is one of the good stories, right?  We're 40 days in.  We're immediately able to do order to cash; bill customers; pick, pack and ship; manufacture***.

76.    Naemura similarly emphasized that "our goal here was to share I think first and foremost that ***the implementation went well; I think that's the headline***."

77.    Additionally, Adent touted that it was precisely because Neogen now had a new and "fully operational" ERP system that the Company would be able exit the Transition Services Agreements, explaining: "***[a] key step that enables the exit of these agreements is the implementation of our new ERP system*** which will allow us to take over order fulfillment services currently provided for the former 3M products[.]"

78.    During the November 30, 2023 Piper Sandler Healthcare Conference, Naemura again proclaimed that "***the most critical component***" of the integration—getting the new ERP system "up and running"—had gone smoothly:

> [W]hen you step back and you look at the 3M Food Safety Division acquisition, what we really have is an opportunity to re-platform the company.  And I think that's what we're doing with ERP as well.  We needed – it was a carve out, didn't

come with an ERP system.  So we're using this as an opportunity to implement a new version of ERP, to accept in some of those product lines from 3M. … And *that is the most critical component for us to bring in those new businesses and get them out of some of those onto our back office and our distribution network.*

… *That's the biggest, most complicated piece of the business, it's the initial implementation of our operating model*, and we're working through that.  *The good news is you heard us say it on the Q1 call, hey, we're up and running*.  And not everybody achieves that, right?

**F.      As A Result Of The Supposedly Successful ERP Integration, By January 2024, Neogen Claimed To Be Fully Ready To Exit The Transition Services Agreements And Take Over All Manufacturing And Distribution Of All 3M Products Other Than Petrifilm**

79.      On January 9, 2024, Defendants announced during Neogen's Q2 of FY 2024 earnings call that, not only was Neogen's ERP system "up and running," but the Company was now ready to finish taking over all 3M Food Safety manufacturing and distribution functions other than those for Petrifilm.  Adent boasted that "[t]his is an exciting time at Neogen as we're approaching several near-term milestones on the journey of integrating the former 3M Food Safety business.  *Following the launch of our new ERP system in September, we made further progress by initiating the exit of several transition service agreements that we have with 3M while continuing to ramp up our internal capabilities*."

80.      Adent not only reiterated his claims of immense progress in the integration, but he also claimed that, because it had gone so well, his outlook for the Company's business had actually markedly improved.  In response to an analyst question about whether, now that the Company was further along in the integration, Defendants still had "conviction" about the growth targets for the combined Company, Adent responded "*Yes, my conviction has changed.  It's gotten better*":

Q: John, for you, maybe a higher level picture.  We're a year past the deal now, a lot of great integration work has happened.  I think one thing we haven't quite seen yet those are we used to talk about kind of a high single digits plus, maybe even some double-digit growth periods as a combined entity. ... So from your end, has your conviction on what this combined entity can do change at all now that we sit here a year later? […]

CEO Adent: Yes.  Thanks, Brandon.  Good to talk to you.  ***Yes, my conviction has changed, it's gotten better***.  I mean I think the things that I've seen during this first year and ***even the amount of things we accomplished in the second quarter*** really gets me excited about the future long term.  And I think that's the thing is that it's sometimes hard to look through all the noise of everything that's going on to look and see what this business is going to be when we're done.  But -- and ***we have made so much progress***. . . . ***You think about the things we've done in the quarter with converting to SAP, moving predominantly, moving off all of the distribution agreements in the tech service agreements***.  The other thing hanging out there and then there is Petrifilm, the plants, the building is up.  It's enclosed, equipment's going.  I mean ***we're making such great progress***.

81.     Adent reiterated these points again two days later during the Company's appearance at the January 11, 2024 JPMorgan Healthcare Conference.  Specifically, Adent emphasized the "significant progress" the Company had made, placing it "on track to be off all of our service agreements by the end of [the fiscal] third quarter excluding Petrifilm," and again touted the "big deal" of having gotten the Company's ERP system fully functioning:

Now I want you to think about the work that was taken to accomplish that.  We replatformed the company in the last 15 months.  ***We implemented SAP***.  We made a book of record for the company.  We changed our process[es] and procedures to do that.  As soon as that was done, ***we immediately then doubled the size of the business by bringing all the 3M products into our distribution network***.  ***And we did all order to cash.  So now we take the order, pick the order, bill the order, talk to the customer, collect the money, that's all done in-house, right?  That's what we did during the second quarter when we finished out***.  Now we've been doing it for 15 months.  ***That is a big deal, right***?

**G.     April 2024: Defendants Disclose "Operational Inefficiencies," But Downplay Any Integration Setbacks As Temporary And Under Control**

82.     On April 9, 2024, before markets opened, Neogen reported disappointing financial results for Q3 of FY 2024, which Adent admitted during the earnings call were "below our expectations."  In addition, Defendants lowered the Company's FY 2024 guidance to between $910 million to $920 million from between $955 million to $985 million for revenue, and to between $210 million to $215 million from between $235 million and $255 million for Adjusted EBITDA due to "operational inefficiencies" flowing from flaws in the ERP implementation.

83.    Adent also disclosed in the Company's earnings press release that Neogen was experiencing certain "operational inefficiencies" that were "affecting our order fulfillment rates and preventing us from meeting the end-market demand."  As Adent explained during the earnings call the same day, the Company was having issues "getting orders to drop in the warehouse from SAP to the SAP module, BWM[]"—meaning Neogen was experiencing issues conveying customer orders to the Company's distribution centers, which was causing order delays.  Adent further explained that, consequently, "there are clearly some customers we're going to have to win back."  But Adent in the Company's press release made crystal clear that these issues were entirely "temporary" and were being addressed:

> The progress we've made on integration, particularly as it relates to the exit of the transition distribution agreement and the resulting increases in volumes in our primary distribution facility, *has created operational inefficiencies* that we continue to manage through.  *We believe these inefficiencies are temporary*, but they are *currently affecting our order fulfillment rates and preventing us from meeting the end-market demand on a consistent basis*, and we are updating our full year outlook to reflect the *lower revenue we now expect to generate*.

84.    In response to Defendants' April 9, 2024 disclosures, Neogen's stock price fell over 9% in a single day, from $14.38 per share on April 8, 2024 to a close of $13.04 per share on April 9, 2024, on extraordinarily high trading volume.

85.    Analysts expressed concerns about the Company's weaker than expected financial results and integration setbacks resulting in order fulfillment and shipping delays.  For example, an April 9, 2024 William Blair report highlighted that Neogen suffered from "continued operational inefficiencies during the integration of the 3M business," which resulted in third quarter EBITDA margins that were "*7.6% below our estimates*."  William Blair also noted as a "[k]ey takeaway[]" the fact that "*continued inefficiencies driven by SAP integration have caused lost sales and customers on a broader scale that management will have to win back*."  William Blair also lowered its estimates for the Company "to account for *delayed SAP resolution* and its

subsequent headwinds to margins," calling Neogen's poor financial results "disappointing," attributing the guidance cut to "continued operational inefficiencies during the integration of the 3M business . . . which we expect will ***lower investor confidence***," and concluding "***we believe the stock is in the penalty box for a few quarters as management looks to regain Street trust through improved execution***[.]"

86.     Notwithstanding these revelations, Defendants minimized the significance of the severe integration failures plaguing the Company and continued to assure investors that the integration was making great progress.  For instance, in the Company's April 9, 2024 earnings call, Neogen stated that the Company had "completely exited the transition services and distribution agreements we have with 3M" during Q3 of FY 2024 as planned.  Also, during the call, Adent reassured investors that the "***third quarter marked a significant step in the integration and our ultimate journey towards full autonomy as a combined business***."  He therefore asserted that the Company's integration problems were temporary and being quickly resolved, *i.e.*, that "***we have our arms around the key issues***[,]" and that "***[w]e believe these challenges are temporary and that we will be able to recover the lost revenue***[,]" and promised investors that "[r]esolving these challenges and meeting our customers' needs are our highest priority."

**H.    During The Second Half Of 2024, Defendants Repeatedly Assured Investors That Any Integration Setbacks Were "Resolved" And "Behind Us"**

87.     From April 2024 and onward, Defendants repeatedly and emphatically assured investors that any issues Neogen had faced regarding the integration were only "temporary" and had been fully resolved, that any order fulfillment problems were "no longer a constraint" on the Company's growth, and that the vast majority of the integration work was "behind us," such that the Company remained firmly "on track" to realize the promised benefits and synergies of the Merger.  For example, just over one month after the April disclosures, Adent explained during an

30

investor conference on May 14, 2024, that, "[t]o come off of the service agreements, which was distribution and back office, we had to stand up SAP. [] *So, we stood up SAP in the second quarter [and] [t]hings went really well*."  In addition, Adent downplayed the temporary setbacks the Company experienced with the ERP integration, stating that "*[w]e made some really good progress with that in the quarter, and we're on track to having that fixed*[.]"

88.      During Neogen's appearance at the William Blair investor conference on June 4, 2024, an analyst asked Adent whether Neogen believed it was on its way to resolving its integration setbacks, asking, "[h]ow comfortable do you feel that this is kind of the trough in a lot of the integration noise?"  Adent replied that Defendants were entirely "comfortable" with the integration precisely because of the supposedly successful integration of the ERP system, stating: "[W]e put in a new ERP system, right.  Not many companies take on that type of challenge and make it through.  *So, I think we are through the majority of that. [ . . .] We're seeing efficiency around production, around shipping, and really is going to get us back to our sales teams and customers knowing that we can – when they place the order they're going to have in two days*[.]"

89.      Analysts relied heavily on Defendants' representations, quoting them verbatim in highly positive reports to investors.  For example, in a report published the same day, William Blair highlighted Defendants' claim that "*ERP integration issues are largely behind them*[.]"  Accordingly, William Blair reported that Neogen's "updates were positive, with preliminary results ahead of guidance and management returning to demand generation *giving more confidence that we have likely reached a trough in integration noise*."

90.      Subsequently, Defendants continued to assure investors that their integration problems had been temporary and were entirely behind them.  For example, on July 30, 2024, Neogen issued a press release announcing its results for Q4 and the full year of FY 2024.  In that

press release, Adent stated that Neogen had "cross[ed] multiple significant integration milestones in the third quarter related to the integration of the former 3M Food Safety business"; that the depressed order fulfillment rates and lengthy shipping delays that had been reported in April 2024 "*are no longer a constraint*"; and that Neogen had "*completed the relocation of the sample handling product line*," such that sample collection products could now be manufactured by Neogen in-house.

91.    During the Company's earnings call the same day, Adent represented that the "operational inefficiencies" that had impacted the Company earlier in 2024 had been fully resolved, boasting that "we committed to resolve the distribution inefficiencies stemming from our SAP and our new warehouse management system," and that those issues had "*now effectively been resolved* and our commercial efforts are squarely focused on winning back the sales that were impacted." Adent told investors that the "last couple of quarters have seen *a tremendous amount of integration progress*," "*the 3M Food Safety operations have now been combined with Neogen*," and "*we have a significant amount of work that's behind us*."

92.    Analysts again took heart from Adent's positive statements about the integration. For instance, William Blair noted in its July 30, 2024 analyst report that the Company's "[k]ey updates" included that "distribution has improved to the point where it is no longer a growth constraint" and financial results had improved "leaving the company in a solid position to execute on expectations from here, in our view" given that "*company-specific headwinds from the past two years seem to be largely behind us*."

93.    As 2024 progressed, Defendants continued to assure investors that all issues with the integration had been fixed, and the integration was proceeding apace. For example, during an

investor conference on September 5, 2024, Naemura assured the market that the "***challenges that plagued us in 2024 are behind us here in 2025***."

94.    On October 10, 2024, Neogen announced that Jones—who became COO in April 2022 and was one of the primary executives responsible for the 3M integration—was resigning. Nonetheless, in its October 10, 2024, earnings presentation, Neogen proclaimed: "***Recent integration challenges resolved***[.]"  And during the Company's earnings call the same day for Q1 of FY 2025, Adent informed investors that, "***[o]n the production side, we've completed the relocation of the former 3M sample collection product line***. [ . . .] ***We currently have all lines operational with the line of sight to reach normal production levels in the third quarter***." Neogen also reiterated its 2025 fiscal year revenue and Adjusted EBITDA guidance.

95.    Remarkably, as late as December 2024, Defendants assured investors that all issues with the ERP system had been fully resolved, and that the integration was "on track" with the bulk of integration work "behind us."  Specifically, on December 4, 2024, Adent presented at the Piper Sandler Healthcare Conference, during which the Company disclosed positive preliminary Q2 of FY 2025 financial results.  Significantly, during the Company's presentation, Defendants reiterated: "***Integration on track, providing a path to a compelling post-integration financial profile***."  Adent emphasized that "***of the four manufacturing lines we acquired from 3M, three are already in our facilities and we're manufacturing and improving efficiency of those businesses***," and reiterated that "***the majority of the integration work behind us***."  Additionally, when an analyst explicitly asked: "ERP integration, are we fully integrated or is there still a little bit more to go?" Adent responded ***"[w]e're not doing any ERP changes for the rest of this year***," thereby reassuring the market that the integration of Neogen's and 3M's back-office systems was essentially complete.

96.     Analysts again took reassurance from Defendants' statements.  In its December 10, 2024 analyst report, William Blair reported that the integration was "essentially complete" and therefore "[we] expect margin expansion through the year to support the shares."

97.     On January 10, 2025, Neogen reported financial results for Q2 of FY 2025 that included a $456.3 million goodwill impairment charge "related primarily to the acquisition of the former 3M Food Safety Division."  The Company's press release quoted Adent as stating that "the integration of the former 3M Food Safety business has been slowed by . . . operational delays," including "a delay in the ramp-up of sample collection production," and that declining margins were "driven primarily by the full cost to exit the various transition service agreements that had been in place, including higher distribution costs."  During the earnings call held that same day, Naemura elaborated that "the ramp-up of sample collection production to full capacity has taken longer than originally anticipated, reducing our revenue in this product line as we have been unable to fully meet demand."

98.     Nevertheless, during the January 10 call, Adent continued to insist that the Company was making integration progress, and explicitly promised investors that persisting integration headwinds soon would be conclusively remediated:

> With respect to the integration, we have discrete initiatives underway to drive improvements and efficiency of our fully integrated shipping and distribution operations, which we will expect to begin to show benefit in the third quarter. Regarding the relocated sample collection production, the process of ramping up is continuing. ***All of the product lines are operational and we believe are on track to reach prior production levels by the end of the third quarter*** [*i.e.*, by the end of February 2025].

99.     Then, just five days later, during an investor conference on January 15, 2025, Adent doubled down on these representations, assuring investors that the ERP system implementation and the exit from Transaction Service Agreements was "complete," and the ERP system-related shipping delays fully "behind us":

It hasn't always been completely smooth, but *we've made significant progress with the integration of the food safety, 3M Food Safety business integration*. Of the seven key integration work streams, *six are effectively done, with a sample collection production expected to return to normal levels next month*. *Our ERP implementation*, which allowed us to exit the transition service agreements with 3M *is complete*, and all the related *shipping delays that we had three quarters ago are behind us*.

100.    Analysts criticized Defendants for their failure to disclose that many previously identified integration flaws had not, in fact, been remedied, but nonetheless fully relied on Defendants' repeated assertions that the issues had been fixed.  For example, William Blair reported that "[t]hese updates are somewhat surprising to us since management announced preliminary results in December with a broadly positive tone on the underlying business," but noted that "[o]n the positive side, the company has completed the vast majority of the 3M integration[,]" given that sample collection production issues were "expected to be done in the third quarter."  William Blair further reported that "[m]anagement indicated that it is continuing to regain previously lost customers from its integration/distribution issues last year" and that Neogen was "at a point where it is looking past share recapture and moving on the offensive to pursue new account openings, suggesting it is past enough integration noise they can service new accounts."

I.    **The Full Truth Is Revealed: The Integration Had Failed, The Integration Problems Were Nowhere Near "Resolved," The ERP Was Dysfunctional, And Neogen Was Unable To Manufacture Key Product Lines**

101.    The full truth was revealed to investors in a series of corrective disclosures in 2025 in which Defendants were forced to admit—contrary to their prior representations—that the integration was not "on track," its problems had not been "resolved," and the work needed to resolve them was not close to "behind us."  Instead, the integration was a debacle, and rather than having a "fully operational" and integrated ERP system, in truth Neogen's ERP system was completely unable to perform the most basic tasks for such an internal management system—ship the right products to the right customers at the right time.

102.    As a result of these ongoing ERP malfunctions, Neogen experienced months-long order delays, excess inventory pileups, expired products, an utter inability to manufacture critical product lines, and, ultimately, a mass flight of customers leading to declining sales.  The problems were so severe that the Company's Board ousted Adent for his complete failure to manage the integration and lack of candor about its progress—creating a special committee to oversee Neogen's management until they could find a replacement—and Neogen was ultimately forced to write down its own total value by over $1 billion.

### 1.    April 9, 2025: Neogen Reveals That The ERP Implementation Is Far From Complete And Fires Adent As A Result

103.    On April 9, 2025, before the market opened, Neogen reported results for Q3 of FY 2025 that again missed expectations due to ongoing integration problems.  In particular, food safety revenue declined more than 3% from the same quarter prior year, to just $152.7 million because Defendants' flawed sample manufacturing integration caused the Company's financial performance to be negatively "impacted by lower sample collection revenue."  And, Neogen again lowered its FY 2025 revenue guidance to just $895 million (versus prior guidance of $900-925 million), and its Adjusted EBITDA guidance to just $195 million (versus prior guidance of $200-215 million).  Included in the guidance reduction was a 27% increase in integration-related capital expenditures due to the integration's ongoing problems.

104.    During the earnings call, Adent reported that, despite his recent assertions that the Company's integration issues would be remedied "by the end of the third quarter," the integration problems hampering Neogen's production of 3M's sample collection product line had instead persisted.  Specifically, Adent disclosed that the performance of the Company's food safety segment for the quarter had been negatively "***impacted by the challenges we've discussed with our sample collection product line***."  Naemura also revealed that "***we continue the process of***

*ramping up the relocated production [of sample collection products] in our facility*," resulting in "*a $25 million headwind for the year*."  Additionally, Naemura revealed that the Company's financial results for the quarter had been negatively affected by persistent "***carryover impact from last year's shipping delays" resulting in declining revenues for "most [of Neogen's] Food Safety product categories***."

105.    Finally, Neogen's ongoing integration problems were so severe and intractable that the Board was forced to act, announcing that it was ousting Adent as CEO without identifying a replacement.[6]  The press release explained that the "***Board determined that now is the time to begin a leadership transition and identify the Company's next CEO***[.]"  Moreover, the Board was not only initiating "a comprehensive search process" to find the next CEO, but it was now creating a special committee purportedly to "support the leadership team in its efforts to drive improved performance."

106.    In response to Defendants' April 9, 2025 disclosures, Neogen's stock price plummeted almost 29% in a single day, from $7.04 per share on April 8, 2025 to a close of $5.02 per share on April 9, 2025, on extraordinarily high trading volume.

107.    Analysts were stunned by Neogen's revelation of further integration problems just three months after assuring investors those problems were "behind us," and directly questioned "management credibility."  William Blair explained in its April 9, 2025 report that Neogen's "below-expectation results were driven primarily by lower sample collection revenue[,]" and stated that investor "***sentiment is probably at its lowest level in years***" as "***continuous guidance cuts have raised questions/concerns about management's credibility and ability to execute***."  As a result, William Blair lowered its Neogen price target from $15 to $13 per share.  Analysts also

---

[6] Adent remained with the Company for roughly the next four months until the Board found his replacement.

attributed Adent's abrupt termination to the Company's problem-riddled 3M integration. William Blair found Adent's sudden termination "***understandable, given the challenges the company has faced***," and reported that, while "***rocky execution over the last several years has led to waning confidence***," "a change in the CEO seat might help sentiment over the coming months."

108. Nonetheless, during the April 9, 2025 earnings call, Adent once again proclaimed that, although the integration had taken "longer than we had originally anticipated," "we continued to make progress in the quarter." For example, Adent emphasized that Neogen's "relocated product lines,"—including its troubled sample collection product line—"***are now producing at the prior levels***," while promising that "our immediate focus is on improving the production efficiency and catching up with our customer's demand." Finally, Adent yet again asserted that the vast majority of integration-related activities were complete, explaining that, "***with sample collection recovering to prior levels***," transitioning the manufacturing of Petrifilm to Neogen's new manufacturing facility "remains the last outstanding integration workstream."

109. As such, in its April 9, 2025 report, William Blair highlighted the fact that "***NEOG said that sample collection production levels have exited F3Q at goal levels, returning to prior rates***," and that the transition to manufacturing Petrifilm in-house was the "last outstanding integration item" and the "last step of the integration process" as "***positive execution updates***[.]" Similarly, Guggenheim Partners noted that "[s]ample handling productions are back to prior levels."

### 2. June 4, 2025: The Full Truth Comes Out, As Defendants Reveal That The Company's ERP System Was Entirely Dysfunctional, And The Integration Is Nowhere Near Complete

110. The full truth was not revealed until June 4, 2025. On that date, in connection with the William Blair Annual Growth Stock Conference, Neogen issued an investor presentation before the markets opened and also made disclosures during the conference, during which

38

Naemura announced Neogen's preliminary Q4 and full year FY 2025 financial results.  During the presentation, Naemura shocked investors when—in direct contravention to Defendants' repeated and unequivocal assurances that Neogen's integration issues had been "resolved" and were "behind us," and that the Company's ERP system was "fully operational" and able to "do all the functions" required of even a rudimentary operations management system—Naemura admitted that *the exact opposite was true*.

111.    In truth, the integration was an abject disaster, and the Company's ERP system was so dysfunctional that it lacked the most basic automated protocols to ensure that it could ship the right amount of product to the right customers.  These problems were so severe that Neogen could not even use the ERP system's automated processes to assemble its products, and the Company was instead forced assemble products by hand—an obviously extraordinarily inefficient process that caused enormous delays in getting products to customers.  As a result, Neogen suffered from massive inventory issues as product expired before it could be sold to customers, crippling its business to such a profound extent that it would be unable to resolve those integration issues for years to come, and would be ultimately forced to incur *over $1 billion* in financial charges.

112.    Specifically, during the investor conference, Naemura explicitly admitted that "***the underlying processes to get the right inventory in the right place need to be improved***"— processes that were supposed to be managed by the Company's supposedly "fully operational" ERP system.  Due to these issues, Naemura later explained during a call the following month that Neogen could not use the ERP system's automated processes and resorted to assembling products *by hand*, as Neogen "***continue[d] to struggle with sustaining consistent uptime of the automated processes, which is causing us to produce a significant amount of products manually***."  As

Naemura admitted on June 4, 2025, "*the result has been an elevated level of inventory write-offs that we've seen beginning in Q3 and then actually being a little larger in Q4*."

113.    Due to these severe integration issues, Naemura admitted that Neogen's production capabilities "*negatively impact[ed] gross margin*" to such an extent that the Company now expected gross margins "to probably be around the high teens"—levels that were far below what Neogen was reporting even pre-Merger, and less than half of the 30% profit margins that Defendants had repeatedly promised investors in touting the Merger.  And underscoring the far-reaching failure that was the 3M Food Safety integration, Naemura further admitted that Neogen was nowhere close to fully resolving these profound integration issues and that the Company was forced to adopt a *nine-step* improvement plan that would require no less than a "*year or two*" to fully complete.

114.    In response to Defendants' June 4, 2025 disclosures, Neogen's stock price plummeted 17% in a single day, from a close of $6 per share on June 3, 2025 to a close of $4.96 per share on June 4, 2025, on extraordinarily high trading volume.

115.    Analysts were stunned, pointedly excoriating management for their repeated misrepresentations about the integration, and even going so far as to call into question management's credibility.  For example, in its June 4, 2025 report, William Blair concluded that management's reassurances could no longer be taken at face value, as their disclosure "*reintroduces uncertainty about whether the company truly is on the cusp of emerging from integration issues*" and "*heighten[s] the uncertainty about future execution (once again)*." William Blair directly noted that despite Defendants' repeated assurances regarding the purported success of the integration, Neogen's current management "keeps uncovering legacy Neogen issues that need to be fixed," which "begg[ed] the question, what else needs to be fixed?":

Our assessment is the company's current leadership team (i.e., CFO and global operations) ***keeps uncovering legacy Neogen issues that need to be fixed, causing many of these disruptions but also begging the question, what else needs to be fixed?*** Management seems confident that it has uncovered the largest issues, but of course recent updates leave some ***questions about what could be next***.

116.    Significantly, William Blair explicitly highlighted that Neogen's ERP system still suffered from some of the most fundamental deficiencies that an operational management system could report: an utter inability to produce and deliver products to customers correctly and timely, which ultimately led to hundreds of millions of dollars' worth of crippling inventory write-downs. As William Blair succinctly put it, Neogen suffered from "***protocols that were not properly established to ensure the right products were shipped at the right time***":

> The write-off of inventory comes from the compounding impact of: 1) a buildup of inventory last year as the company emerged from supply chain issues and looked to build some safety inventory, 2) ***protocols that were not properly established to ensure the right products were shipped at the right time, and 3) the recent stand-up of a new SAP system that added another layer of complexity to all these moving pieces***. Management believes that it has a handle on the situation, but recent execution adds a level of uncertainty about this.

117.    Similarly, Guggenheim Partners on July 18, 2025 issued a report that also placed the blame for these "self-inflicted" integration failures squarely on Neogen management. Specifically, Guggenheim Partners stated that "***[m]anagement is in the penalty box due to a series of self-inflicted issues since the 3M deal***." As a result of "***the latest self-inflicted wound*** following the 3M systems integration," Neogen would be plagued by "***unexpected inventory write-offs for the foreseeable future, negatively impacting profitability in F4Q25 and through fiscal 2026***." Given these fundamental and persistent issues, Guggenheim Partners opined that "***Management needs to 'own the problem,' get clean, and establish a track record without disappointing for several quarters***."

J. **Defendants' Fraud Is Confirmed By Numerous Former High-Level Neogen Executives, Who Confirmed That The CRM System Was Not Combined "On Day Two," The ERP System Was Not "Fully Operational," And Neogen Was Unequipped For In-House Manufacturing And Distribution Of 3M Products**

118.    Neogen was experiencing severe, pervasive, and undisclosed problems with the 3M Food Safety integration during the Class Period, rendering Defendants' positive statements about the integration materially false and misleading.  Neogen's integration of 3M Food Safety was far from "on track," making "good progress," or "nearly complete," and none of the problems stemming from Defendants' failed integration activities had ever "effectively been resolved." Instead, the entire integration was a complete disaster, and the integration problems Defendants continuously claimed had been resolved persisted throughout the Class Period.

119.    As numerous former executives and employees of both Neogen and 3M have confirmed, Defendants failed to perform the requisite due diligence on 3M Food Safety, lacked the expertise to manage the transition, had no real plan for the complex integration that they were undertaking, and had no basis whatsoever for their positive statements.  As the former employees confirmed, Neogen's CRM system was *not* combined with 3M Food Safety's system "on day two"—the two companies' data remained separate.  And Neogen's ERP system was *not* "fully operational" by October 2023, but instead was so dysfunctional that Neogen was utterly unable to manage inventory or process orders, and had to manage its operations entirely manually on spreadsheets, causing months' long shipping delays, lost orders, inventory write-offs, and lost customers.

1. **The Integration Was A "Colossal Failure," The Company's IT Systems Were Never "Fully Integrated," And Neogen's ERP Was Never "Up And Running," Or "Fully Operational"**

120.    At the outset of the Merger, contrary to Defendants' public statements, former employees who worked directly with the Company's CRM system confirmed that the Company

had *not* "combined our CRM systems on day two," and that it was *not* the case that the Company had a "consolidated CRM system with all the customers in one database and [was] able to track sales and customer interaction in one database."  FE-3,[7] a sales executive who worked with the Company's CRM system on a daily basis, directly contradicted this claim.  Indeed, when read Adent's statements that the CRM systems had been combined "on day two" he exclaimed ***"[a]bsolutely 100% false"*** and stated that the systems were never merged during his entire tenure, explaining that "***[i]f they did, I never saw it and no one else ever saw it.  It didn't happen while I was there***."

121.    FE-3 explained that he could only access Neogen's legacy customer data in the CRM, and not 3M's, directly contradicting Defendants' claim of having "all the customers in one database and able to track sales and customer interaction in one database."  In fact, FE-3 explained that the opposite was true: while FE-3 was instructed not to sell Neogen's products to existing 3M customers (because he primarily sold hygiene monitoring products where 3M had competing product lines similar to Neogen's products), he had no way of determining which accounts were already 3M accounts.  Instead, he would contact a customer and get into the sales process, only to find out they were already a 3M customer that he could not sell to.  As he explained:

> Neogen and 3M had the same products.  We weren't allowed to sell to any 3M customer, any 3M leads or prospects but that was a problem because ***we had no way of knowing who were existing or prospective 3M customers because there was no data or list telling us where the 3M product and people may be***.  It was a wing and a prayer, you could be well into the presentation and sale and find out 3M was already selling to the hospital.  We didn't know who or what we were doing.  There was no organization and no strategy how to make this thing work.

---

[7] FE-3 was a Sales Development Executive who worked out of the Company's Lansing, Michigan office from November 2021 through November 2023, when he voluntarily left the Company.  During this time, FE-3 focused primarily on selling the hygiene monitoring product line and reported to Inside Sales Manager Jennifer Evans.

122.    FE-3 said that he never received access to 3M's data via any CRM system before he left the Company in November 2023.  He said the lack of a properly functioning and fully integrated CRM system definitely led to lost sales, because "[y]ou'd call into a company and you'd be halfway through the process, and you'd have to back out…" because they were a 3M customer already.  He said that the members of his sales team—approximately 12 to 14 sales personnel—all had the same experience.

123.    FE-5[8]—who was one of the Neogen executives tasked with overseeing the Company's SAP preparations and implementation—explained that the Company's ERP integration was a "***colossal failure***," and directly contradicted the Company's public statements about it.  FE-5 served as Neogen's Director of Supply Chain Planning for the U.S. from the time of the Merger's close in September 2022 until he retired in August of 2024.  FE-5 had previously served as 3M's Global Supply Chain Manager for 36 consecutive years—including 12 years as the acting Director for 3M Food Safety.  As Neogen's Director of Supply Chain Planning for the U.S., FE-5 became responsible for all supply planning and production planning activities for all of Neogen's and 3M's food safety products.

124.    FE-5 explained that he understood from his previous work at 3M that SAP implementation was an enormous undertaking that could take several years to do properly.  For example, FE-5 participated in an SAP integration at 3M that involved standing up an SAP system for 3M Food Safety—*i.e.*, the exact same business Neogen was attempting to implement a new ERP system for now—which spanned a total of five years prior to the "go-live" date.  According

---

[8] FE-5 served as Neogen's Director of Supply Chain Planning for the U.S. from the time of the Merger's close in September 2022 until he retired in August of 2024.  During his first three months of employment with Neogen (*i.e.*, September through November 2022), FE-5 reported to Neogen's then Vice President of Manufacturing, Jerome Hagedorn.  Thereafter, FE-5 reported directly to Neogen's Vice President of the Supply Chain, Melody Alford, who in turn was a direct report of former Neogen COO Jones.

to FE-5, 3M's intensive preparation for the SAP go-live required a meticulous process of cleansing the data to be inputted into SAP.  That process alone lasted roughly three to four years.  Prior to "going live," in January 2017, FE-5 also explained that 3M also began testing scripts and continued to do so for approximately nine months.  FE-5 explained that this level of preparation was what led to a successful implementation at 3M.

125.    In stark contrast to 3M's careful preparations, FE-5 explained that Neogen's efforts to prepare for its SAP implementation were "***horrific***."  He stated: "nothing was prepared in Neogen"; instead, the Company simply "***bought 3M and took a[n] SAP box off the shelf and said I can do this in 12 months***."  For example, FE-5 reported that, at Neogen "***the scripts were being written at the same time as the go live***"—*i.e.*, SAP scripts were written in July and August of 2023 and then tested in August for merely one month before the new ERP system went live in September, which made it virtually impossible to successfully implement the system.  FE-5 explained that when he raised his concerns that the Company's ERP system should not go live one month after the scripts were written, his warnings were ignored by management.

126.    Consequently, FE-5 explained that, when Neogen's new ERP system actually did go live in September of 2023 it instantaneously was a "***colossal failure***."  Specifically, FE-5 confirmed that Neogen had previously operated its supply chain on "pen and paper," and further explained that folks at Neogen "didn't feel the need that they had to clean data," emphasizing, "[t]hey just didn't do it."  And again, when FE-5 instructed his superiors that the lack of data cleansing would create problems, "nobody listened."  Instead, FE-5 was instructed to pull all of the data in the 3M database, "put it into the system and away we go."  He explained that the fact that the 3M data was not first cleaned or made uniform with the Neogen data led to a "cross contamination of files."

127.    FE-5 explicitly stated that, immediately after the new ERP system went live at Neogen in September 2023, "*it was such a disaster that we could not ship product, we could not fulfill orders, we had no idea where product was in the warehouse, customers got product sent to them but were never billed or customers got billed ten times what they should have paid.*" He explained that these problems impacted both Neogen's and 3M's food safety products.

128.    According to FE-5, many of these problems stemmed from the failures of the SAP warehouse module.  He explained that SAP has several different "modules," including separate modules for supply planning, production planning, and warehouse, which includes distribution capabilities and inventory management.  To function properly, SAP needs to be set up so that each module is connected.  However, FE-5 stated that *Neogen never spent time testing the connection between the supply and product planning modules and the warehouse module to ensure efficient product distribution prior to going live*.  As FE-5 described, when Neogen went live on SAP, it was immediately clear that the warehouse module governing distribution and inventory activities was a "*colossal failure*" and remained a "*huge issue*"—"*They could not distribute enough product to meet customer demand.*"

129.    After he was read Adent's October 10, 2023 statement that "[l]ast month, we had the initial go-live with our Food Safety business in the U.S. and Canada as well as corporate, making the cut over to the new ERP, on which we are now up and running.  Implementation has generally gone well in that we are fully operational on the new system, processing orders and shipping products," FE-5 immediately replied: "*bulls\*\*t*," and explained that "*SAP was not running smoothly.  Everything was being done piecemeal.  We couldn't find any products.*" He recalled that after the go-live he and his team would discuss how to troubleshoot SAP implementation issues in meetings at least two or three times per week.

130.    FE-1[9] corroborated FE-5's explanations of the Company's SAP debacle.  FE-1
stated that a successful go-live of the ERP system by September 2023 was never possible based
on how little the Company had done to prepare by summer 2023.  Shortly after the Merger closed,
FE-1 became a Production Planning Analyst and was heavily involved in Neogen's efforts to
prepare for its new ERP system's implementation, including serving as an "SAP Super User"—
which FE-1 described as a specialized role whereby an employee was trained to a higher level on
SAP, developing intimate knowledge about how the ERP system would function and then applying
that knowledge to support other SAP users at the Company.  As such, FE-1 was one of the Neogen
employees who had specialized knowledge concerning the proper preparations necessary for a
successful ERP implementation and was personally responsible for ensuring that the Company's
transition over to its new SAP system would go smoothly.

131.    FE-1 explained that getting the SAP implementation right the first time it goes live
was absolutely critical, *i.e.*, "[t]he minute you turn it on, it is make or break."  He explained, "[y]ou
have to make it happen, you have to get it right."  According to FE-1, if SAP is not set up properly
when it goes live and the SAP implementation fails, "***you lose access to inventory, you lose access
to customers, you can't even process orders.  The whole system crashes and everything just goes
dark.  The company as [a] whole would come to a halt***."  Accordingly, Neogen employees
understood the consequences of having a failed SAP implementation, and FE-1 said that they were
further apprised of these consequences by employees who came from 3M and had already
encountered a flawed ERP implementation.

---

[9]  FE-1 worked for Neogen from approximately May 2021 through June 2023, first as a Manufacturing
Specialist/Production Scheduler, and, beginning in December 2022, as a Production Planning Analyst.  During that
time, FE-1 reported to two different Production Planning Managers, the second of whom came to Neogen from 3M
after the Merger.  FE-1's work was largely focused on the SAP implementation, and he ultimately left the Company
voluntarily in part due to problems with the SAP implementation.

132.    However, FE-1 confirmed that, from the outset of the process, it was clear that Neogen was not prepared or set up for a functional ERP implementation.  Corroborating FE-5's descriptions, FE-1 explained that, prior to the Merger, Neogen's business operations and processes were "really archaic," including because many critical functions were literally done by hand, with pen and paper, and that even using an excel spreadsheet was considered an upgrade.  FE-1 recalled that, because "we were on paper," "[t]here were a lot of issues" getting prepared for the SAP implementation and Neogen's implementation team had "a hard time writing scripts," *i.e.*, the detailed written instructions for the SAP system that spell out the exact outcomes that should result from specific user actions, on a step by step basis.  He explained that "***you can't turn from a pen and paper Company into SAP Super Users overnight***."

133.    FE-1 further explained that senior management was well aware of these issues. Throughout his tenure, FE-1 attended weekly "Touch Point Meetings" concerning the status of Neogen's efforts to prepare for the SAP implementation with personnel at the director level, which were typically held on Microsoft Teams, but occasionally in person at Company headquarters when there were more significant events.  These Touch Point meetings were also attended roughly monthly by Vice President of Food Safety Jerome Hagedorn.  He stated that Adent would provide status updates concerning Neogen's efforts to prepare for an SAP implementation to Company employees during Neogen's regular townhall meetings.

134.    FE-1 explained that it was clear at these Touch Point meetings that the Company was not going to be ready to go live with SAP, because it was regularly discussed that "***we pretty much can't even write scripts.***"  FE-1 described writing SAP scripts as equivalent to writing computer code and analogized that, if Google were a script, you would type a search into the search box, press enter, and the outcome would be the search results.  He further explained that in writing

a script you are "telling the system I want to take this action and when I take this action I want the SAP system to do this thing." The goal of the script is to enter a command with an expectation of a certain outcome.

135.   FE-1 stated that successfully writing and testing SAP scripts is essential to any properly functioning SAP implementation. However, FE-1 confirmed that, even by the time he left the Company in mid-June of 2023, *the Company had not successfully run any "test scripts"* and thus there "*was no way we're going to go live*" anytime soon. As he put it: "*go-live dates meant nothing because we didn't have scripts*."

136.   Additionally, FE-1 noted that Neogen was unable to get SAP running properly because they "didn't have the right people" to execute the script testing and an SAP implementation, recounting that "pretty much all the Super Users" for SAP left within a month of his own departure in June 2023. Accordingly, when informed that Neogen ultimately went "live" on SAP in September 2023, FE-1 stated bluntly that there was "*no way it could have been functioning*" by that point; "they were just so far away from it when I left in late June 2023."

137.   FE-7[10] corroborated that the Company's ERP rollout preparations were grossly inadequate. He recalled that he was incredulous when he heard the short timeline on which Neogen planned to implement SAP. FE-7 explained that he had been involved in a transition to SAP at a previously employer—a healthcare company—and that the transition "required 65 employees and took 2 years to install." By contrast, Neogen "only had 10 people on the SAP team" and was trying to do the implementation in half the time.

---

[10] FE-7 was employed by Neogen as Senior Director Global Capex Projects, Engineering and Facilities from January 2022 through December 2024. In this role FE-7 was personally responsible for overseeing the transfer of 3M manufacturing and distribution operations to Neogen manufacturing plants and warehouses, and initially reported directly to Adent and later to a Senior Vice President of Manufacturing who in turn reported to Adent.

138.    FE-7 corroborated FE-5 and FE-1's statements that the transition was made even more challenging by the fact that every record and process at the Company was on "either paper or excel," and that "[a]ll of a sudden [the Company was trying to] move that into an SAP."  He also explained that in order to succeed with an SAP rollout, a long "transition period" is required, but that the Company allowed for no such transition.  Consequently, he explained, "*everything went wrong*."  He also noted that no one was properly trained on how to use SAP, comparing it to "[s]omebody who always drove an automatic car and you put them in a manual [stickshift car] and you say, go drive.  They have no clue."  FE-7 confirmed that the Company "still had a lot of problems" by October 2023, when Adent publicly stated that the system was "fully operational," and that **numerous SAP problems persisted until he left in December 2024**.

139.    FE-3 similarly corroborated that the Company's ERP rollout was disastrous.  Indeed, after he was read Adent's same October 10, 2023 statement, FE-3 responded, "*I don't feel that is accurate, that was completely false.*"  FE-3 explained that he typically took orders from his customers via email or phone and then placed them into the CRM system, but that the orders would not get properly transmitted to the warehouse via the ERP system so that the goods could be picked, packed and shipped.  Additionally, while the CRM system would show the items his client had ordered as in stock, this was often not the case.  He explained that "*You'd sell something and in the system it would show that you had plenty of inventory*," but that "*often that was wrong*."

140.    Moreover, FE-3 stated he would often only find out "through the grapevine" that the kits had not shipped, sometimes as much as 60 days later, and only because he did a courtesy call to the customer, at which point he would learn that they never received their order.  On other occasions, he'd found out because customers would call and ask where the orders were.  "*We lost*

*sales and customers because these customers needed the kits for their companies*.”  He also said that in the period of time between the ERP go-live and when he left, *he was hearing from customers at least a few times a week that they did not get their order*.

141.    FE-4[11] similarly corroborated that the SAP implementation and go-live “*did not go smoothly*” from when it first started in September 2023.  FE-4 was a VP of Software and Product Engineering, but although his work primarily involved the software and device side of Neogen’s business, he also managed a customer success team for his products, and those same customers were also customers of Neogen’s other product lines, since the consumable products were designed for use with Neogen’s devices and software.  As such, FE-4 regularly heard from his customers about their inability to get their orders fulfilled and delivered once the ERP went live in September 2023.  FE-4 explained that, due to the SAP failures, “*[o]rders would come in and wouldn’t be able to be fulfilled through SAP, so we had to fulfill the orders manually*,” meaning that everything had to be done on spreadsheets that were sent back and forth between parts of the Company.  He said that there were three-month delays on orders due to the complete failure of the SAP warehouse system to process orders.

142.    FE-2,[12] a former Neogen sales representative, corroborated that these SAP problems were rampant and severely damaging sales—indeed, in contrast to Defendants’ statements that Neogen quickly had its ERP system “fully operational,” he said that the opposite was true.  As a representative who sold more than 2,000 products and managed 100 accounts, he

---

[11] FE-4 worked as Neogen’s Vice President of Software and Product Engineering from February 2023 through April 2024 and reported to Joe Heinzelmann, who in turn reported directly to Jones.  In this position, although his work primarily involved the software and device side of Neogen’s business, FE-4 was also in charge of Customer Success for customers of his products.

[12] FE-2 worked for Neogen from February 2022 through January 2024.  He worked first as a Technical Sales Representative and then as a Sales Representative, each time based in Lansing, Michigan.  As a Sales Representative, FE-2 was responsible for the Pacific Northwest sale region, selling any number of 2,000 plus products to his 100 plus accounts, and reported to Jennifer Evans.

described the ERP rollout as "***general chaos***" and noted regular "***problems creating orders and being able to fulfill those orders***."  FE-2 explained that, under normal circumstances, consumables orders would have five to ten day turnaround from the creation of the Purchase Order (PO) until delivery to the customer.  However, when Neogen attempted to integrate its own business and 3M Food Safety on SAP, "from my perspective selling the Allergen and Mycotoxin line [of products] ***took up to 2, 3, 4 months to deliver after the PO was created***."  FE-2 emphasized that "***the consumables were taking several months causing customers to seek out the product from competitors***."  When asked if he ever saw these problems fixed, FE-2 stated the problems were never worked out during his time, *i.e.*, before he left in February 2024.

143.    FE-2 further stated that these problems were regularly discussed at meetings with supervisors and reported higher up the chain, including to members of the C-Suite.  For example, FE-2 recalled that senior sales directors and team leaders would speak about the problems with the integration at weekly Tuesday meetings, and that at least one or two of these meetings were attended by Chief Scientific Officer Jason Lilly ("Lilly"), wherein Lilly would give an update.  Additionally, FE-2 recalled quarterly all hands meetings with Adent and other C-Suite executives addressing the problems with the integration and SAP, during which Adent or Lilly would say they were aware of the issues.

### 2. Defendants' Manufacturing Transition Was Disastrous, And The Problems Were Never "Resolved" During The Class Period

144.    FE-7, a senior executive who oversaw the transition of 3M Food Safety product lines to Neogen's manufacturing and distribution facilities—reporting first directly to Adent, and then to the Company's Senior VP of Manufacturing —explained that, contrary to Defendants' public statements claiming that its manufacturing transition was "on track," in reality Neogen was

unable to integrate manufacturing of key 3M Food Safety products, and, particularly, its sample handling product line.

145.    FE-7 explained that 3M Food Safety had manufactured its sample handling product line in Brookings, South Dakota.  After the Merger, the plan was to take the old 3M machinery and bring it to the Neogen facility in Lexington, Kentucky.  But according to FE-7, Neogen did no planning or preparation for this transition; instead, in January or February 2024, Neogen literally pulled the plug on the manufacturing equipment and moved it to a new facility that was in no way set up for the equipment.  As he explained, "***they cut all the wires, packed it on a flatbed, and shipped to me***."  As a result of Neogen's lack of planning, "***[i]t took the team in Lexington about 6 months just to figure out how to hook the machine up and get it up and running***."

146.    FE-7 explained that, by summer 2024 the machine was running but it kept failing, and that even when it was running, there were "a lot of mechanical failures."  He explained that the machinery was outdated, and that it was difficult to find parts for it, however, "[r]ather than Neogen investing in a new machine, they decided to keep it and keep fixing it."  Consequently, when FE-7 would visit the Lexington facility to see how the machine was running, he would often see a manual line set up instead of the machine being used—*i.e.*, the products were being filled and packed by hand, by human laborers, instead of by the machinery, massively slowing down production.

147.    When asked if the C-Suite was aware of these issues, FE-7 stated that he would regularly tell his boss—a Senior VP who reported directly to Adent—of the problems at the manufacturing facility and "flew him down several times to see the problems."  FE-7 also recalled that Jones visited the Lexington facility regularly and saw that the machines weren't working.

148.    FE-5 corroborated that Neogen's integration of sample handling manufacturing was still not functional by the time he left the Company in August 2024.  According to FE-5, by that time, if Neogen needed to manufacture 10,000 sample collection products per month, they were only capable of manufacturing 500 such products per month.  He explained that this manufacturing deficiency stemmed from the fact that moving the machines from 3M to Neogen was "***a mess***" and even thereafter the Company simply could not get the necessary equipment up and running properly.  Thus, when informed that on July 30, 2024, Adent publicly claimed that Neogen's "[s]hipping performance [had] improved throughout the quarter" and was now "no longer a constraint," FE-5 replied "***I don't agree with that***."  FE-5 explained that he had approximately ***$8 million worth of back orders*** for sample handling products when he left the Company in August 2024 and opined "***that's not a 'success'***"—"***they lost a ton of customers***."  FE-5 compared this massive backlog to what was typical when he ran 3M Food Supply's supply chain while it was still part of 3M, explaining that, at that time, "my total monthly back order was under $10,000 for years and years."

149.    Both FE-7 and FE-5 explained that the Company's manufacturing and inventory problems were further compounded by ongoing ERP failures.  For example, FE-7 explained that SAP was supposed to automatically allocate raw materials for manufacturing based on orders received.  As he explained, "[y]ou would want to produce x amount of Clean Trace [consumables]. So it automatically goes to SAP and allocates the required raw materials for that particular batch." However, SAP was continuing to fail at this function by the time he left the Company in December 2024.  As he explained, "***[i]t [would say in SAP], I have x amount of raw materials A B C, but physically when you go [to the facility] it's not there, it's on back order***."  FE-7 explained that SAP problems contributed to the inventory write-offs the Company announced at the end of the

Class Period, in June 2025, because SAP could not properly manage the Company's inventory. FE-5 confirmed that "the whole inventory system was a mess" during his tenure. For instance, he explained that SAP would say we had inventory in stock at a warehouse when we didn't or say we didn't have the inventory in stock, but we did. Given these persistent issues, FE-5 surmised that the massive inventory write-offs Defendants disclosed in June 2025 must have resulted from the flawed SAP implementation.

### 3.    Neogen's Financial Planning Processes Also Were Flawed

150.    FE-6[13] served as the Company's Senior Director of Global Marketing and Operations for the Food Safety Division from the close of the Merger in September 2022 through January 2024. FE-6 said that he found that, from the outset, Neogen seemed to have no plan whatsoever to achieve the purported growth targets of the combined business. As he explained, each of the two businesses, pre-Merger, were single-digit-percentage growth businesses, yet Neogen was projecting the combined business to be a double-digit growth business without any plan or explanation of how it would get there:

> Neogen was shown as a high single-digit growth company through a combination of organic and inorganic activity. The 3M business, it wasn't defined exactly what the growth rate within there was, but it was viewed to be, again, a high single-digit growth rate business. ***The business case that was shown was to move the combined entity to a double-digit growth business combined***. ***I don't know that any of us really had clarity on exactly how that was going to occur***. There were certainly some cues within there like international expansion, account cross-selling, being able to make faster decisions to capitalize on new growth opportunities.
>
> But ***I can tell you myself coming over to Neogen, I was surprised at how undefined that playbook was***. I think there was probably a very high-level expectation that they had certain accounts, we had certain accounts and you'd put them together and all of a sudden, there'd be cross-selling and the business would grow faster. I don't know that it wasn't that easy, let's just say. I mean that was tried immediately. And ***the majority of the opportunities really were for relevant***

---

[13] FE-6 was the Senior Director, Global Marketing and Operations for Neogen's Food Safety Division from September 2022 to January 2024. He previously 3M's Director, Global Marketing and Operations, Food Safety Division from April 2020 – September 2022 and joined Neogen in connection with the Merger. He reported directly to COO Jones.

*customers where the core technologies just did not fit with that user case*. **I think there was a lot of concern around how are we going to realize this growth?  What are the things that we're going to do that are different on day one here that are going to get us to a faster growth plan.**

I can tell you from my standpoint, the time I was there, I don't feel like I ever saw a convincing playbook of how to realize that. … I don't think most probably would say they had a really clear understanding of what was going to change that was going to get the business to a faster growth rate.

151.    FE-6 further explained that he did "multiple exercises" to try to bring these issues to the attention of "senior leadership," but he did not believe there was ever "any substantial change in action that came from it," because the Company was instead operating in "***crisis mode***," with its "***hair on fire***" during the integration:

> **I did multiple exercises to try to draw these issues out from the global marketing team, global and regional marketing teams to roll up issues and bring them forward to senior leadership**.  I don't know that there was ever really any substantial change in action that came from it.  I think the company was operating enough in crisis mode that maybe some of these items just felt like luxury.  For sure there was a lot of customer-facing activity to try to resolve these.  **I remember specifically a lot of instances where senior leadership would be called on the customer calls to try to smooth things over, would try to take actions inside of the organization.  But I think there was just a lot of hair on fire, frankly**, regarding transition activities, ERP deployment, trying to negotiate support from 3M where needed.

152.    FE-3 likewise confirmed that the Company had no basis or method for its sales forecasting.  FE-3 said that each salesperson was simply asked to do their own forecast, but that they were given no data or basis for their forecasting: "***You were guessing.  You didn't have data nor resources to make an educated assessment***."  FE-3 contrasted this with other sales positions at other companies where, in order to make a forecast, "[y]ou would have comparison, you would know what you're looking at, what products have the customer used in the past, are they still using the product."

153.    FE-3 explained that it didn't actually matter what number each salesperson came up with, because executive management through the C-Suite would make up the numbers they

wanted.  He explained, "*[y]ou would spend weeks on these projections and they were going to do whatever they wanted to do with the data and the goals*…They would make us go through this process for weeks, and *they would then change the numbers, and the numbers were always higher, never lower*."  FE-3 was aware that the same was true for all of the sales personnel in his division based on his conversations with them.

### K.    Post Class Period Events Further Confirm Defendants' Fraud

154.    Shortly after the Class Period ended, Defendants continued to make disclosures that further revealed the truth about Neogen's catastrophic integration, and in particular, that the Company's "fully operational" ERP system was not functional.

155.    On July 29, 2025, Neogen held its earnings call for the fourth quarter and full year of fiscal 2025.  Notwithstanding the Company's claims as recently as April 2025 that sample collection product manufacturing was "now producing at the prior levels," Adent now admitted that its manufacturing processes were not working at all, forcing Neogen's workers to *literally assemble sample handling products by hand*.  Specifically, sample collection production remained "*very inefficient*" in large part because the Company "continue[d] to struggle with sustaining consistent uptime of the automated processes, *which is causing us to produce a significant amount of products manually*"—a stunning new fact that Defendants had never disclosed during the Class Period.  Naemura similarly explained that Neogen's failure to successfully integrate its manufacturing of 3M's sample collection product line was dramatically harming profitability, because "*[t]he elevated level of manual work is causing us to incur cost for expensive temporary labor and excessive scrap rates*."  Consequently, Neogen's adjusted EBITDA margin was just 18% for the fourth quarter—far below the 30% promised throughout the Class Period—due to "lower volume" "inventory write-offs" and "sample collection production inefficiencies."

156.    Naemura further disclosed that the sample collection problems Defendants had minimized quarter after quarter had, in reality, devastated the Company's balance sheet, ***forcing yet another massive goodwill write-down of nearly $600 million***.  Naemura explained:

> During the fourth quarter, in connection with our annual goodwill valuation assessment, ***we further impaired the carrying value of goodwill primarily associated with the 3M Food Safety division acquisition***. As we have seen end-market conditions weaken and some impacts on the global trade environment, as well as ***inconsistent execution in our startup of sample collection production***, we determined that ***a further impairment under US GAAP was warranted, and recorded an additional $598 million non-cash charge***.

157.    On September 15, 2025, the Company announced that Naemura was resigning as CFO and acting COO with no replacement identified.  Naemura's resignation marked the latest in a series of departures of C-Suite officers including Adent and COO Jones.  Shortly thereafter, in November 2025, CSO Lilly would also depart the Company.

158.    On October 9, 2025, Neogen held its earnings call for the first quarter of fiscal year 2026.  During the call, Neogen's new CEO, Mike Nassif ("Nassif"), made clear that Neogen was still nowhere near achieving its purported integration goals because "***execution challenges are holding us back***."  During the call, Naemura explained those challenges in further detail, and admitted that the inventory write-offs the Company disclosed on June 4, 2025 were the result of a total breakdown in the Company's demand forecasting and inventory planning processes—the same processes that were supposed to be managed by the Company's ERP system (meaning that the ERP system had never functioned properly).  Naemura further revealed that the ***inventory write-offs "really ha[d] more to do with getting the right products, frankly, that have shelf life to the right places, in the right amounts***"—*i.e.*, the very things that the ERP was supposed to be managing.  Nassif similarly admitted that "***[o]ne of the contributing factors to the recent elevated inventory write-off is simply the fact that we're carrying too much inventory.***"

159.    Additionally, Naemura admitted that Neogen had *still* not been able to stand up its sample handling manufacturing, explaining that "we continue to see an elevated level of sample collection production inefficiencies," and revealed that these manufacturing inefficiencies were so severe that the Company was "***selling the product at a loss currently***."  Nassif similarly admitted that "we have not maintained our market share" in the food safety business—specifically, in sample collection, allergens, and natural toxins—as a "***result of execution challenges related to the 3M integration and some resulting inconsistencies in supply.***"  And Naemura acknowledged that achieving efficient sample collection production was not going to be a reality any time soon, but instead would be ***a "multi-quarter" activity***.

160.    In an October 10, 2025 report, William Blair reflected on Neogen's dramatic integration failure, noting the complete overhaul of its entire management structure and the fact that there was "***still much that needs to be proved***" with regards to the critical components of the integration.  As the report noted, "***[o]n the backs of the company going through a management transition (now also looking for a new CCO and new leadership in the U.S. & Canada and Europe regions), there is still much that needs to be proved with continued noise around things like the Petrifilm manufacturing facility and inventory write-offs, EBITDA headwinds, and commercial execution***."

161.    On November 14, 2025, credit rating agency S&P Global lowered Neogen's credit rating from BB- to B+, citing the Company's "very high" leverage and the fact that "Neogen's acquisition of 3M's food safety business continues to strain operating performance, with significant integration and stand-up costs to date."  S&P noted that Neogen had incurred $50 million in integration-related costs in FY 2025 alone, and that, while it had been promised that such costs would taper off, Neogen had already incurred another $18 million in integration costs

in Q1 of FY 2026 alone.  As such, S&P noted that Neogen's EBITDA margin was a mere 15.8%—just *half* of the 30% EBITDA margin Neogen had promised it would achieve as a result of the Merger.

162.    Finally, Neogen's disastrous 3M Food Safety integration continued to materially impact the Company even as of the filing of this complaint.  At a January 15, 2026 investor conference, CEO Nassif apologized to investors for prior management's integration misrepresentations and failures.  Nassif admitted that—*over four years* after the Merger was announced—Neogen had still made little progress in the integration, explaining that Neogen was "*still in the early stages of a turnaround*."  In fact, Neogen had so utterly failed to integrate 3M Food Safety that Nassif acknowledged that, when he first joined the Company in 2025, he was shocked by the state of the business, observing: "*Wow that is a company that is having a lot of challenges*."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

163.    During the Class Period, Defendants made materially false and misleading statements, and omitted material facts, in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Throughout the Class Period, Neogen's press releases, earnings and investor conference call transcripts, and earnings and investor conference presentations, included material misstatements and omissions concerning the status and progress of the Company's integration of 3M Food Safety.  These material misstatements and omissions had the effect of creating in the market an unrealistically positive assessment of Neogen's business and its ability to successfully integrate its own food safety business with the 3M Food Safety business.  In truth, Defendants knew throughout the Class Period that Neogen was experiencing significant and widespread problems with the 3M Food Safety integration—issues that Defendants

deliberately concealed from and actively misrepresented to investors.  Defendants' misstatements are set forth in full below, along with a summary of the material facts that Defendants withheld from the public that rendered them materially false and misleading when made.

### A.    The January 5, 2023 Earnings Call

164.    On January 5, 2023, Neogen reported financial results for Q2 of FY 2023.  During Neogen's earnings call that day, Adent claimed that Defendants had made "significant progress" integrating the commercial systems and sales teams between the announcement of the acquisition and its close, and affirmatively represented that Neogen's CRM system was fully and successfully integrated immediately after the September 1, 2022 closing:

> ***We've made significant progress to date in the realignment and coordination of our commercial efforts***.  ***We combined CRM systems on day two***, modified geographic coverage areas and work[ed] together to identify and prioritize the highest potential revenue and synergy opportunities.  We've had successes within the marketplace, with ***customers responding positively to the new products and solutions available to them***.

165.    The statements in paragraph 164 were materially false and misleading and omitted material facts.  In truth, Defendants had *not* "made significant progress to date" integrating Neogen's and 3M's CRM systems; and Defendants indisputably had *not* "combined CRM systems on day two" following the Merger close.   Defendants' representations were completely contradicted by the independent accounts of former employees who explained that during this timeframe, Neogen's integration was massively delayed, its integration attempts thus far had been plagued by failures, and its IT systems were still far from integrated.  For instance, FE-3—a sales executive who worked with the Company's CRM system on a daily basis—directly contradicted Defendants' assertions that the companies' CRM systems were fully integrated within two days of the acquisition's closing, calling the statement "[a]bsolutely 100% false," and explaining that he never saw the CRM systems consolidated during his entire tenure (through the end of 2023), *i.e.*,

that "[i]t didn't happen while I was there."  Instead, FE-3 and numerous other Neogen sales representatives "had no way of knowing who were existing or prospective 3M customers" which would have made it difficult at best for there to be any "cross-selling opportunities."

### B.    The January 11, 2023 JPMorgan Healthcare Conference

166.    On January 11, 2023, Adent attended the annual JPMorgan Healthcare Conference on behalf of Neogen.  During the investor conference, Adent reiterated that Neogen's CRM system had been fully integrated by the "second day of the integration," which was a "big deal" because Neogen and 3M Food Safety were now supposedly successfully operating their customer management and communication activities under "one common platform":

> ***The second day of integration, we had combined our CRM systems.  Now that's a big deal because in one common platform, we knew who the common customers were, what they were buying, who was calling on them***, *so what allowed us to do was in this first quarter is we have all the sales teams realigned, everybody knows who their customers are. Everybody knows who they're calling on*.  We've done all the cross training and we've identified what are the biggest opportunities for cross-selling within those customer bases.  Because what I warned the team about was while this integration is big for Neogen, we cannot turn our back on our customers.  So the team was very focused on making sure we're forward-facing with the customers to continue to drive things forward.  And we've been able to do that.

167.    The statements in paragraph 166 were materially false and misleading and omitted material facts.  In truth, Defendants had *not* successfully "combined our CRM systems" such that the two companies were operating under "one common platform"; Neogen's sales representatives did *not* know "who the common customers were, what they were buying, [or] who was calling on them"; and Neogen did *not* "have all the sales teams realigned" such that "[e]verybody knows who their customers are, [and] everybody knows who they're calling on."  In fact, Neogen and 3M Food Safety were *not* operating under "one common platform," and thus the two companies' sales representatives did *not* know who each others' customers were at the time of Adent's statement.  This was confirmed by the Company's former sales representatives.  For example, FE-3—a sales

executive who worked with the Company's CRM system on a daily basis—directly contradicted these claims.  He explained that Defendants' assertions that the companies' CRM systems were fully integrated within two days of the acquisition's closing was "[a]bsolutely 100% false" and, in fact, the two CRM systems were never successfully combined during his entire tenure (through the end of 2023).  FE-3 reported that it simply "didn't happen while I was there."  Instead, FE-3 and numerous other Neogen sales representatives "had no way of knowing who were existing or prospective 3M customer" and thus could not have engaged in "cross-selling."

### C.    The March 30, 2023 Earnings Call And Presentation

168.    On March 30, 2023, Neogen reported financial results for Q3 of FY 2023.  During the Company's earnings call that day, Adent emphasized that "***our ERP implementation for the combined business is well underway with completion on schedule for the end of calendar 2023***."  In the accompanying earnings presentation slides, Defendants again represented that their "[i]ntegration activities [were] progressing well," and that the "***ERP upgrade [remained] on track***."

169.    The statements in paragraph 168 were materially false and misleading and omitted material facts.  In truth, Neogen's ERP implementation for the combined business was *not* "well underway" and Defendants had absolutely *no* basis in fact to claim that its "completion [was] on schedule for the end of calendar 2023."  As Defendants admitted at the end of the Class Period, the opposite was true: Neogen's ERP system was an abject failure, and could not even perform the most basic functions of an internal management system as it lacked "***the underlying processes to get the right inventory in the right place***."  In fact, the Company's integration failure was so profound that Neogen could not use rudimentary protocols to manufacture products, and instead resorted to assembling products *by hand*, which was grossly inefficient and dramatically impacted the Company's financial results.  Underscoring these fundamental failures, Naemura admitted in

June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new *nine-step* improvement plan to address these issues that would require as much as two more years to complete.

170.    The falsity of Defendants' statements is also confirmed by multiple former employees, each of whom described how Neogen was not at all prepared to implement SAP.  For instance, FE-5 explained that Neogen's efforts to prepare for its SAP implementation as of this time were "***horrific***," as "nothing was prepared in Neogen"; instead "they bought 3M and took a[n] SAP box off the shelf and said I can do this in 12 months."  And, as one of Neogen's SAP Super Users, FE-1, confirmed, it was clear from the outset that Neogen was not prepared or set up to implement a functional ERP system.  FE-1 explained that, even as late as mid-June 2023, Neogen had not successfully run any "test scripts," and they "pretty much c[ouldn't] even write [the] scripts" they needed to test before they could implement Neogen's new SAP system—thus there "was no way we're going to go live" anytime soon.

### D.    The June 6, 2023 William Blair Growth Stock Conference Call And Presentation

171.    On June 6, 2023, Adent attended the William Blair Growth Stock Conference on behalf of the Company.  In the associated presentation, Defendants asserted that the "*[i]ntegration remain[ed] on track*."  Significantly, during this conference Adent laid out in detail Neogen's near-term integration milestones roadmap.  Specifically, Adent told investors that, over the course of the next nine months, "*we will have three of the four [3M] manufacturing lines of the key product lines in-house*" at Neogen's manufacturing plant: "sample handling will be in-house, pathogen detection is in-house, and today, hygiene monitoring is already in-house."

172.    Indeed, Adent represented that the transition of the manufacturing of these key product lines was allegedly proceeding so seamlessly that he even boasted "*we sped up the*

*timeline to bring those product lines in-house*.”  Moreover, Adent stated that Neogen was also accelerating the timeline of the implementation of its “new ERP system” by “*bringing [] forward*” “*our SAP implementation*[.]”  Adent stated that this accelerated ERP implementation would be another “*significant accomplishment that we'll have done in nine months is we will be off the transition service agreements, so the back office agreement which is order[] [to] cash that will be all in-house and distribution will all be in-house also*.”

173.    The statements in paragraphs 171-72 were materially false and misleading and omitted material facts.  In truth, Defendants had no basis in fact whatsoever to assert that “we will have three of the four [3M] manufacturing lines of the key product lines in-house” within the next nine months, or that Neogen was capable of exiting its back-office and distribution transition services agreements within that same time frame.  Nor did they have any basis in fact to claim that Neogen was capable of “bringing [] forward” “our SAP implementation[.]”  Instead, Neogen was nowhere close to being able to implement a functional ERP system.   Indeed, as Defendants admitted at the end of the Class Period, the opposite was true: Neogen's ERP system was an abject failure, and could not even perform the most basic functions of an internal management system as it lacked “*the underlying processes to get the right inventory in the right place*.”  In fact, the Company's integration failure was so profound that Neogen could not use rudimentary protocols to manufacture products, and instead resorted to assembling products *by hand*, which was grossly inefficient and dramatically impacted the Company's financial results.   Underscoring these fundamental failures, Naemura admitted in June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new *nine-step* improvement plan to address these issues that would require as much as two more years to complete.

174.    Moreover, former employees directly involved in the Company's SAP implementation confirmed that Neogen failed to perform the most basic preparations and testing needed to implement SAP.  FE-5 said that Neogen's ERP system preparations were "horrific," as "nothing was prepared in Neogen"; instead "they bought 3M and took a[n] SAP box off the shelf and said I can do this in 12 months."  FE-1 confirmed that, by the time of Defendants' June 2023 statements, Neogen was still so unprepared that there was "was no way we're going to go live" with SAP anytime soon.  FE-7 further explained that, contrary to Defendants' public statements claiming that its manufacturing transition was "on track," in reality, Neogen did no preparation whatsoever to integration of 3M's sample handling line such that "[i]t took the team…about 6 months just to figure out how to hook the machine up and get it up and running" once it was moved to Neogen in January 2024, and, subsequently, the machinery never consistently functioned properly, such that Neogen was forced to make products "manually."

**E.    The July 27, 2023 Earnings Call, Presentation, And Press Release**

175.    On July 27, 2023, Neogen reported financial results for Q4 and the full year of FY 2023.  In the earnings press release issued by the Company that day, Adent repeated that Neogen had "important integration workstreams underway" and that "***the full integration of the former 3M Food Safety Division***" was "***proceeding according to plan***."  In Neogen's earnings call presentation the same day, Defendants stated that the critical "***implementation of enterprise systems***"—*i.e.*, the ERP system—likewise remained "***on track***."

176.    The statements in paragraph 175 were materially false and misleading and omitted material facts.  In truth, "the full integration of the former 3M Food Safety Division" was *not* "proceeding according to plan" and the "implementation of enterprise systems" did *not* remain "on track."  Instead, Neogen was nowhere close to being able to implement a functional ERP system.  Indeed, as Defendants admitted at the end of the Class Period, the opposite was true: Neogen's

ERP system was an abject failure, and could not even perform the most basic functions of an internal management system—to the extent that Neogen resorted to assembling products *by hand*, which was grossly inefficient and dramatically impacted its financial results.  Underscoring these fundamental failures, Naemura admitted in June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new ***nine-step*** improvement plan to address these issues that would require as much as two more years to complete.

177.    Moreover, former employees directly involved in the SAP implementation confirmed that implementation of the new ERP system was not anywhere close to "on track." FE-5 explained that Neogen's SAP implementation was "horrific" because "nothing was prepared" for the implementation.  And FE-1 similarly confirmed that, when he left the Company in June 2023, there "was no way we're going to go live" with Neogen's new ERP system anytime soon due to the Company's failure to compete even the most basic SAP scripts needed for the ERP system to function.

### F.    The October 10, 2023 Earnings Call And Presentation

178.    On October 10, 2023, Neogen reported financial results for Q1 of FY 2024.  On this date, Defendants announced that they had achieved "***the most critical component***" of integrating 3M Food Safety—the integration and implementation of Neogen's new ERP system, which was now purportedly "***fully operational***."  Implementing a "fully operational" ERP system was the mission-critical step in the 3M integration, not only because it was necessary to allow Neogen's supply chain operations to run smoothly, but also because, according to Defendants, it was "[a] key step that enable[d] the exit of the[ transition services] agreements."

179.    In the Company's presentation slides for its October 10, 2023 earnings call, Defendants for the first time proclaimed that another "***[s]ignificant milestone [had been] achieved with initial ERP implementation***."  Specifically, Defendants claimed to have "***completed [the]***

67

initial *ERP go-live*," such that the Company was now independently "*processing orders and shipments*."  During the earnings call, Adent declared that "*[l]ast month we had the initial go-live with our Food Safety business in the US and Canada as well as corporate, making the cut over to the new ERP [system] on which we are now up a running*."  He further confirmed that Neogen's "new ERP system [was] up and running," which was "*a significant step to have behind us*" and "allow[ed] us to take over order fulfillment services" from 3M.

180.    During the same call, Naemura similarly assured investors that "we are fully immersed in our ERP implementation, which will enable us to extract ourselves from the transition service arrangements we have with 3M."  Adent also emphatically touted that *the ERP* "*[i]implementation has generally gone well*" and "the good news [i]s the business was up and running.  *We were able to do all the functions, nothing stopped*" and "*we are fully operational on the new system, processing orders and shipping products*."  Adent further boasted that with a "SAP conversion, you hear all the horror stories but you don't hear the good stories; *this is one of the good stories*, right?  *We're 40 days in, we're immediately able to do order to cash; build customers; pick, pack and ship; manufacture*[.]"

181.    Adent and Naemura both emphasized the significance of Neogen's achievement of this crucial ERP system implementation integration milestone, with Naemura stating "our goal here was just to share I think, first and foremost, that *the implementation went well; I think that's the headline*," and Adent echoing:

> [W]hat we wanted to talk about was *the success really of the integration and moving off our two transition services agreements and standing up ERP*.  And for those of you that have been involved in a lot of different companies, those were significant risk factors that could derail organizations.

182.    The statements in paragraphs 178-81 were materially false and misleading and omitted material facts.  In truth, Defendants had *not* "completed [the] initial ERP go-live"; the new

ERP system was *not* "now up and running," Neogen was *not* "fully operational on the new system, processing orders and shipping products," *nor* was it "immediately able to do order to cash; bill customers; pick, pack and ship; manufacture[.]"  Instead, as Naemura admitted at the end of the Class Period—a full 20 months after these statements—the exact opposite was true: Neogen's ERP system was a disaster, and could not even perform the most basic functions of an internal management system as it lacked "***the underlying processes to get the right inventory in the right place***."  In fact, the integration failure was so profound that Neogen resorted to assembling products *by hand*, which dramatically impacted its financial results.   Underscoring these fundamental failures, Naemura admitted in June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new ***nine-step*** improvement plan to address these issues that would require as much as two more years to complete.

183.    Moreover, former employees directly involved with the SAP implementation confirmed that the new system was not "fully operational" by October 2023.  FE-5 described that, after the new ERP system went live, "***it was such a disaster that we could not ship product, we could not fulfill orders, we had no idea where product was in the warehouse, customers got product sent to them but were never billed or customers got billed ten times what they should have paid***."  FEs-3, 4, 2, and 7 all independently corroborated that they experienced these ERP system problems immediately following the go-live.  After he was read Adent's October 2023 statement that the new ERP system was "up and running" by September 2023 and that the "[i]mplementation has generally gone well in that we are fully operational on the new system, processing orders and shipping products," FE-5 immediately responded: "bulls**t," explaining "SAP was not running smoothly.  Everything was being done piecemeal.  We couldn't find any

products."  And, after being read the same statement by Adent, FE-3 responded, "I don't feel that is accurate, that was completely false."

### G.    The January 9, 2024 Earnings Call And Press Release

184.    On January 9, 2024, Neogen reported financial results Q2 of FY 2024.  In the earnings press release announcing the Company's financial results, Adent again touted the progress of the integration, emphasizing the successful launch of the ERP system, which had allowed Neogen to "successfully complete" the integration of the former 3M pathogen detection and sample handling product lines into Neogen's facilities.  As Adent proclaimed, "*we have made notable recent progress*" on the integration; "[w]e initiated the exit of our transition services agreements, *successfully completed the initial phases of the integration of two additional product lines* and remain on track to exit all transition agreements outside of Petrifilm manufacturing[.]"

185.    During the earnings call, Adent stated "*we're approaching several near-term milestones on the journey of integrating* the former 3M food safety business."  Adent also again claimed that Neogen had "*successfully completed the first phase of the relocation*" of the sample collection product line during the quarter, explaining:

> Following the launch of our new ERP system in September, we made further progress by initiating the exit of several transition service agreements that we have with 3M, while continuing to ramp up our internal capabilities.  *On the manufacturing front, we also successfully completed the first phase of the relocation of the former 3M pathogen and sample handling product lines into Neogen facilities*.  The final relocation of the sample handling production we now expect to complete in Q4, but otherwise remain on track to exit all transition agreements outside of Petrifilm manufacturing by the end of the third quarter.

186.    The statements in paragraphs 184-85 were materially false and misleading and omitted material facts.  In truth, the Company had *not* "successfully complet[ed] the initial phases of the integration of two additional product lines" during the second quarter, *i.e.*, the quarter ending November 30, 2023.  Instead, as Defendants themselves admitted at the end of the Class Period,

the exact opposite was true: Neogen was unable to integrate manufacturing of key product lines, to the point that, even by the end of the Class Period, these issues were so pervasive that Neogen was forced "to produce a significant amount of products manually.  Moreover, FE-7 explained that Neogen did no planning whatsoever for transitioning 3M's sample handling manufacturing—instead, at the beginning of 2024, Neogen literally pulled the plug on the manufacturing equipment at 3M and moved it to Neogen's facility that was in no way set up for the equipment.  As a result of Neogen's lack of planning for the relocation of the sample handling line, "[i]t took the team …about 6 months just to figure out how to hook the machine up and get it up and running," after which it was plagued by "mechanical failures."  And FE-5 corroborated that the manufacturing transition was "a mess."

### H.    The January 11, 2024 JPMorgan Healthcare Conference Call

187.    On January 11, 2024, Adent attended an investor conference on behalf of Neogen.  During the investor call, Adent again boasted that "*[w]e implemented SAP*," which he claimed was "*a big deal*" and a resounding success because "*now we take the order, pick the order, bill the order, talk to the customer, collect the money*," allowing Neogen to "*double[] the size of the business by bringing all the 3M products into our distribution network*":

> Now I want you to think about the work that was taken to accomplish that.  We replatformed the company in the last 15 months.  *We implemented SAP*.  We made a book of record for the company.  We changed our process and procedures to do that.  As soon as that was done, *we immediately then doubled the size of the business by bringing all the 3M products into our distribution network*.  *And we did all order to cash.  So now we take the order, pick the order, bill the order, talk to the customer, collect the money, that's all done in-house*, right?  That's what we did during the second quarter when we finished out.  Now we've been doing it for 15 months.  *That is a big deal*, right?

188.    The statements in paragraph 187 were materially false and misleading and omitted material facts.  In reality, Defendants had *not* successfully "implemented SAP"; and Neogen's ERP system was *not* functional enough to "take the order, pick the order, bill the order, talk to the

customer, collect the money[.]"  Rather, the exact opposite was true.  Neogen's ERP system was an abject failure, and could not even perform the most basic functions of an internal management system.  In fact, the Company's integration failure was so profound that Neogen was forced to assemble products *by hand*, which was grossly inefficient and dramatically impacted the Company's financial results.  Underscoring these fundamental failures, Naemura admitted in June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new ***nine-step*** improvement plan to address these issues that would require as much as two more years to complete.

189.    Moreover, former employees directly involved with the SAP implementation confirmed that SAP was still entirely unable to function by this time.  FE-5 described that, after the new ERP system went live, "***it was such a disaster that we could not ship product, we could not fulfill orders, we had no idea where product was in the warehouse, customers got product sent to them but were never billed or customers got billed ten times what they should have paid***."  FEs-3, 4, 2, and 7 all independently corroborated these ERP problems following the go-live.

**I.    The April 9, 2024 Earnings Call, Presentation, And Press Release**

190.    On April 9, 2024, the Company reported its financial results for Q3 of FY 2024.  In the Company's press release that day, Adent enthusiastically declared that the "***third quarter saw us complete a number of milestone achievements related to the integration*** of the former 3M Food Safety business."  Specifically, he claimed:

> ***We completed the relocation of the pathogen detection product line and the initial phases of the relocation of the sample handling product line***, which we expect to complete in the fourth quarter.  ***We also completed the exit of the transition service agreements covering back-office functions and distribution***.

191.    Defendants repeated the same statements touting their purported integration milestone achievements in the Company's earnings call presentation the same day, proclaiming

that "*[s]ignificant integration milestones [were] achieved*" during the third quarter, including "[f]ully exit[ing the] transition services and distribution agreements," and "[f]ully integrat[ing]" all back-office and distributions services.  During the earnings call, Adent further emphasized that during the quarter Neogen had "*complete[d] a number of milestone achievements* on our integration journey[,]" including "*the first two of our four-phase relocation of the former 3M sample handling product line*," and "*completely exit[ing] the transition services and distribution agreements we have with 3M*."

192.    The statements in paragraphs 190-91 were materially false and misleading and omitted material facts.  In truth, it was materially false and misleading for Defendants to claim they had "complete[d] a number of milestone achievements[,]" including "completely exit[ing] the transition services and distribution agreements we have with 3M" and finishing "the first two of our four-phase relocation of the former 3M sample handling product line[.]"  Instead, and as Defendants admitted at the end of the Class Period, Neogen's ERP system was an abject failure, and could not even perform the most basic functions of an internal management system.  In fact, the Company's integration failure was so profound that Neogen resorted to assembling products *by hand*, which dramatically impacted the Company's financial results.  Underscoring these fundamental failures, Naemura admitted at the end of the Class Period that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new *nine-step* improvement plan to address these issues that would require as much as two more years to complete.

193.    Moreover, former employees directly involved with the SAP implementation confirmed that the system remained dysfunctional at the time of Adent's statements.  FE-5 described that, after the new ERP system went live, "*it was such a disaster that we could not ship*

*product, we could not fulfill orders, we had no idea where product was in the warehouse, customers got product sent to them but were never billed or customers got billed ten times what they should have paid*."  He explained that the SAP warehouse module governing distribution and inventory activities was a "colossal failure" and remained a "huge issue"—"They could not distribute enough product to meet customer demand."  FEs-3, 4, 2, and 7 all independently corroborated these ERP system problems continued to plague the Company as of April 2024.  Finally, FE-7 confirmed that, by this time, the Company had achieved virtually nothing with respect to moving 3M's sample handling manufacturing in house other than literally moving the equipment to a new facility, as it took six months (from January 2024) just to get the machinery running, with severe problems persisting through his retirement in December 2024, and FE-5 corroborated that these problems were occurring through at least August 2024 when he retired.

**J.    The June 4, 2024 William Blair Growth Stock Conference Call And Presentation**

194.    On June 4, 2024, Adent attended the William Blair Growth Stock Conference.  In the Company's presentation for this conference, Defendants represented that Neogen had completed most of the work involved with integrating 3M Food Safety (and that any attendant capital spending on the integration was nearly finished), stating that the "*[m]ajority of integration workstreams and related spending have been completed*[.]"  Moreover, during the investor call Adent continued to represent that Neogen had already achieved the vast majority of critical integration-related milestones, and claimed that the integration was going so smoothly that "the faster we bring [3M functions] in house…the better off we are":

> Our integration is fully underway, right.  There were six main platforms with thousands of work streams.  Five of those are being effectively done this quarter, right.  **So, we have brought in sample handling**.  We have brought in pathogen detection, it is now in-house.  Hygiene monitoring is done.  **And we came off our services agreements whether it was the back office and distribution.  So, five of**

*the six were done*, okay. [ . . .] **We have seen the faster we bring things in-house, even though it's challenging, the better off we are**.

195.     Adent further reported that "the majority of those big, multi, thousand different workstreams that we're doing for integration, ***the majority of those are behind us***."

196.     The statements in paragraphs 194-95 were materially false and misleading and omitted material facts.  In truth, Defendants had *not* successfully "brought in sample handling" and those integration milestones were *not* "behind us."  *Nor* had the "[m]ajority of integration workstreams and related spending [] been completed[.]"  Instead, Defendants' admissions at the end of the Class Period evidence the exact opposite: the Company was so completely incapable of manufacturing those products that, as of July 2025, Neogen's manufacturing was not functional and the Company was still "producing a significant amount of product manually," *i.e.*, having its workers make them by hand.  Moreover, the "majority" of integration "workstreams" were not "behind" the Company—indeed, even by June 2025, Naemura admitted that Neogen needed another "year or two" to complete the integration, and even by January 2026, Neogen's new CEO admitted that the company was *still* "in the early stages of the turnaround."

197.     The falsity of Defendants' statements was further confirmed by former Neogen employees, including FE-7, who explained that SAP problems contributed to the inventory write-offs Neogen announced at the end of the Class Period in June 2025, because SAP could not properly manage Neogen's inventory.  And FE-5 likewise confirmed that "the whole inventory system was a mess" during his tenure and at least until August 2024 when he left Neogen.

198.     Also during Neogen's June 4, 2024 William Blair investor conference, Defendants reaffirmed that any integration-related problems that they had disclosed during the previous earnings presentation—which they had previously characterized as "temporary"—remained minor, easily fixable, and would be resolved by the end of the quarter.  Specifically, in its June 4,

2024 investor presentation, Neogen reassured investors that Neogen had "*[d]emonstrated continued shipping progress* throughout the quarter" and "[r]emain[ed] *on track to resolve ERP-related order fulfillment challenges* in Q1."  And during the investor call the same day, Adent again stated that the ERP-related shipping issues would be resolved by the end of Q1 of FY 2025— the quarter ended August 31, 2024.  Indeed, Adent not only repeatedly emphasized that the problems were nearly resolved, but also responded to analyst questions on the topic, each time assuring investors that the problems were fixed and there would be no further issues:

> *We're on track to solve kind of the shipping issue we're having with ERP*.  We are not making any change.  We ended up getting the right resources there, and really driving the things we needed to fix and getting our second, third parties there to help us fix that.  So, *we feel comfortable kind of where we are to have that fully resolved by the first quarter*.  And I think what's most exciting for us is we're going to be back on our front foot selling, right. *Sales teams are not going to be worried about, is the product coming, when's the product coming*.  It is now back out to drive revenue growth.  And we're starting to see that in the order book, and those are things that we're going to continue to drive going forward.

199.    Additionally, in response to an analyst who inquired whether Neogen had passed the "trough" of its integration problems, *i.e.*, "[h]ow comfortable do you feel that this is kind of the trough in a lot of the integration noise?" Adent replied:

> *[C]omfortable . . . we put in a new ERP system, right.  Not many companies take on that type of challenge and make it through*.  So, I think *we are through the majority of that . . . We're seeing efficiency around production, around shipping*, and really is going to *get us back to our sales teams and customers knowing that we can – when they place the order they're going to have in two days* and we're going to drive forward.  So we're excited about the future.

200.    The statements in paragraphs 198-99 were materially false and misleading and omitted material facts.  Neogen was *not* "on track to resolve [] ERP-related order fulfillment challenges in Q1" (the quarter ending August 31, 2024), and had *not* seen "efficiency around production" or "[d]emonstrated continued shipping progress throughout the quarter," *nor* had Neogen reached a point where its "sales teams are not going to be worried about, is the product

coming, when's the product coming."  Instead, as Defendants would later reveal, even by the end of the Class Period (a full year after these statements), the ERP system integration was an abject failure, and Neogen *still* could not ensure that its customers would receive their orders because it lacked "***the underlying processes to get the right inventory in the right place***," and "***protocols… to ensure the right products were shipped at the right time***."

201.    Moreover, FE-5 confirmed that the SAP warehouse module governing distribution and inventory activities was a "colossal failure" and remained a "huge issue" through at least August 2024 when he left the Company.  Thus, when informed that Defendants were claiming Neogen's shipping issues were on track to be resolved around this time, FE-5 explained that he had approximately $8 million worth of back orders for sample handling products as of the time he left the Company in August 2024 and opined "that's not a 'success'"—"they lost a ton of customers."  Similarly, rather than seeing "efficiency around production," with respect to production of sample handling products, FE-7 explained that the equipment was not even fully up and running by June 2024, and subsequently *never* functioned efficiently.

**K.    The July 30, 2024 Earnings Call, Presentation, And Press Release**

202.    On July 30, 2024, Neogen released its financial results for Q4 and the full year of FY 2024, and made clear that any integration issues had been resolved.  In the Company's July 30, 2024 press release, Adent announced that Neogen had resolved its order fulfillment problems, *i.e.*, that Neogen "saw ***improvement in our order fulfillment rates*** throughout the quarter," which he declared now "***are no longer a constraint***."  And, in the Company's fiscal year 2024 earnings presentation the same day, Neogen further represented that "***[s]hipping performance [had] improved throughout the quarter***," such that it was now "***no longer a constraint***," and that the ***ERP*** "***[s]ystem-related distribution issues have since been resolved***."  Thus, according to Defendants, Neogen was "***[m]oving past integration challenges***" promptly and effectively.

203.    During the Company's earnings call the same day, Adent repeated the same refrain. First, he stated: "*We also saw improvement throughout the fourth quarter in our shipping performance*."  Next, he reiterated that "[o]n our last earnings call, we committed to resolve the distribution inefficiencies stemming from our SAP and our new warehouse management system by the end of the first quarter" and *those issues* "*have now effectively been resolved*[.]"

204.    The statements in paragraphs 202-03 were materially false and misleading and omitted material facts.  In reality, Defendants had *not* improved order fulfillment rates or shipping performance such that SAP system issues were "no longer a constraint."  *Nor* had the Company's "distribution inefficiencies" stemming from Defendants' ERP implementation "effectively been resolved" by this time.  Instead, as Defendants ultimately admitted, the opposite was true: the ERP system was an abject failure, and could not perform the most basic functions of an internal management system.  These deficiencies were so profound that Neogen resorted to assembling products *by hand*, which dramatically impacted its financial results.  Underscoring these failures, Naemura admitted in June 2025 that Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new *nine-step* improvement plan to address these issues that would require as much as two more years to complete.

205.    Former employees corroborated that SAP was still dysfunctional by this time.  FE-5 explained that, at least through August 2024, the SAP warehouse module governing Neogen's distribution and inventory activities was a "colossal failure" and remained a "huge issue," explaining that "[t]hey could not distribute enough product to meet customer demand."  Indeed, when specifically read Defendants' July 30, 2024 statements claiming that Neogen's "[s]hipping performance [had] improved throughout the quarter" and was now "no longer a constraint," FE-5 replied "*I don't agree with that*."  FE-5 explained that he had approximately $8 million worth of

back orders for sample handling products as of the time he left the Company in August 2024 and opined "that's not a 'success'"—"they lost a ton of customers."

206.    In Neogen's July 30, 2024 press release, Adent further asserted that the Company had "***cross[ed] multiple significant integration milestones in the third quarter*** related to the integration of the former 3M Food Safety business," including that Neogen purportedly had now "***completed the relocation of the sample handling product line***."   In the FY 2024 earnings presentation the same day, Defendants again highlighted the fact that the "[r]elocation of sample handling manufacturing [was] complete" and stated that "***[a]ll former 3M Food Safety products***, outside of Petrifilm, ***and supporting services [had been successfully] integrated into Neogen***." Thus, according to Defendants, all "***[k]ey integration activities [were] nearly complete***."

207.    During the Company's July 30, 2024 earnings call, Adent reiterated more of the same.  Specifically, he stated that the "last couple of quarters have seen a tremendous amount of integration progress" such that, "[o]utside of the new facility we're building [to manufacture Petrifilm], ***the 3M Food Safety operations have now been combined with Neogen***" and "we have a significant amount of work that's behind us."  He also represented that, "***[a]fter crossing multiple significant integration milestones in the third quarter, progress continued*** on multiple fronts in the fourth quarter."  Specifically, Adent reported: "***We finished relocating the former 3M sample handling product lines in our facility*** in Lexington, Kentucky, and ***are now in the process of ramping up to full production levels***, which we expect to be at the end of next month."

208.    The statements in paragraphs 206-07 were materially false and misleading and omitted material facts.  In reality, Defendants had *not* successfully "completed the relocation of the sample handling product line" and it was materially false and misleading for Defendants to claim that all "[k]ey integration activities [were] nearly complete."  Indeed, as discussed herein,

Defendants would ultimately admit that the exact opposite was true.  Nearly a year later in June 2025, the 3M Food Safety integration remained an abject failure, and the Company's ERP system could not perform even basic protocols required of an internal management system to ensure that product was manufactured and delivered to customers timely and correctly.  Information provided by former employees further corroborates this.  For instance, as FE-5 explained, incurring millions of dollars' worth of back orders definitely is "not a 'success,'" and as FE-7 explained, the sample collection manufacturing line suffered from constant "mechanical failures" that continued through the time he left the Company in December 2024, forcing the Company to use manual processes, *i.e.*, to assemble products by hand.

### L.    The September 5, 2024 Wells Fargo Healthcare Conference Call And Presentation

209.    On September 5, 2024, Naemura attended an investor conference on Neogen's behalf.  In the investor presentation for this conference, Defendants continued to claim that the "*[i]ntegration [was] on track*," that **sample handling "production [was] ramping up**," and that "***[i]mprovement in order fulfillment rates [was] sustained*.**"  Naemura also again emphasized during the investor conference that the Company's integration "challenges" were "**behind us here in 2025**":

> [W]e have some well-documented challenges with our shipment operations, and that was throughout the course of 2024.  In our fourth quarter, we talked about getting over the hump on that in Q4, and ***I'm just happy to report that that progress has been sustained through Q1 and we feel that those challenges that played just in 2024 are behind us here in 2025***.

210.    Additionally, in their presentation at the Wells Fargo investor conference, Defendants continued to assert that all back-office and distribution services remained "[f]ully integrated."  And, during the investor conference, when an analyst specifically asked, "[d]o you think you're past the most significant integration challenges at this point?", Naemura replied:

*Yeah.  Look, it can't be underestimated what was accomplished in the second half of fiscal 2024*.  And our teams worked tirelessly to get this done.  But we fundamentally brought not only – we stood up a new distribution facility that brought in all the 3M business into it.  So *we extracted ourselves from the 3M logistics and distribution network and came off the order to cycle back office support from 3M all into a new implementation of SAP, while at the same time, we brought in fundamentally three or two – two more additional product lines on the manufacturing*.

211.    The statements in paragraphs 209-10 were materially false and misleading and omitted material facts.  In truth, Neogen's order fulfillment and sample collection production integration-related "challenges" persisted and were not, in fact, "behind us."  Instead, Neogen's ERP system was an abject failure, and could not even perform the most basic functions of an internal management system—to the extent that the Company resorted to assembling products *by hand*, which dramatically impacted the Company's financial results.   Underscoring these fundamental failures, Naemura admitted at the end of the Class Period that Neogen was nowhere close to solving these integration problems, and would require a ***nine-step*** improvement plan to address these issues that would take as much as two more years to complete.  And, as FE-7 confirmed, Neogen's sample handling was not "ramping up," it was barely functional, with constant equipment failures and regular use of "manual" processes.

**M.    The October 10, 2024 Earnings Call, Presentation, And Press Release**

212.    On October 10, 2024, Neogen announced its financial results for Q1 of FY 2025.  And in connection therewith, Defendants continued to assert over and over again that all issues with the ERP systems implementation had been fixed and were fully resolved.

213.    In the Company's press release reporting those results, Adent continued to assert that "*[t]he system-related issues in our distribution center that impacted our order fulfillment rates were resolved and the business was not constrained by shipping*" during the first quarter.  And, in their earnings slide presentation the same day, Defendants similarly stated that the

"*[s]ystem challenges from H2 FY24 have been resolved,*" those "*[i]mprovement[s] ha[d] been sustained*," and Neogen was "*no longer constrained by shipping*."  Thus, Defendants claimed that Neogen's "*[r]ecent integration challenges [had been] resolved*."

214.    During the Company's earnings call the same day, Adent reiterated much of the same.  Specifically, he represented that, "[w]ith respect to our integration progress, *the ERP-related challenges that we've been experiencing in our primary distribution center have been resolved and we no longer are constrained by shipping*."  Additionally, "[o]n the production side, we've completed the relocation of the former 3M sample collection product line. . . *We currently have all lines operational with the line of sight to reach normal production levels in the third quarter*. . . [and] *the recent shipping challenges [are] behind us*[.]*"

215.    The statements in paragraphs 213-14 were materially false and misleading and omitted material facts.  It was materially false and misleading for Defendants to claim that any past ERP system issues had been "resolved" and Neogen's business was no longer "constrained by shipping" issues.  In reality, the exact opposite was true.  Defendants admitted at the end of the Class Period that the integration and implementation of the ERP system was an abject failure, and the ERP system was so broken it could not do some of the most basic functions to ensure that product was produced and delivered to customers timely and correctly.  Information provided by former employees further corroborates this.  As FE-7 explained, the sample handling manufacturing line suffered from constant "mechanical failures" that continued through the time he left the Company in December 2024, forcing the Company to use manual processes, *i.e.*, to assemble sample collection products by hand.

**N.     The December 4, 2024 Piper Sandler Healthcare Conference Call And Presentation**

216.     On December 4, 2024, Adent attended the Piper Sandler Healthcare Conference on Neogen's behalf.  Even as late as December 2024, Defendants continued to insist that Neogen's ERP system was fully operational, that all issues had been fully resolved.  With respect to the ERP integration, when a Piper Sandler analyst asked, "ERP integration, are we fully integrated or is there still a little bit more to go[?]," Adent again assured the market that ERP integration issued has been completely resolved, replying, "*[w]e're not doing any ERP changes for the rest of this year*."  When an analyst sought additional detail and inquired "what's left to do" regarding the integration, Adent made crystal clear that the ERP system integration had been "accomplish[ed]":

> Yeah.  Look, we're not – at Neogen, we're not for the faint hearted, right?  I think *a lot of people have paused when they do an ERP conversion* or when they buy a business or when they have to stand up 16 international sites within 18 months, *or when they have to move three manufacturing facilities and stand up a worldwide distribution center*.  *But we did that all at once within 18 months and we're able to accomplish it*.

217.     In Neogen's investor presentation for this conference, Defendants also stated that the "*[i]ntegration [was still] on track*," and the "*[m]ajority of integration workstreams and related spending have been completed*[.]"  And, during the investor call the same day, Adent once again insisted that "of the four manufacturing lines we acquired from 3M, three are already in our facilities and *we['] re manufacturing and improving efficiency of those businesses.* . . . So we're excited to have that behind us and be – *the majority of the integration work behind us*[.]"

218.     The statements in paragraphs 216-17 were materially false and misleading and omitted material facts.  Neogen's integration was decidedly *not* "on track" and the "majority of integration work" was clearly *not* "behind" the Company, *nor* was the ERP system "fully integrated" or "accomplish[ed]."  Moreover, Neogen clearly was *not* "manufacturing and improving efficiency" with respect to its sample handling product line.  Indeed, as Naemura was

later forced to admit, Neogen's sample handling production line was unable to function and employees were making the product by hand and Neogen was forced "to produce a significant amount of products manually."  Moreover, as Defendants admitted months after the end of the Class Period, on October 9, 2025, Neogen still had not been able to stand up its sample handling manufacturing by that time, acknowledging that "we continue to see an elevated level of sample collection production inefficiencies" that were so severe that Neogen was "selling the product at a loss currently."

### O.    The January 10, 2025 Earnings Call

219.    On January 10, 2025, Neogen disclosed its financial results for Q2 of FY 2025. During the Company's earnings call with investors, Adent stated that, "[w]ith respect to the integration, *we have discrete initiatives underway to drive improvements and efficiency of our fully integrated shipping and distribution operations*," and claimed that Defendants had "*made further progress in the quarter winning back market share we ceded from shipping delays late last fiscal year*."  Adent reiterated that "the process of ramping up is continuing[,] *[a]ll of the product lines are operational*[,]"and "we're going to be able to bring those capacity rates back up by the end of the third quarter."

220.    The statements in paragraph 219 were materially false and misleading and omitted material facts.  In reality, for the same reasons set forth above at paragraph 215, Neogen had *not* "drive[n] improvements and efficiency of our fully integrated shipping and distribution operations."  And, for the same reasons set forth above at paragraph 218, it was false and materially misleading for Defendants to claim that, regarding sample collection products, "the process of ramping up is continuing[,] [a]ll of the product lines are operational[,]"and "we're going to be able to bring those capacity rates back up by the end of the third quarter" when the exact opposite was true.

**P.    The January 15, 2025 JPMorgan Healthcare Conference Call**

221.    On January 15, 2025, Adent attended the JPMorgan Healthcare Conference representing Neogen.  During that conference, Adent asserted that the ERP system implementation was "complete" and that "all" of the Company's shipping delays were "behind us":

> [W]e've made significant progress with the integration of the food safety -- 3M Food Safety business integration.  ***Of the 7 key integration work streams, 6 are effectively done***, with sample collection production expected to return to normal levels next month.  ***Our ERP implementation, which allowed us to exit the transition service agreements with 3M is complete and all the related shipping delays that we had 3 quarters ago are behind us***.

222.    The statements in paragraph 221 were materially false and misleading and omitted material facts.  In truth, for the reasons set forth above at paragraphs 215 and 218, Defendants' ERP implementation was *never* "complete" and the resulting shipping delays were *never* 'behind' the Company.  Instead, Neogen's ERP implementation was an unmitigated disaster throughout the entire Class Period.  Indeed, in direct contravention to Defendants' repeated and unequivocal assurances that Neogen's integration issues had been "resolved" and were "behind us," and that the Company's ERP system was "fully operational" and able to "do all the functions," Naemura admitted in June 2025 that the exact opposite was true.  In reality, the integration and implementation of the ERP system was a dramatic failure.  In Naemura's own words, "the underlying processes to get the right inventory in the right place [still] need[ed] to be improved" even at that late date—an issue that was so extensive that it would cause an "elevated level of inventory write-offs" not only during the last two quarters of FY 2025, but also well into FY 2026 as well.

223.    Moreover, for the reasons set forth above at paragraph 218, Defendants had no reasonable basis in fact to assert that "sample collection production [was] expected to return to normal levels next month."  As Defendants admitted months after the end of the Class Period, on

October 9, 2025, Neogen still had not been able to stand up its sample handling manufacturing by that time, explaining that "we continue to see an elevated level of sample collection production inefficiencies," and revealing that these manufacturing deficiencies were so severe that the Company was "selling the product at a loss currently."

### Q.    The April 9, 2025 Earnings Press Release

224.    On April 9, 2025, Neogen disclosed its financial results for Q3 of FY 2025. Notwithstanding disappointing financial results and lowered guidance, Defendants yet again sought to minimize the extent of any integration issues.  In the Company's press release issued that day, Adent asserted that, "[d]uring the third quarter, **we continued to make good progress on the integration**" and specifically represented that "**we made significant improvements in our sample collection production and reached prior throughput levels at the end of the quarter.**"

225.    The statements in paragraph 224 were materially false and misleading and omitted material facts.  First, Defendants had *not* "made significant improvements in our sample collection production" and it was materially misleading for them to claim that "we hit the goal we wanted on sample handling with production" during the third quarter for the same reasons set forth above at paragraph 222.   Additionally, Defendants had *not* "continued to make good progress on the integration" such that transitioning the manufacturing of Petrifilm to Neogen's new manufacturing facility "remain[ed] the last outstanding integration workstream."  Instead, only two months later, on June 4, 2025, Defendants would be forced to disclose that, due to the ERP's failure to manage demand forecasting, distribution, and inventory, the Company was *already* making massive inventory write-offs by the time of their April 9, 2025 statements.  Specifically, less than two month later Defendants admitted to "**an elevated level of inventory write-offs** that we've seen beginning in Q3," *i.e.*, the quarter spanning December 2024 through February 2025, "and then actually being a little larger in Q4," *i.e.*, the quarter spanning March 2025 through May 2025.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

226.    Numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning the progress of Neogen's 3M Food Safety integration were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following:

227.    *The 3M Food Safety Merger Was The Most Important Transaction In The Company's History, And The Integration Was So Critical To The Company That Defendants Spoke About It At Length In Every Single Investor Communication They Issued Leading Up To And Throughout The Class Period*.  The 3M Food Safety Merger was, by far, the most significant event in Neogen's history.  Neogen repeatedly touted the Merger as a "massive step forward" and "major milestone for Neogen" that would "clearly be a transformative deal for the company," creating a "global leader in food security."  Indeed, the Merger effectively doubled the size of the Company, and was promised to more than double its revenue and adjusted EBITDA and supercharge the Company's profit margins.  The Merger also caused Neogen's food safety business to account for the vast majority of the Company's revenue—more than 70%.

228.    Given the significance of the Merger and subsequent integration of 3M Food Safety, Defendants spoke at length about the integration's significance and progress in every single earnings press release, earnings conference call, investor conference presentation, and major SEC filing leading up to and throughout the Class Period, including throughout each and every one of the roughly 20 investor events Neogen held during the Class Period.

229.    Moreover, the Individual Defendants held themselves out as highly knowledgeable about the integration, speaking in exacting detail about specific aspects of the CRM and ERP integrations and the Company's back-office, distribution, and manufacturing transitions, among other things, and assuring investors of their close and intense focus on the details of the integration.

For instance, during the Company's December 14, 2021 call announcing the Merger, Adent promised investors that "our focus throughout the integration will be to minimize disruption." During the Company's Q2 FY 2022 earnings call on December 21, 2021, Adent emphasized that: "*[O]n the integration, we know how important this is*. . . *And we know that it's extremely important to do that right*."  During Neogen's October 10, 2023 earnings call, Naemura explicitly represented that Defendants were keenly focused on the ERP implementation, stating: "*we are fully immersed in our ERP implementation*."  During the same call, Adent likewise promised the market that Defendants were "focused on the execution of the upcoming key transition activities in the second and third quarters[.]"  Similarly, during Neogen's November 30, 2023 investor call, Adent stated that successfully integrating and implementing the ERP system was "*the most critical component for us to bring in [3M Food Safety's] businesses*[.]"

230.    *Defendants ultimately admitted that the integration had been a total failure, contradicting their prior statements that it was "on track," that the ERP was "fully operational," and that all problems were "resolved."*  At the end of the Class Period—contrary to Defendants' repeated claims that the integration's problems were "resolved" during the Class Period, and that the ERP and CRM systems integration and implementation had been resounding successes, with an ERP system that was now "fully operational"—Defendants now admitted that the exact opposite was true.  In reality, the integration of 3M Food Safety was a disaster, and by the end of the Class Period, the ERP system was unable to perform even the most basic functions of a competent internal management system, including "*protocols… to ensure the right products were shipped at the right time*."  In Defendants' own words, Neogen lacked "*the underlying processes to get the right inventory in the right place*."  These deficiencies were so profound that Neogen was ultimately forced to write down a total of over $1 billion of the goodwill value of 3M Food

Safety; its executives admitted that shipping delays were still ongoing; the ERP system could not manage orders or inventory; the Company had to write off tens of millions of dollars in expired test products; and the sample handling manufacturing line was such a complete failure that the Company was using temporary laborers to make its products "manually," *i.e.*, by hand.  This was the antithesis to a "fully operational" ERP system.

231.    In addition, Neogen's new management further confirmed the abject failure that was the integration.  Indeed, the Company's new CEO recently admitted that, when he joined Neogen in August 2025—two months after the end of the Class Period—he noted that he was shocked by the state of the business, and observed: "***Wow, that looks like a company that is having a lot of challenges***."  And even as recently as January 16, 2026—a week before this filing—the new CEO acknowledged that Neogen was "***still in the early stages of the turnaround***."  These admitted problems—which existed throughout the Class Period and were never fixed—blatantly contradict Defendants' Class Period statements, and strongly support Defendants' scienter.

232.    *Investment Analysts Who Closely Followed Neogen Doubted Defendants' Candor And Credibility Based On Their Disclosures.*  As Defendants gradually revealed the truth in a series of corrective disclosures, professional securities analysts expressly compared the information contained in those disclosures to Defendants' prior false and misleading statements, and cast doubt on Defendants' candor and credibility as a result.  For example, following Defendants' April 9, 2025 disclosures, William Blair analysts noted that investor "sentiment is probably at its lowest level in years" as "continuous guidance cuts have raised questions/concerns about management's credibility and ability to execute."  William Blair analysts found Adent's sudden termination "understandable, given the challenges the company has faced," and noted that "rocky execution over the last several years has led to waning confidence."

233.    Following the Company's June 4, 2025 disclosures, William Blair again questioned management's credibility, noting that "[m]anagement believes that it has a handle on the [integration] situation, but recent execution adds a level of uncertainty about this."  William Blair further noted that "EBITDA and margins [] have been revised downward for multiple years now," such that the disclosure "reintroduces uncertainty about whether the company truly is on the cusp of emerging from integration issues" and "heighten[s] the uncertainty about future execution (once again)."  Indeed, the report made crystal clear that Neogen's management had now destroyed its credibility with investors, noting that "[o]ur assessment is the company's current leadership team (i.e., CFO and global operations) keeps uncovering legacy Neogen issues that need to be fixed, causing many of these disruptions but also begging the question, what else needs to be fixed?" and that "[m]anagement seems confident that it has uncovered the largest issues, but of course recent updates leave some questions about what could be next."

234.    A July 18, 2025 Guggenheim Partners report similarly opined that "[m]anagement is in the penalty box due to a series of self-inflicted issues since the 3M deal," including the fact that, "[a]t a recent investor conference [on June 4, 2025], NEOG announced they will incur unexpected inventory write-offs for the foreseeable future, negatively impacting profitability in F4Q25 and through fiscal 2026," which simply "was the latest self-inflicted wound following the 3M systems integration[.]"  Given these collective issues, Guggenheim Partners opined: "Management needs to 'own the problem,' get clean, and establish a track record without disappointing for several quarters."

235.    *Neogen's Board Ousted Adent and overhauled its entire senior management*.  As discussed further above, as a result of his repeated misrepresentations of the integration's status and his failure to manage the integration, the Company issued a press release on April 9, 2025

stating that the "Board determined that now is the right time to begin a leadership transition and identify the Company's next CEO[.]"  Moreover, the Board no longer trusted senior management and thus created a "special committee" to oversee them, *i.e.*, to "support the leadership team in its efforts to drive improved performance."

236.    Adent's exit was just one of a series of unplanned departures among the most senior executive officers of the Company.  In March 2025, Jones—the executive most directly responsible for the 3M Food Safety integration—resigned from the Company; in May 2025, CSO Lilly resigned from the Company; and on September 15, 2025—shortly after the end of the Class Period—Neogen announced that CFO Naemura was resigning.  On October 10, 2025, William Blair reported that the Company's "management transition" was ongoing, with Neogen "now also looking for a new C[hief] C[ommercial] O[fficer] and new leadership in the U.S. & Canada and Europe regions."

237.    *Former Senior Executives And Other Employees Discussed The Integration's Problems Directly With Senior Management Throughout The Class Period.*  Numerous former employees quoted herein provide compelling facts supporting Defendants' scienter.  For example, FE-6, a former senior executive, explained that he did "multiple exercises" to try to bring the integration's problems to the attention of "senior leadership," but he did not believe there was ever "any substantial change in action that came from it," because the Company was instead operating in "***crisis mode***," with its "***hair on fire***" during the integration.  As he explained:

> ***I did multiple exercises to try to draw these issues out from the global marketing team, global and regional marketing teams to roll up issues and bring them forward to senior leadership***.  I don't know that there was ever really any substantial change in action that came from it. … ***I remember specifically a lot of instances where senior leadership would be called on the customer calls to try to smooth things over, would try to take actions inside of the organization. … But I think there was just a lot of hair on fire, frankly***, regarding transition activities, ERP deployment, trying to negotiate support from 3M where needed.

238.    FE-1 explained that throughout his tenure he attended weekly "Touch Point Meetings" concerning the status of the SAP implementation with personnel at the director level, which were sometimes held in person at Company headquarters when there were more significant events.  These Touch Point meetings were also attended roughly monthly by Vice President of Food Safety Jerome Hagedorn.  FE-1 explained that it was clear at these Touch Point meetings that the Company was not going to be ready to go live with SAP, because it was regularly discussed that "***we pretty much can't even write scripts***"—*i.e.*, the detailed instructions for the SAP system that spell out exact user actions, data inputs, and expected system results, step by step.  As such, he explained, it was clear by the end of June 2023, when he left, that there "***was no way we're going to go live***" anytime soon.

239.    *The Transition Services Agreements Created Pressure On Defendants To Rush The Integration, Supporting An Inference Of Recklessness*.  The Transition Services Agreements were extremely costly to Neogen and ate deeply into their profit margins, creating immense pressure to rush the integration without taking steps to make sure the proper preparations had been completed.  First, the back-office Transition Services Agreement required Neogen to pay a fixed monthly fee for back-office services, and, after the 18-month initial term of the agreement (expiring roughly at the end of March 2024) the monthly fee would increase for each six-month extension.  This created immense pressure for Neogen to rush to stand up its new ERP system by September 2023 and exit the back-office Transition Services Agreement by no later than April 2024.

240.    Second, under the distribution Transition Services Agreement, Neogen would pay 3M "a fee calculated based on a fixed percentage of net sales" for products distributed by 3M.  This created additional pressure for Neogen to rush to transition distribution in-house.

241.    Third, under the manufacturing Transition Services Agreement, Neogen would be forced to pay yet another fee for any products 3M continued to manufacture for Neogen, consisting of a variety of costs related to the production of the product plus a "mark-up percentage."  And this mark-up percentage would "gradually escalate each year," such that the longer Neogen stayed on the manufacturing Transition Services Agreement, the lower its profits would be.

242.    The enormous financial pressures created by the costs of the Transition Services Agreements motivated Defendants to rush the integration, including its most critical component—the ERP implementation—regardless of whether they were in any way prepared to take over those functions, further supporting, at a minimum, an inference of extreme recklessness.

## VIII.   LOSS CAUSATION

243.    On April 9, 2024, before the markets opened, Neogen issued an earnings press release for Q3 of FY 2024 reporting disappointing earnings and revealing that exiting the back-office and distribution arrangements with 3M had "created operational inefficiencies" that were "currently affecting our order fulfillment rates," leading them to reduce their revenue outlook. During the April 9, 2024 earnings call, Adent further explained that those distribution inefficiencies had negatively impacted Neogen's ability to "ship products to customers"—a problem that he warned was expected to "carry[] into Q4"ending on May 31.  These problems had "contributed to an extended period with a higher-than-usual backlog of open orders."  As such, Naemura further explained that "our extended lead times negatively impacted demand" and Adent explained that, consequently, "there are clearly some customers we're going to have to win back."

244.    In response to Defendants' April 9, 2024 disclosures, Neogen's stock price fell over 9% in a single day, from $14.38 per share on April 8, 2024 to a close of $13.04 per share on April 9, 2024, on extraordinarily high trading volume.

245.     Analysts expressed concerns about the Company's weaker than expected integration progress and resulting order fulfillment delays.  For example, William Blair issued an analyst report on April 9, 2024, noting as a "[k]ey takeaway[]" the fact that "continued inefficiencies driven by SAP integration have caused lost sales and customers on a broader scale that management will have to win back."  Piper Sandler similarly noted that "Neogen posted a challenged quarter as EBITDA missed expectations and the company lowered full year revenue and EBITDA guidance" and that the "the quarter was impacted by changes to distribution."

246.     Nevertheless, as discussed herein, Defendants continued to make materially false and misleading statements and omitted material information that prevented Neogen's stock price from falling even further and maintained artificial inflation in the price of Neogen's stock.

247.     On April 9, 2025, before market open, Neogen reported disappointing financial results for the third quarter of FY 2025.  The same day, Neogen issued a press release revealing that its CEO, Adent, was being terminated, explaining that the Neogen "Board determined that now is the time to begin a leadership transition and identify the Company's next CEO[.]"  Additionally, during Neogen's April 9, 2025 earnings call for Q3 of FY 2025, Adent reported that the performance of the Company's food safety segment for the quarter had been negatively "impacted by the challenges we've discussed with our sample collection product line."  Naemura also revealed that "we continue the process of ramping up the relocated production [of sample collection products] in our facility," resulting in "a $25 million headwind for the year."  Additionally, Naemura revealed that the Company's financial results for the quarter had been negatively affected by persistent "carryover impact from last year's shipping delays" resulting in declining revenues for "most [of Neogen's] Food Safety product categories."  And further, Neogen

disclosed a downward guidance revision for fiscal 2025 "primarily due to third-quarter results being lower than expected[.]"

248.    In response to Defendants' April 9, 2025 disclosures, Neogen's stock price plummeted almost 29% in a single day, from $7.04 per share on April 8, 2025 to a close of $5.02 per share on April 9, 2025, on extraordinarily high trading volume.

249.    In its April 9, 2025 analyst report, William Blair explained that Neogen's "below-expectation results were driven primarily by lower sample collection revenue[,]" and stated in a report dated the next day that investor "sentiment is probably at its lowest level in years" as "continuous guidance cuts have raised questions/concerns about management's credibility and ability to execute."  Additionally, analysts attributed Adent's abrupt termination to the Company's problem-riddled 3M Food Safety integration.  For instance, in its April 9, 2025 report, Piper Sandler reported that "Neogen announced a CEO transition, with John Adent stepping down once a successor is in place" and attributed the leadership change to the fact that the 3M "integration ended up more challenging than expected[.]"  William Blair found Adent's sudden termination "understandable, given the challenges the company has faced," and similarly reported that, while "rocky execution over the last several years has led to waning confidence," "a change in the CEO seat might help sentiment over the coming months."

250.    Nevertheless, as discussed herein, Defendants continued to make materially false and misleading statements and omitted material information that prevented Neogen's stock price from falling even further and maintained artificial inflation in the price of Neogen's stock.

251.    On June 4, 2025, Neogen issued an investor presentation before the markets opened and also made disclosures during an investor conference call, during which Naemura presented the Company's preliminary financial results for Q4 and FY 2025.  Naemura now admitted that

"the underlying processes to get the right inventory in the right place need to be improved"—processes that were supposed to be managed by the ERP—and that, "the result has been an elevated level of inventory write-offs that we've seen beginning in Q3 and then actually being a little larger in Q4." Naemura revealed that these inventory write-offs—a direct consequence of the Company's ERP integration failures—would again reduce the Company's profitability, *i.e.*, "will negatively impact gross margin" in the fourth quarter.  Consequently, Neogen "expect[ed] EBITDA margin to probably be around the high teens once we get things fully closed and ready to report"—margins that were well below even pre-Merger Neogen profit margins, and barely more than half of the 30% profit margins Defendants had promised Neogen would achieve in FY 2025 as a result of the Merger.  Additionally, the Company announced that it had created a nine-step targeted integration improvement plan that would take at least another "year or two" to fully complete.

252.    In response to Defendants' June 4, 2025 disclosures, Neogen's stock price fell over 17% in a single day, from a close of $6 per share on June 3, 2025 to a close of $4.96 per share on June 4, 2025, on extraordinarily high trading volume.

253.    In its June 4, 2025 analyst report, William Blair lamented that the "biggest incremental update was a fourth-quarter write-down of inventory that will result in transient headwinds to margins taking EBITDA margins into the high teens."  William Blair explicitly connected those inventory write-downs to the Company's ERP failures, explaining that the write-off was due in large part to "protocols that were not properly established to ensure the right products were shipped at the right time, and [] the recent stand-up of a new SAP system that added another layer of complexity to all these moving pieces."  William Blair further noted that "EBITDA and margins [] have been revised downward for multiple years now."  Consequently, William Blair found that the disclosure "reintroduces uncertainty about whether the company truly is on the cusp

of emerging from integration issues" and "heighten[s] the uncertainty about future execution (once again)."  Moreover, "the company's current leadership team (i.e., CFO and global operations) keeps uncovering legacy Neogen issues that need to be fixed, causing many of these disruptions," which "beg[s] the question, what else needs to be fixed?"

254.    A July 18, 2025 Guggenheim Partners report similarly opined that "[m]anagement is in the penalty box due to a series of self-inflicted issues since the 3M deal," including the fact that, "[a]t a recent investor conference [on June 4, 2025], NEOG announced they will incur unexpected inventory write-offs for the foreseeable future, negatively impacting profitability in F4Q25 and through fiscal 2026," which "was the latest self-inflicted wound following the 3M systems integration[.]"  And concerning the Company's continued inability to manufacture sufficient sample collection products, Guggenheim Partners acknowledged that "[i]ntegration pains are real for any transaction, but these dragged out longer than many investors anticipated."  Given these collective issues, Guggenheim Partners advised that "Management needs to 'own the problem,' get clean, and establish a track record without disappointing for several quarters."

## IX.    PRESUMPTION OF RELIANCE

255.    At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

    a)    Neogen's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b)    As a regulated issuer, Neogen filed periodic reports with the SEC and the NASDAQ;

    c)    Neogen regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)   Neogen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace.

256.   As a result of the foregoing, the market for Neogen's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock.  All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of Neogen's common stock at artificially inflated prices, and a presumption of reliance applies.

257.   A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Neogen's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

258.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

259.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Neogen who knew that such statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

260.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all purchasers of Neogen common stock from January 5, 2023 through June 3, 2025, inclusive (the "Class"), and were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Neogen at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates,

successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

261.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Neogen's shares were actively traded on the NASDAQ.  As of June 30, 2023, the Company had approximately 216,308,912 shares outstanding. While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

262.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

263.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.

264.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Neogen;

d)      whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Neogen;

e)      whether the market price of Neogen shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

265.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XII.    CLAIMS FOR RELIEF

## <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

266.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

267.    Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Neogen shares; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Neogen shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

268.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Neogen shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

269.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Neogen's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Neogen's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Neogen and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set

forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

270.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

271.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Neogen's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge

of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

272.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Neogen shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and the other members of the Class purchased Neogen shares during the Class Period at artificially inflated prices and were damaged thereby.

273.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that Neogen was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their Neogen shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

274.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

275.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

276.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

277.    The Individual Defendants acted as controlling persons of Neogen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

278.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

279.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members

of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII.  PRAYER FOR RELIEF

280.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a)   Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c)   Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)   Awarding such other and further relief as this Court deems appropriate.

## XIV.  JURY DEMAND

281.   Lead Plaintiffs demand a trial by jury.

Dated: January 20, 2026                     Respectfully submitted,

By: */s/ Gregory A. Mitchell*
E. Powell Miller (P39487)
Marc L. Newman (P51393)
Gregory A. Mitchell (P68723)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
mln@millerlawpc.com
gam@millerlawpc.com

*Local Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Joshua H. Saltzman
Sara DiLeo
Marco A. Dueñas
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com
mduenas@saxenawhite.com

Maya Saxena
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
msaxena@saxenawhite.com
lhooker@saxenawhite.com

**GRANT & EISENHOFER P.A.**
Karin E. Fisch
James S. Notis
Cecilia E. Stein
Vincent J. Pontrello
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
kfisch@gelaw.com
jnotis@gelaw.com
cstein@gelaw.com
vpontrello@gelaw.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**KLAUSNER KAUFMAN JENSEN**
**& LEVINSON**
Robert D. Klausner
7080 NW 4th Street
Plantation, FL 33317
Tel.: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for Proposed Lead
Plaintiff Miami FIPO, Orlando, and West
Palm Beach Firefighters*

**REEVES LAW FIRM**
Jeffrey A. Reeves
1100 Peachtree Street, Suite 250
Atlanta, GA 30309
Tel. (404) 795-6139
jeff@reeveslawfirmpc.com

*Additional Counsel for Lead Plaintiff
Metropolitan Employee Benefit System*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ Gregory A. Mitchell*
Gregory A. Mitchell (P68723)