**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> NEOGEN CORPORATION, JOHN ADENT, and DAVID NAEMURA, <br><br> Defendants. | No. 1:25-cv-00802-HYJ-RSK <br><br> Hon. Hala Y. Jarbou <br><br> <u>ORAL ARGUMENT REQUESTED</u> |

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION
<u>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**

MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49503
Tel: (616) 831-1700

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

*Counsel for Defendants*

February 10, 2026

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 3

    A.    The Parties ................................................................................................ 3

    B.    Neogen Plans For The Merger And Warns Investors Of Potential Risks.................... 4

    C.    Integration Is Successful, But Operational And Other Challenges Persist And Are Contemporaneously Disclosed.................................................................... 6

ARGUMENT................................................................................................................ 11

I.    PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD A MISSTATEMENT OR OMISSION ..................................... 11

    A.    Plaintiffs Fail To Plead Falsity With Particularity........................................ 12

        1.    The FE Allegations Are Not Credible, Particularized, Or Demonstrative Of Falsity ................................................................ 12

        2.    The June 2025 Alleged Corrective Disclosure And Post-Class Period Statements Do Not Establish Falsity.................................... 23

    B.    Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor .................................................................................................. 25

    C.    The Challenged Statements Of Puffery, Corporate Optimism, And Opinion Are Not Actionable ................................................................................ 27

II.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD SCIENTER ................................................................... 29

    A.    Plaintiffs Do Not Plead Intent Or Motive And Opportunity..................................... 30

    B.    Plaintiffs' Recklessness Allegations Are Insufficient................................................ 31

III.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION.................................................................... 33

IV.    PLAINTIFFS' SECTION 20(a) CLAIM FAILS............................................................ 34

CONCLUSION................................................................................................................ 34

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Accredo Health, Inc. Sec. Litig.*,
   2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005)....................................................................16

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..........................................................................28

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
   334 F. Supp. 2d 985 (S.D. Ohio 2004) ................................................................................32

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................................11

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................................11

*In re Champion Enters., Inc., Sec. Litig.*,
   144 F. Supp. 2d 848 (E.D. Mich. 2001), *aff'd sub nom.*, *Miller v. Champion
   Enters. Inc.*, 346 F.3d 660 (6th Cir. 2003)...........................................................................27

*D.E.&J Ltd. P'ship v. Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir.
   2005) .................................................................................................................................28, 29

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
   2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................................................28

*Doshi v. Gen. Cable Corp.*,
   823 F.3d 1032 (6th Cir. 2016) ..................................................................................29, 30, 31

*Doshi v. Gen. Cable Corp.*,
   386 F. Supp. 3d 815 (E.D. Ky. 2019) ..................................................................................16

*Dougherty v. Esperion Therapeutics, Inc.*,
   905 F.3d 971 (6th Cir. 2018) ...............................................................................................12

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)..............................................................................................................33

*In re Fed.-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001)..........................................................................22, 26

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2001) ...............................................................................................30

ii

*In re Huntington Bancshares Inc. Sec. Litig.*,
   674 F. Supp. 2d 951 (S.D. Ohio 2009) ...............................................................12, 13

*I.B.E.W. v. Ltd. Brands, Inc.*,
   788 F. Supp. 2d 609 (S.D. Ohio 2011) ..................................................................30

*Klobus v. Akero Therapeutics*,
   2025 WL 2646877 (N.D. Cal. Aug. 15, 2025) ........................................................32

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) .................................................................................31

*Kuyat v. BioMimetic Therapeutics, Inc.*,
   747 F.3d 435 (6th Cir. 2014) .................................................................................30

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
   622 F.3d 471 (6th Cir. 2010) .................................................................................29

*Lim v. Hightower*,
   2024 WL 4349409 (N.D. Ohio Sep. 30, 2024) ..................................................28, 31

*Lim v. Hightower*,
   2025 WL 2965692 (6th Cir. 2025) .................................................11, 12, 26, 32, 34

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)....................................................................13

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)....................................................................20

*Miller v. Champion Enters. Inc.*,
   346 F.3d 660 (6th Cir. 2003) .............................................................................25, 26

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
   22 F. Supp. 3d 669 (E.D. Ky. 2014), *aff'd sub nom.*, *Pension Fund Grp. v.*
   *Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015) ........................3, 27, 28

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016) .................................................................................33

*In re Omnicare*, *Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) .................................................................................33

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)...............................................................................................28

iii

*Pittman v. Unum Grp.*,
    2020 WL 2846929 (E.D. Tenn. June 1, 2020), *aff'd*, 861 F. App'x 51 (6th Cir.
    2021) ...........................................................................................................................28

*Pittman v. Unum Grp.*,
    861 F. App'x 51 (6th Cir. 2021) ................................................................................32

*Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*,
    556 F. Supp. 3d 772 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir.
    Sep. 1, 2022) ..............................................................................................................13

*Porter v. Graftech Int'l Ltd.*,
    2025 WL 2393087 (N.D. Ohio Aug. 18, 2025) ...........................................12, 15, 28

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) .....................................................................................30

*Sarafin v. BioMimetic Therapeutics, Inc.*,
    2013 WL 139521 (M.D. Tenn. Jan. 10, 2013), *aff'd sub nom.*, *Kuyat v.
    BioMimetic Therapeutics, Inc.*, 747 F.3d 435 (6th Cir. 2014)...................................13

*In re Sotera Health Co. Sec. Litig.*,
    2025 WL 1648942 (N.D. Ohio Mar. 19, 2025) ....................................................16, 20

*Stein v. U.S. Xpress Enters., Inc.*,
    2020 WL 3584800 (E.D. Tenn. June 30, 2020)......................................................31, 32

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008).....................................................................................................11

*Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings, Inc.*,
    2022 WL 989240 (W.D. Tenn. Mar. 31, 2022), *aff'd*, 83 F.4th 514 (6th Cir.
    2023) .................................................................................................................13, 14, 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................3, 11, 29

**Statutes**

15 U.S.C. § 78u-4 .................................................................................................1, 12, 29

15 U.S.C. § 78u-5 .............................................................................................................26

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................1, 11

Fed. R. Civ. P. 12(b)(6).................................................................................................1, 11

iv

Defendants Neogen Corporation ("Neogen" or the "Company"), John Adent, and David Naemura (together, the "Individual Defendants," and with Neogen, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss, in its entirety and with prejudice, the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint")[1] filed by Lead Plaintiffs Operating Engineers Construction Industry and Miscellaneous Pension Fund, the City of Miami Fire Fighters' and Police Officers' Retirement Trust, Metropolitan Employee Benefit System, the City of Orlando Firefighters' Pension Fund, the City of Orlando Police Officers' Pension Fund, the City of Orlando General Employees' Pension Fund, and West Palm Beach Firefighters' Pension Fund (collectively, "Plaintiffs"), pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA").

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this action on behalf of all persons and entities that purchased Neogen common stock from January 5, 2023 to June 3, 2025 (the "Class Period"), and assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Prior to the start of the Class Period, on September 1, 2022, Neogen acquired 3M Corporation's food safety business ("3M")—a $5.3 billion transaction (the "Merger"). ¶ 1. The Complaint challenges statements from 17 separate earnings calls and investor conferences concerning three aspects of the Merger "integration" process: (i) the combination of Neogen and 3M's customer resource management systems (the "CRM Statements"); (ii) the launch of a joint enterprise resource planning system (the "ERP Statements"); and (iii) the integration of the sample product line that Neogen acquired from 3M (the "Sample Product Statements"). Plaintiffs allege

---

[1] Citations to "¶ _" refer to paragraphs of the Complaint.

that the challenged statements were false and misleading because, among other reasons:  (i) the Company "had not successfully 'combine[] CRM systems;'" (ii) "Neogen's ERP system was a disaster;" and (iii) "Neogen's sample handling production line was unable to function."  *See, e.g.*, ¶¶ 167, 182, 218.  According to Plaintiffs, Neogen revealed the "truth" about the integration of the CRM system, ERP system, and sample product line when, on three separate occasions, the Company either revised its earnings guidance downward or otherwise spoke about operational challenges that were impacting the business.  But none of those alleged "corrective disclosures" renders any of the challenged statements false or misleading.   Neogen contemporaneously disclosed to the market updates on its integration process and the risks attendant to its business as a result of the Merger.  Put simply, the fact that some of those risks materialized does not equate to fraud.

The Complaint should be dismissed for at least the following reasons.

*First*, Plaintiffs' claims must be dismissed for failure to plead an actionable misstatement or omission.  Unable to explain why any of the challenged statements are actually false or misleading, Plaintiffs resort to relying on seven anonymous, former Neogen employees ("FEs"). But the majority of the FEs were lower-level employees, none had meaningful contact with the Individual Defendants, and none were employed at Neogen throughout the duration of the Class Period.  Plaintiffs' only other basis for pleading falsity—pointing to supposed "admissions" by Defendants—falls flat as the "admissions" do not actually speak to the challenged statements. Moreover, many of the challenged statements are forward-looking, and thus, protected by the PSLRA safe harbor, or non-actionable opinions and puffery.  *See* Point I, *infra*.

*Second*, Plaintiffs' claims are independently subject to dismissal because the Complaint is devoid of particularized facts sufficient to plead scienter.  Plaintiffs fail to plead any of the

traditional hallmarks that courts often find indicative of scienter (*e.g.*, insider stock sales or concrete benefits to the Individual Defendants), and their attempt to rely on anonymous FE allegations to plead scienter falls woefully short.  Plaintiffs' scattershot of other allegations, including the existence of transition agreements between Neogen and 3M, the importance of the Merger, and Mr. Adent's departure from Neogen, also fail.  *See* Point II, *infra*.

*Third,* Plaintiffs' claims are independently subject to dismissal because Plaintiffs have not established loss causation with respect to the three alleged "corrective disclosures," none of which "corrected" any of the challenged statements.  *See* Point III, *infra*.

*Finally*, because Plaintiffs fail to allege a primary violation of the Exchange Act, their "control person" claims under Section 20(a) also fail.  *See* Point IV, *infra*.

## STATEMENT OF FACTS[2]

### A.    The Parties

Neogen is a global life sciences company that develops, manufactures, and markets products and services dedicated to food and animal safety.  ¶ 29.

John Adent was Neogen's President and Chief Executive Officer and a member of its board of directors from July 2017 to April 9, 2025.  ¶ 30.

David Naemura was Neogen's Chief Financial Officer from November 2022 to September 15, 2025, and acting Chief Operating Officer from March 2025 to September 15, 2025.  ¶ 31.

---

[2] On this motion, the Court may consider and take judicial notice of "documents incorporated into the complaint by reference" and documents filed with the U.S. Securities and Exchange Commission. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.,* 22 F. Supp. 3d 669, 675 (E.D. Ky. 2014), *aff'd*, 614 F. App'x 237 (6th Cir. 2015).

**B.** **Neogen Plans For The Merger And Warns Investors Of Potential Risks**

On December 14, 2021, Neogen announced the Merger, resulting in the acquisition of four product lines from 3M:  (i) hygiene monitoring; (ii) pathogen detection; (iii) sample handling (or sample collection); and (iv) indicator testing, which included the "Petrifilm" testing product.  ¶¶ 42, 44–47.  Neogen also entered into three transition services agreements with 3M pursuant to which 3M would continue to provide back office, distribution, and manufacturing functions for the acquired 3M product lines (the "Transition Services Agreements").  ¶ 54.  While most of the Transition Services Agreements provided for an initial 18-month term, with the possibility of further extensions, the Transition Services Agreement for the indicator testing product line had a four-year term, with two possible six-month extensions.  Ex. 2 at 141; ¶¶ 55, 58 n.5.[3]

Neogen management created a "detailed," multi-step "integration plan," which was disclosed the day the Merger was announced.  ¶ 50; Ex. 3 at 20.  "Phase I" was designed to "drive 'day-1' readiness pre-signing to close."  Ex. 3 at 20.  "Phase II" focused on "implement[ation] and execut[ion]," and included workstreams to "[l]everage manufacturing and distribution transition support from 3M," "[c]onstruct [a new production facility]," "roll-out [the] new IT/ERP system," and "[t]ransition 3M distribution and manufacturing capabilities to Neogen."  *Id.*; *see also* ¶ 51. Neogen also informed its investors that its overarching integration plan would require "net capital investments of ~$150-$~175 million over a 3 year period."  Ex. 3 at 20.

Critically, the "integration" of Neogen and 3M would include "thousands" of workstreams. Ex. 4 at 8.  These included:  (i) combining the customer relationship management ("CRM") system; (ii) launching a new enterprise resource planning ("ERP") system; and (iii) transferring

---

[3] Citations to "Ex. _" refer to the exhibits attached to the accompanying Declaration of Stefania D. Venezia.

the manufacturing and distribution for the four acquired product lines from 3M to Neogen's own facilities.  ¶¶ 51–53.  The CRM system "managed customer sales and communications."  ¶ 52.  The new ERP system was designed to help Neogen manage core operational business functions, including "supply chains, demand forecasting, ordering, fulfillment and accounting."  ¶ 53.

As is true for any transaction of this magnitude, the long-term success of the go-forward company was contingent on a variety of factors, not just the integration of IT systems and the migration of product lines.  Accordingly, Neogen warned investors of the risks associated with the Merger, including "uncertainty of the expected financial performance of the combined [Neogen]," "the ability of the combined [] company to implement its business strategy," and potential "difficulties and delays in the combined [] company achieving revenue and cost synergies."  Ex. 5 at 4–5; *see also* Ex. 2 at 35–36.

And, throughout the Class Period, the Company further warned of the risks inherent in the integration process, including that "continued successful integration of the 3M [] business" could not be assured and certain "synergies, growth opportunities and other benefits" may not be realized.  Ex. 6 at 16–17; *see also* Ex. 7 at 14–15 (similar); Ex. 8 at 16; Ex. 9 at 14–15.  Neogen further warned that "[t]he integration of [3M] with Neogen presents challenges, and the failure to successfully integrate [3M] could have a material adverse effect on our business, financial condition or results of operations."  Ex. 6 at 16; *see also* Ex. 7 at 15 (similar); Ex. 8 at 16; Ex. 9 at 14.  As explained by the Company, "[t]here is a significant degree of difficulty inherent in the process of integrating," including difficulties integrating 3M "while carrying on the ongoing operation of all businesses," "managing a significantly larger company than before the consummation of the [Merger]," and "integrating certain manufacturing, information technology,

5

purchasing, accounting, finance, sales, billing, human resources, payroll and regulatory compliance systems." Ex. 6 at 16; *see also* Ex. 7 at 15 (similar); Ex. 8 at 16; Ex. 9 at 14–15.

The Merger closed on September 1, 2022. ¶ 62.

### C.    Integration Is Successful, But Operational And Other Challenges Persist And Are Contemporaneously Disclosed

Neogen's integration progress—which involved much more than the integration of the CRM system, ERP system, and the sample product line—was promptly and accurately disclosed to investors. Such updates included, among other things, forward-looking assessments as to when the four acquired product lines would be integrated, status updates concerning the CRM system migration, and updates as to when the ERM system would go-live. During the Class Period, Neogen also disclosed other headwinds facing the Company, including macroeconomic conditions and post-Merger related growing pains (*e.g.*, efficiency issues, operational challenges, and inventory management hurdles). Plaintiffs, with an incredibly broad stroke, attempt to paint Neogen's candid disclosures and status updates as fraud, taking the untenable position that *any* bad news concerning Neogen's manufacturing and production was a false and misleading statement concerning the integration of the CRM system, ERP system, or sample product line. But a review of the actual statements made by the Company, in context, makes plain that Plaintiffs' theory lacks merit.[4]

On January 5, 2023, Neogen disclosed that, two days after the closing of the Merger, the Company "combined CRM systems," a statement that Plaintiffs allege was false. ¶¶ 164–65. But the combination of CRM system data was not the end of the Merger "integration" process. Plaintiffs ignore the fact that, on that same day, Neogen reminded its investors that: (i) it was still

---

[4] For a comprehensive list and analysis of the alleged misstatements, *see* Ex. 1 (Alleged Misstatements Chart).

in the "early days in the integration"; (ii) the Company "still [had] a number of things to do"; (iii) the Transition Services Agreements would remain in place; and (iv) the Company would collaborate with 3M to address "[p]roduction and backlog issues that materialize[d] between signing and closing."  Ex. 10 at 3.

Plaintiffs also allege that Neogen misled investors on:  (i) March 30, 2023, when Neogen explained that the ERP integration was "underway" and expected to launch by the end of 2023; (ii) June 6, 2023, when Neogen projected that the sample handling and pathogen detection product lines would be moved in-house by Q3 2024 (*i.e.*, by the end of February 2024), with several of the Transition Services Agreements being terminated around the same time; (iii) June 6, 2023, when Neogen stated that it was still in the process of "bringing [] forward" the SAP[5] system; and (iv) July 27, 2023, when Neogen made similar statements regarding the ERP system.  ¶¶ 168–69, 171–73, 175–76.  But none of those statements were false; rather, they were updates and projections with respect to the timing of specific integration work streams.  *See* Ex. 11 at 3; Ex. 12 at 8; Ex. 13 at 7; Ex. 14 at 3.

On October 10, 2023, Neogen disclosed that it had completed an "initial go-live with [its] Food Safety business in the US and Canada as well as corporate, making the … cut over … to the new ERP."  Ex. 15 at 3.  While Plaintiffs seize on Mr. Adent's statement that the ERP system was "fully operational," which Plaintiffs say was false, Neogen also explained that it was "not as efficient yet on the new system as [it was] on the old," and that it would take "a little while to get that efficiency up."  *Id.* at 4, 7.  Plaintiffs also ignore Neogen's explanation that, as a result of these inefficiencies, order processing and shipments were experiencing delays and "backlog[s]."  *Id.* at

---

[5] "SAP" refers to SAP SE, a type of ERP system.  The new ERP system was a SAP system.

4, 5, 6, 11.  For this reason, Neogen had an "elevated level of open orders" and expected that some corresponding revenue would "shift from Q2 into Q3."  *Id*. at 4–5.

On January 9, 2024, Neogen announced its Q2 2024 earnings.  Plaintiffs claim that certain of the Company's January 9, 2024 statements were false and misleading, including Neogen's statement that it had "successfully completed the first phase of the relocation of the former 3M pathogen and sample handling product lines."  Ex. 16 at 3; ¶¶ 185–86.  While Plaintiffs challenge Neogen's status update concerning the relocation of the sample product line, they conveniently ignore Neogen's explanation that "[t]he *final relocation* of the sample handling production" was delayed and expected to be completed in Q4 2024.  Ex. 16 at 3 (emphasis added).

On April 9, 2024, Neogen announced its Q3 2024 financial results.  Plaintiffs again distort statements from this earnings call in an attempt to fit their narrative.  For example, Plaintiffs allege that Neogen's statement that it "completed" the first "two of [its] four phase relocation of the … sample handling product line" was false and misleading, but ignore Neogen's repeated disclosure that the final relocation of the sample product line was delayed until Q4 2024.   Ex. 17 at 3.  Nor was the Company being opaque about the sample product line's production timeline—Neogen told investors that production would not begin until Q1 2025.  *Id*.

Plaintiffs also point to certain of Neogen's April 9, 2024 statements as "corrective" disclosures, but none of these statements corrected *any* of the Company's prior disclosures.  Rather, Neogen explained that the exit of certain Transition Services Agreements and the related system implementation "created inefficiencies in [Neogen's] operations."  *Id.*  The backlogs, shipping inefficiencies, and delays that Neogen previously disclosed in October 2023 "continue[d]" and were expected to continue into Q4 2024 "at a rate higher than previously anticipated."  *Id.* at 6.  While Neogen anticipated that such inefficiencies would be "temporary,"

8

it disclosed that they would prevent the Company from "meeting the end-market demand on a consistent basis."  Ex. 18 at 1.  Accordingly, Neogen's Q3 2024 financial results were "below [its] expectations" and the Company further revised downward its FY 2024 outlook.  Ex. 17 at 3.

Plaintiffs similarly take issue with Neogen's June 4, 2024 statements that the "majority" of integration workstreams were completed and that it had "brought in sample handling."  Ex. 4 at 8–9; ¶¶ 194–96.  But Plaintiffs ignore that the sample product line had in fact been moved from 3M to Neogen's in-house facilities.  Ex. 4 at 8.  Plaintiffs further challenge additional statements made by Neogen on June 4, 2024 and July 30, 2024, including that (i) it was "on track to solve [] the shipping issue [it was] having with ERP" by Q1 2025, and (ii) shipping performance had improved.  ¶¶ 198, 200, 202–04; Ex. 4 at 8; Ex. 19 at 8.  But Neogen was transparent about lingering post-ERP integration hiccups.  For example, the Company explained that, despite the successful ERP go-live and subsequent improved shipping performance, "[d]istribution inefficiencies from recent integration activities continued."  Ex. 19 at 3.  And, on September 5, 2024, Neogen noted that the Company "anticipate[d] some demand headwind as a kind of hangover for some of the execution challenges" experienced in prior quarters.  Ex. 20 at 3.

On October 10, 2024, Neogen announced its Q1 2025 earnings, which were down compared to 2024.  Ex. 21 at 5.  Plaintiffs allege that certain updates from this earnings call were false and misleading—*e.g.*, the statement that "ERP-related challenges that [Neogen] [had] been experiencing in [its] primary distribution center have been resolved"—but ignore the related statement that Neogen still saw "opportunity to drive improvements in the efficiency of that operation."  *Id.* at 4; ¶¶ 214–15.  Neogen also explained that, while the sample product line had been successfully relocated the prior quarter, it was still "in the process of ramping up production" and was unable "to [] keep up with end user demand."  Ex. 21 at 4.

On January 10, 2025, the Company announced its Q2 2025 earnings and revised its FY 2025 outlook downward.  Ex. 22 at 4.  Plaintiffs challenge certain statements from that earnings call—namely, Neogen's statement that "[a]ll of [its] product lines are operational"—on the basis that Neogen's sample product line was allegedly "unable to function." *Id.*; ¶¶ 218–20.  But Neogen told its investors that it was still in "the process of ramping up" production of its sample product line.  Ex. 22 at 4.  Plaintiffs also allege that Neogen's statement that the Company had "discrete initiatives underway" to improve the "efficiency of [its] fully integrated shipping and distribution operations" was false and misleading because "the ERP system was [] broken." *Id.*; ¶¶ 215, 219–20.  But the challenged statements say nothing at all about the ERP launch.

On April 9, 2025, the Company announced its Q3 2025 earnings, which included a further downward revision of its FY 2025 outlook.  While Plaintiffs allege that this earnings call somehow "corrected" challenged statements concerning certain integration workstreams, Neogen explained that the revision was "primarily due to third-quarter results being lower than expected and the effect of the rising level of macroeconomic uncertainty … as well as the expected impact of tariffs." Ex. 23 at 3.  Plaintiffs take issue with Neogen's statements that it had made "significant improvements in [its] sample collection production" and had "reached prior throughput levels at the end of the quarter." *Id.* at 1; ¶¶ 224–25.  But again, Plaintiffs ignore Neogen's statements from that same day that, "[f]rom [that] point forward," the Company's "immediate focus" would be "improving the production efficiency and catching up with our customers' demand." Ex. 24 at 4.

Finally, at a June 4, 2025 investor conference, Neogen presented a comprehensive nine-point plan for Company-wide improvement over the coming years, which Plaintiffs somehow reimagine as a corrective disclosure that admitted to "integration failure." *See, e.g.*, ¶ 192.  The nine-point plan, however, was focused on, among other things, operational efficiencies like

10

"acceler[ating] [] growth," "reinvigorat[ing] innovation," accelerating the "building [of] the Neogen leadership team," "reduc[ing] net leverage … and maintain[ing] ample liquidity," and "accelerat[ing] governance activities." Ex. 25 at 10.  It was not, as Plaintiffs assert, an "admission" that its prior statements as to integration were false and misleading.  They were not.

## ARGUMENT

To avoid dismissal under Fed. R. Civ. P. 12(b)(6), Plaintiffs must "state a claim to relief that is plausible on its face." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).  The Court must assume that well-pled factual allegations in the Complaint are true.  *Id.*  But the Court need not accept legal conclusions, naked assertions, conclusory statements, or implausible inferences. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Here, Plaintiffs fail to satisfy the plausibility standard of *Twombly* and *Iqbal,* much less the heightened pleading standards of the PSLRA and Rule 9(b).

### I.    PLAINTIFFS' SECTION 10(b) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD A MISSTATEMENT OR OMISSION[6]

Plaintiffs must plead the existence of a material misstatement or omission consistent with the exacting standards of Rule 9(b) and the PSLRA.  *See Tellabs*, 551 U.S. at 319–21.  Rule 9(b) requires the party alleging fraud to plead "with particularity the circumstances constituting fraud or mistake," which requires Plaintiffs to "detail the 'who, what, when, where, and how of the alleged fraud.'"  *Lim v. Hightower,* 2025 WL 2965692, at *6 (6th Cir. 2025).  Plaintiffs "must [also] satisfy the 'elephant-sized boulder' known as the 'heightened pleading' requirements of the

---

[6] To state a Section 10(b) claim, Plaintiffs must allege "(1) a material misrepresentation or omission … ; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

PSLRA." *Id.*  The Complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading."  *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018) (citing 15 U.S.C. § 78u–4(b)(1)).  Plaintiffs fail to meet these standards here.

### A.    Plaintiffs Fail To Plead Falsity With Particularity

Entirely absent from the Complaint are any facts—let alone *particularized* ones—establishing that the challenged statements were demonstrably false when made.  For each of the challenged statements, Plaintiffs' playbook is the same.  Apart from conclusory (and misleading) assertions that the challenged statements were "not" true, Plaintiffs' theory of falsity rests on:  (i) the repetition of deficient statements from unreliable FEs, and (ii) supposed "admissions" made by Defendants in statements at the end of (or after) the Class Period.  Neither is a viable pathway for pleading falsity.

### 1.    The FE Allegations Are Not Credible, Particularized, Or Demonstrative Of Falsity

Plaintiffs rely heavily on the uncorroborated statements of seven anonymous FEs.  "As the reliance on such confidential witnesses has grown, courts have responded by closely examining the allegations and 'sharply discounting' those that are vague, conclusory, or irrelevant."  *Porter v. Graftech Int'l Ltd.*, 2025 WL 2393087, at *16 (N.D. Ohio Aug. 18, 2025).  To determine the weight such statements should be afforded—if any—the Court "will examine the descriptions of each of those individuals' jobs to ascertain whether any would have been in a position to have gained first-hand knowledge of the facts attributed to him or her," and "the detail of the information each is reported to have provided."  *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 960 (S.D. Ohio 2009).  "[T]he who, what, when, where, and how a confidential witness knew of information should be definite, as allegations that are too vague and conclusory are not to be

accorded much weight." *Id.*  Plaintiffs must also demonstrate that the FEs' allegations "provide an adequate basis for believing that [D]efendants' statements were false" when made.  *Id.* at 965. Plaintiffs' FE allegations fail on both fronts.

a)      **FE-1**

FE-1 was a "Production Planning Analyst" who worked at Neogen from May 2021 to June 2023.  ¶¶ 33, 130–36.  In other words, FE-1 was a lower-level employee who did not report to senior management or the Individual Defendants, and who departed Neogen before the majority of the challenged statements were made.  Accordingly, Plaintiffs cannot allege a "high likelihood" that FE-1, "by virtue of his position or responsibilities[,] was actually privy to the information" alleged.  *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 2022 WL 989240, at *29 (W.D. Tenn. Mar. 31, 2022), *aff'd*, 83 F.4th 514 (6th Cir. 2023); *see also Sarafin v. BioMimetic Therapeutics, Inc.*, 2013 WL 139521, at *19 (M.D. Tenn. Jan. 10, 2013) (confidential witness assertions not "particularly persuasive" when a witness is a "lower level employee"), *aff'd sub nom.*, *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435 (6th Cir. 2014); *In re Huntington*, 674 F. Supp. 2d at 964 (discounting allegations from "low-level employees [where] [p]laintiffs fail[ed] to allege how such employees obtained the knowledge"); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting sources "employed in rank-and-file positions … [who] had no contact with the Individual Defendants"); *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 794 (N.D. Ohio 2021) (discrediting allegations when witness employed "toward the end of the class period"), *aff'd*, 2022 WL 3972478 (6th Cir. Sep. 1, 2022).

Even if the Court credited FE-1's allegations (it should not), none establish that any of the challenged statements were false when made.  Plaintiffs use FE-1 to challenge certain ERP

Statements, including the statements that "ERP implementation" was "on track," and the statement that Neogen was "bringing [] forward" SAP implementation.  ¶¶ 168, 170–72, 174–75, 177.  According to FE-1, there "was no way [Neogen was] going to go live" because the Company had not run the necessary "test scripts."  ¶¶ 135, 168, 170–72, 174–75, 177, 238.  Putting aside the unparticularized nature of these statements, FE-1 departed Neogen months before the ERP go-live was actually scheduled to be completed, and purported delays in the first half of 2023—including any delays in writing scripts—say nothing about the Company's ability to launch the ERP system on-time.  ¶¶ 134–36.  Moreover, FE-1's generic statement that Neogen had "really archaic" business processes that used "pen and paper" has no bearing on the anticipated timeline for the completion of the ERP system.  ¶ 132.

### b)    FE-2

FE-2 was a "Sales Representative" responsible for the "Pacific Northwest" who left Neogen in January 2024.  ¶¶ 34, 142 n.12.  FE-2 did not have visibility into Neogen's global sales and integration efforts, nor do Plaintiffs plead that FE-2 had any actual contact with the Individual Defendants.  *Id.*; ¶ 143.  The best Plaintiffs can muster is the generic allegation that FE-2 recalled "quarterly all hands meetings with Adent and other C-[s]uite executives" at which "problems with the integration and SAP" were purportedly discussed.  ¶ 143.  But Plaintiffs fail to plead that FE-2 actually *attended* any such meetings, *when* such meetings occurred, *who* was present, and *what* specifically about integration was discussed.  *See ServiceMaster Glob.*, 2022 WL 989240, at *32 (dismissing claims where the complaint failed to plead "what specifics were discussed as part of these meetings, what was said, or who said it"); *Plymouth Cnty.*, 556 F. Supp. at 797–98 (allegations that witnesses "observed executives attending meetings" and "general statements about their attendance at meetings" are insufficient); *see also supra* p. 13.

14

As with FE-1, even if the Court credited FE-2's allegations (it should not), none establish that any of the challenged statements were false when made.  Plaintiffs plead that certain ERP Statements (*see* ¶¶ 178–81, 183, 187, 189–91, 193) were false and misleading on the basis that, according to FE-2:  (i) the initial ERP rollout was "general chaos" resulting in "problems creating orders"; and (ii) ERP integration caused delivery delays for the "Allergen and Mycotoxin" products.  ¶ 142.  But FE-2's statement concerning "general chaos" is impermissibly "vague and conclusory."  *Porter*, 2025 WL 2393087, at *16; *see also ServiceMaster Glob.*, 2022 WL 989240, at *29 ("[C]onfidential witness cannot simply echo conclusory allegations with their own vague affirmations.").  And FE-2's statements concerning shipping delays for two specific products do not come close to establishing that the ERP Statements were false or misleading.  The Company had already disclosed that, following the ERP go-live, it was processing orders and shipments, but with "some delay."  Ex. 26 at 3.  Finally, according to Plaintiffs, "[FE-2] independently corroborated [that] ERP system problems continued to plague the Company *as of April 2024*," ignoring that FE-2 left Neogen *in January 2024*.  ¶¶ 190–93 (emphasis added).

### c)    FE-3

FE-3 was a "Sales Development Executive" who departed Neogen in November 2023.  ¶ 35.  There are no facts pled establishing that FE-3 had any first-hand knowledge concerning the challenged statements, or that he had direct contact with anyone in senior management (let alone the Individual Defendants).  Plaintiffs only offer the vague assertion that FE-3 "worked" with the CRM system, and do not plead that FE-3 had any experience with, or even contact with, Neogen's ERP system.

Even putting that aside, FE-3 does not establish that any of the challenged statements were false when made.  Plaintiffs plead that the CRM Statements were false and misleading

15

because FE-3 "could only access Neogen's legacy customer data in the CRM" and "never received access to 3M's data via any CRM system before he left the Company."  ¶¶ 121–22. But the fact that a lone sales representative was not able to access 3M customer data does not render Mr. Adent's statements that the CRM systems were combined "on day two" or that there was a "common platform" false or misleading.  ¶¶ 164–67.  *See In re Sotera Health Co. Sec. Litig.*, 2025 WL 1648942, at *27 (N.D. Ohio Mar. 19, 2025).  Moreover, the fact that FE-3 was shown Mr. Adent's January 5, 2023 and January 11, 2023 statements and declared them "false" is also insufficient.  ¶ 120; *see Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 839 n.9 (E.D. Ky. 2019) ("[C]onfidential sources cannot be used to merely parrot conclusory allegations contained in the complaint.").

Plaintiffs next plead that FE-3 corroborated the allegation that Neogen's "ERP rollout was disastrous," as FE-3 heard of shipping delays "through the grapevine."  ¶¶ 139–40.  Indeed, according to Plaintiffs, "FEs-3, 4, 2, and 7 all independently corroborated" that:  (i) they "experienced [] ERP system problems following the go-live"; and (ii) "ERP system problems continued to plague the Company as of April 2024."  ¶¶ 178–81, 183, 187–91, 193.  But, as explained above, Plaintiffs have failed to plead that FE-3 had *any* exposure to the ERP system, let alone exposure sufficient to establish that any ERP Statements were false and misleading. *See supra* p. 13.  And information learned "through the grapevine" (¶ 140)—*i.e.*, "merely regurgitating gossip and innuendo"—is wholly insufficient.  *In re Accredo Health, Inc. Sec. Litig.*, 2005 WL 8152649, at *12 (W.D. Tenn. Apr. 11, 2005).  FE-3 also makes a smattering of allegations concerning the Company's sales forecasting (*see* ¶¶ 152–53) but Plaintiffs fail to explain how those allegations render any of the challenged statements false or misleading.

In any event, the ERP system—not the CRM system—was used for "demand forecasting" and FE-3 did not work with the ERP system.  ¶ 53.

### d)    FE-4

FE-4 was a "Vice President of Software and Product Engineering" who started at Neogen in February 2023 and left in April 2024.  ¶ 36.  FE-4 did not report to any of Neogen's senior management, nor do Plaintiffs plead that he had any contact with the Individual Defendants.  Plaintiffs also fail to plead that FE-4 worked with, or was responsible for, the CRM or ERP system.  Nevertheless, according to FE-4, the ERP implementation "did not go smoothly" and "[o]rders would come in and wouldn't be able to be fulfilled through [ERP]," leading to "manual" dispatch.  ¶ 141.  Putting aside that Plaintiffs have not pled that FE-4 was involved with the ERP system, Plaintiffs plead that such allegations render certain ERP Statements false and misleading.  ¶¶ 178–81, 183, 187, 189–91, 193.  Not so.  None of the ERP Statements declared that the ERP implementation went "smoothly."  To the contrary, Neogen disclosed the operational challenges that followed the ERP go-live, including system inefficiencies and shipment delays.  *See supra* pp. 7–8.  In any event, merely stating that ERP integration "did not go smoothly" is impermissibly vague.  *See supra* pp. 13–15.  And isolated, second-hand complaints from customers concerning shipping delays are also insufficient to render any of the ERP Statements false or misleading.  *See supra* pp. 15–16.

### e)    FE-5

FE-5 was a "U.S. Director of Supply Chain Planning" who departed from Neogen in August 2024.  ¶ 37.  FE-5 did not report to senior management during the Class Period.  *Id.* Nor is it pled that he had any contact with the Individual Defendants.  Plaintiffs allege that FE-5 raised concerns about the ERP system and was "ignored by management," but fail to identify

17

any specific individuals in management or how or when FE-5 raised concerns and was "ignored." ¶¶ 125–26.

Nor does FE-5 come close to establishing that any challenged statements were false and misleading.  Plaintiffs plead that a wide swath of the ERP Statements (¶¶ 168, 170–72, 174–75, 177–81, 183–87, 189–91, 193–95, 197–99, 201–03, 205) and certain of the Sample Product Statements (¶¶ 184, 186, 190–91, 193, 198–99, 201–03, 205, 206–208) were misleading because of FE-5's hyperbole describing the ERP integration process as a "colossal failure," (¶¶ 190–91, 193, 198–99, 201–03, 205), "horrific," (¶¶ 168, 170–72, 174), or "a mess" (¶¶ 184, 186, 194–95, 197).  But such conclusory statements lack particularity and do not provide any basis to render any of the ERP Statements false or misleading.  The same is true for FE-5's generic declarations that certain of the challenged statements were "bullsh**t." ¶¶ 178–81, 183; *see supra* p. 16.  Moreover, as already discussed, Neogen had fully disclosed that it was not "as efficient yet on the new system as [they] were on the old," and that the Company was processing orders with "some delay."  *See* Ex. 15 at 4; Ex. 26 at 3.

Next, FE-5 alleges that Neogen's statements concerning the ERP launch were misleading because Neogen operated on Excel or "pen and paper," the "scripts were being written" in July and August of 2023," and data that was put into the ERP system was not "clean[]," leading to "cross contamination of files." ¶¶ 125–26.  But none of these allegations render Neogen's statements about being "on track" for an initial ERP launch by the end of 2023 false or misleading.  That Neogen did not previously use a SAP system does not render Neogen's statements about a future rollout in any way false or misleading.  As FE-5 concedes, Neogen was testing scripts halfway through 2023, well in advance of the initial launch

18

deadline.  ¶ 125.  Moreover, any inefficiencies in shipping products or fulfilling orders (¶¶ 127–28) were promptly disclosed to investors in October 2023.  *See supra* pp. 7–8.

FE-5 allegedly "corroborated" that, by August 2024, "sample handling manufacturing was still not functional."  ¶ 148.  But that says nothing about sample product line integration and, therefore, does not render any of the Sample Product Statements false or misleading.  The month *prior*, Mr. Adent told investors that Neogen "finished relocating the former 3M sample handling product lines in [its] facility … and are now in the process of ramping up to full production levels."  Ex. 27 at 3.  In other words, the manufacturing infrastructure had been migrated, but production was not yet at historical levels.

FE-5 also disagreed with Neogen's July 30, 2024 statement that "[s]hipping performance [had] improved throughout the quarter" on the basis that he had $8 million in back orders for sample handling products in August 2024.  ¶¶ 202–03, 205.  But one employee's experience with back orders for a single product line is not indicative of the entire company's performance across all product lines.  Nor are such backorders surprising given that Neogen already disclosed that it was suffering from "inefficiencies" and "higher-than-usual backlog[s]."  Ex. 17 at 3.

Finally, FE-5's allegation that "the massive inventory write-offs Defendants disclosed in June 2025 *must have* resulted from the flawed SAP implementation" (¶ 149) (emphasis added) is vague, conclusory, and wholly speculative in light of the fact that FE-5 left the Company in August 2024, nearly a year *prior* to the disclosure of such write-offs.

### f)    FE-6

FE-6 was a "Senior Director of Global Marketing" who left the Company in January 2024.  ¶ 38.  FE-6 did not report to any of the Individual Defendants, nor does the Complaint

plead that FE-6 had any contact with the Individual Defendants or was otherwise involved with either the ERP or CRM systems.

Nor do FE-6's allegations establish falsity.  As a threshold matter, the allegations attributed to FE-6 are sourced from content published on AlphaSense, a third-party website that is "powered" by artificial intelligence.[7]  FE-6's statements purportedly came from two interviews with AlphaSense analysts, neither of which were conducted in connection with this action.  ¶¶ 33 n.1, 38 n.2.  Courts have heavily discounted anonymous statements from third-party websites such as "glassdoor.com" and "CBS News" where, as here, Plaintiffs do not "allege any facts supporting the reliability of the … employee statements" and do not establish that they "possess knowledge of [the] alleged fraudulent misconduct."  *In re Sotera*, 2025 WL 1648942, at *5 n.4; *see also Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 802 (S.D.N.Y. 2020) (disregarding allegations that merely "recapitulate[d]" a short-seller report's "characterization of purported interviews with anonymous sources" without "alleg[ing] any independent corroborative facts, any independent investigation by counsel, or any contact by plaintiff's counsel with the interviewees").

Moreover, the allegations attributed to FE-6 are extraordinarily vague and irrelevant— most of his statements pertain to Neogen's "growth rate" and Neogen's purported lack of a "convincing playbook" of how to realize said growth.  ¶¶ 150–51.  But Neogen's growth plans, and the feasibility of those plans, do not render any of the challenged statements false or misleading.  Nor do Plaintiffs explain how growth rates would have any impact on the integration of the CRM system, ERP system, or sample product line.  FE-6's other remarks concerning "multiple exercises" with "senior leadership" and proverbial "hair on fire …

---

[7] *See* AlphaSense*, https://www.alpha-sense.com/pricing/.

regarding transition activities [and] ERP deployment" are impermissibly unparticularized and likewise fail to advance Plaintiffs' claims. ¶ 151; *see also supra*, pp. 12–16.

### g)    FE-7

FE-7 was a "Senior Director" of "Capital Global Capex Projects, Engineering, and Facilities" who left the Company in December 2024.  ¶ 39.  While the Complaint pleads that FE-7 "initially reported to Mr. Adent" (¶ 144) Plaintiffs fail to plead that FE-7 did so during the Class Period or that FE-7 had any contact with either of the Individual Defendants during that time.

In addition, like the other deficient FE allegations, none of FE-7's allegations establish falsity.  Plaintiffs plead that certain of the ERP Statements (¶¶ 178–81, 183, 187, 189–91, 193, 198–99, 201) and Sample Product Statements (¶¶ 171–72, 174, 184, 186, 190–91, 193–95, 197, 206–11, 213–15) are false and misleading because FE-7 claimed to be "involved in a transition to SAP at a previous[] employer" and alleges that Neogen was inadequately prepared for its transition given its staffing levels and preparation time.  ¶ 137.  But an employee's past experience with ERP implementation at a separate company does not render any statements about the status and future timeline for Neogen's ERP integration false or misleading.  ¶ 21. And FE-7's assertions that Neogen "still had a lot of problems" by October 2023 are vague, lack particularity, and say nothing about the integration workstreams at issue in the challenged statements.  ¶ 138.  In any event, Neogen disclosed in October 2023 that there were inefficiencies with the SAP transition and explained the lingering effects of those inefficiencies. *See supra* pp. 7–8.

Similarly, FE-7's statement that Neogen "cut all the wires" from a piece of sample product manufacturing equipment and "packed it on a flat bed, and shipped it to [him]" in January or February 2024 does not reveal the falsity of any challenged statement.  ¶ 145.  In

June 2023, Neogen stated that the sample product line would be brought "in house" by the end of Q3 2024—*i.e.*, by the end of February 2024. Ex. 13 at 7; Ex. 12 at 8. That one piece of equipment did not get shipped until close to that initial deadline does not render Neogen's statements from June 2023 false or misleading. Moreover, in January 2024, Neogen explained that, while the first phase of sample product line relocation was completed, the final phase would not be completed until Q4 2024—*i.e.*, the end of May 2024. Ex. 16 at 3.

FE-7 further alleges that, in the summer of 2024, the manufacturing equipment previously sent to him was operational but suffered from "mechanical failures" resulting in a "manual line set-up" being used. ¶ 146. Again, the fact that one piece of machinery was experiencing mechanical hiccups does not render any of the challenged Sample Product Statements—which concerned integration efforts of an entire product line—false or misleading. *See In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 564 (E.D. Mich. 2001) ("[a]necdotal evidence of particular problems" are insufficient). In any event, on July 30, 2024, Neogen told investors that sample handling systems had been successfully "relocat[ed]" to Neogen's facilities, but were still in the process of "ramping up to full production." Ex. 27 at 3. FE-7's statements are entirely consistent with that statement. FE-7 also attempts to explain "that SAP problems contributed to the inventory write-offs the Company announced at the end of the Class Period" (¶ 149), but that statement is speculative at best given that those write-offs were disclosed months *after* FE-7 left Neogen. *See* Ex. 28 at 5.

**2.    The June 2025 Alleged Corrective Disclosure And Post-Class Period Statements Do Not Establish Falsity**

In addition to the deficient allegations of former employees, Plaintiffs point to supposed "admissions" by Defendants at the end of, or after, the Class Period in an attempt to establish falsity.  Plaintiffs' attempts to salvage their claim fail.

*First*, Plaintiffs allege that the ERP Statements "were materially false and misleading" because "Defendants admitted at the end of the Class Period" that "Neogen's ERP system was an abject failure,  and could not even perform the most basic functions … as it lacked 'the underlying processes to get the right inventory in the right place.'"  ¶¶ 168–69, 171–73; *see also* ¶¶ 175–76, 178–82, 187–88, 190–192, 198–200, 203–04, 209–15, 221–22.  Defendants did no such thing.  Rather, Mr. Naemura provided a preview of Q4 2025 financial results, discussed "transitory headwinds that will negatively impact gross margin," and expanded on those headwinds:

> Yeah.  And too tough to quantify exactly right now, I would say.  But as we came out of fiscal 2024, we had gone through a period of kind of supply constraint, and we've kind of remedied that.  And over the course of fiscal 2025 have loaded inventory into our new larger global footprint. *I think what we're seeing is the underlying processes to get the right inventory in the right place need to be improved, and we're working on that*.  But the result has been an elevated level of inventory write-offs that we've seen beginning in Q3 and then actually being a little larger in Q4.  We've gotten to the root cause of it, and we'll get that fixed.  So, we should see that abate over the coming quarters.

Ex. 28 at 5 (emphasis added).  That statement from Mr. Naemura says *nothing* about the ERP system and does not render any of the ERP Statements false or misleading.

*Second*, Plaintiffs repeatedly claim that the ERP Statements were "materially false and misleading" because, at that same conference, Mr. Naemura "admitted" that "Neogen was nowhere close to solving these integration problems, as the Company was forced to adopt a new nine-step improvement plan to address these issues that would require as much as two more years to complete."  ¶¶ 168–69, 171–73, 175–76, 178–82, 187–88, 190–92, 202–04; *see also* ¶¶ 209–11.

23

Not so.  Mr. Naemura's statement was not about "integration problems" but, rather, the Company's future plans for overall improvement:

> As things have been a little rougher, we're very focused on improving execution and frankly, driving better results.  We've put out, and you may have seen or I'll show it here later, a series of execution focus areas that the company's working on kind of nine key – nine key areas that or what we anticipate being the focus areas that we'll talk a lot about over the next kind of year or two.

Ex. 28 at 3.  The presentation accompanying those remarks contains a slide titled "Targeted Improvement Plan," which contains nine points.  Ex. 25 at 10.  Of those nine points, only *one* touched on a limited aspect of the Merger integration, and nowhere is there any "admission" that Neogen would take "years" to solve "integration problems."  *Id*.

*Third*, Plaintiffs allege that the ERP Statements and Sample Product Statements were false and misleading because, relying on post-Class Period statements from a July 29, 2025 earnings call, "the Company's integration failure was so profound that Neogen could not use rudimentary protocols to manufacture products, and instead resorted to assembling products by hand."  ¶¶ 168–69, 171–73; *see also* ¶¶ 175–76, 178–82, 184–88, 190–92, 194–96, 202–04, 209–11, 216–17.  But Mr. Adent's actual statement says nothing about the ERP system or sample product line integration but, rather, addresses production efficiency and machinery:

> We saw improved output of sample collection production during the quarter, which enabled a sequential revenue improvement of around 50% in the overall product category, although remained lower than prior-year levels.  The challenge with achieving these higher rates is that we were very inefficient in doing so.  The production equipment is of an advanced age, and we continue to struggle with sustaining consistent uptime of the automated processes, which is causing us to produce a significant amount of products manually.

Ex. 29 at 5.

*Fourth*, Plaintiffs allege that certain Sample Product Statements were false and misleading because Defendants "admitted" on an October 9, 2025 earnings call that "Neogen still had not been able to stand up its sample handling manufacturing" and further discussed inventory write-

24

offs.  ¶¶ 216–25.  But the October 9, 2025 statements merely noted that Neogen was "carrying too much inventory," still experiencing "an elevated level of sample collection production inefficiencies," which were being sold at a loss, and explained that "excess spoilage in inventory, [] really has more to do with getting the right products, frankly, that have shelf life to the right places in the right amounts."  Ex. 30 at 4, 6, 18.  As discussed, the fact that Neogen was experiencing inventory write-offs across all products does not make any prior statements regarding the status of integration on one specific product line misleading.  Nor do "inefficiencies" in sample line production speak specifically to integration.

*Finally*, Plaintiffs allege that certain ERP Statements and Sample Product Statements were false or misleading because, on January 14, 2026, Neogen's new CEO stated that the Company was "in the early stages of the turnaround."  ¶¶ 194–96.  But this broad, generalized comment does not make any of Neogen's statements false or misleading.  It simply referred to a plan to "stabilize, accelerate, [and] expand" Neogen in the future.  Ex. 31 at 4.

> **B.**    **Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor**

The PSLRA prohibits reliance on "forward-looking statements" as a basis for liability where (i) those statements are "accompanied by meaningful cautionary language," or (ii) plaintiffs fail to plead "actual knowledge of [the statements'] false or misleading nature."  *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

Many of the challenged statements are forward-looking,[8] and discuss Neogen's future plans with respect to Merger integration and anticipated timelines, including that the ERP

---

[8] A "forward-looking statement" is statutorily defined to include "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share … or other financial items," "a statement of the plans and objectives of management for

25

integration was "on track," "on schedule," or "expect[ed] to be complete," and that the Company was "approaching several near-term milestones on the journey of integration." ¶¶ 168, 171–72, 184–85, 190, 198, 209, 217.[9] *See Lim*, 2025 WL 2965692, at *8 (statements discussing "goals, intentions, plans, or hopes are not actionable under the [] safe-harbor"); *Miller*, 346 F.3d at 677 ("[S]tatements that imply projections or objectives … fall[] squarely within the definition of 'forward-looking statements.'"); *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d at 565 ("[C]laims to the effect that 'the consolidation ... continues as planned' or that 'management is proceeding with their ... integration,' while in the present tense, are inherently forward-looking."). These forward-looking statements are protected under both prongs of the PSLRA safe harbor.

*First*, the statements were not only identified as forward-looking,[10] but were accompanied by meaningful cautionary language.  For example, the Company warned investors that the "integration of the 3M [] business with Neogen presents challenges," including "integrating certain manufacturing, … purchasing, accounting, finance, [and] sales, … systems," and that "the failure to successfully integrate the 3M [] business could have a material adverse effect on our business,

---

future operations," "a statement of future economic performance," and "any statement of the assumptions underlying" the foregoing.  15 U.S.C. § 78u-5(i)(1).

[9] *See also* ¶ 171, ("we will have three of the four [3M] manufacturing lines of the key product lines in-house"); ¶ 172 ("in nine months [] we will be off the transition service agreements, so the back office agreement which is order[] [to] cash that will be all in-house and distribution will all be in-house also"); ¶ 175 (the Company had "important integration workstreams underway" and "the full integration of [3M]" was "proceeding according to plan"); ¶ 214 (the Company has "the line of sight to reach normal production levels in the third quarter"); ¶ 216 ("'[w]e're not doing any ERP changes for the rest of this year"); ¶ 219 ("we have discrete initiatives underway to drive improvements and efficiency of our fully integrated shipping and distribution operations").

[10] Ex. 4 at 2; Ex. 11 at 2; Ex. 12 at 2; Ex. 13 at 2; Ex. 16 at 2; Ex. 14 at 2; Ex. 18 at 3; Ex. 21 at 2; Ex. 22 at 2–3; Ex. 32 at 2; Ex. 33 at 2; Ex. 34 at 2; Ex. 35 at 2; Ex. 38 at 2; Ex. 39 at 3–4; Ex. 40 at 3.

financial condition and results of operations."  Ex. 7 at 15; Ex. 6 at 16; Ex. 8 at 16.  This alone shields Defendants from liability.

Second, these forward-looking statements are independently protected because Plaintiffs do not plead Defendants' actual knowledge of the statements' purported falsity at the time the statements were made.  *In re Champion Enters., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 872 (E.D. Mich. 2001), *aff'd sub nom.*, 346 F.3d 660 (6th Cir. 2003).  Here, Plaintiffs rely almost exclusively on FEs to make generic assertions that various "[i]ntegration[] [p]roblems" were discussed "directly with senior management."  ¶ 237.  But no FE alleges *any* direct personal contact with Mr. Adent or Mr. Naemura (let alone contact sufficient to establish actual knowledge on the part of Defendants).  *See supra* pp. 12–22.  In short, the Complaint does not contain a single allegation establishing that Defendants had actual knowledge that any statement was false and misleading when made.

**C.    The Challenged Statements Of Puffery, Corporate Optimism, And Opinion Are Not Actionable**

Many of the challenged statements are non-actionable puffery or corporate optimism.  For example, Plaintiffs challenge statements that customers are "responding positively to the new products and solutions available to them" (¶ 164), the Company has made "significant progress" in integration (*id.*), or that integration was "progressing well" (¶ 168), as well as statements describing Neogen's CRM and SAP implementation progress as a "big deal" (¶¶ 166, 187).[11]  Such statements constitute "vague corporate optimism that is immaterial as a matter of law*." Norfolk*

---

[11] *See, e.g.*, ¶¶ 168, 171–72, 175, 209 (integration and the ERP upgrade were "on track"); ¶¶ 184, 185  (the Company "ha[s] made notable recent progress"); ¶ 198 (the Company is "on track to resolve ERP-related order fulfillment challenges in Q1" and "feel[s] comfortable" that those challenges will be "fully resolved by the first quarter"); ¶ 199 ("I think we are through the majority of th[e]" ERP system challenges).  *See also* ¶¶ 179–81, 185, 190–91, 195, 198, 202–03, 206–07, 209–10, 217, 219, 221, 224.

*Cnty.,* 22 F. Supp. 3d at 684–85 (statements describing sales growth and trends as "strong" constituted inactionable puffery); *see Lim v. Hightower*, 2024 WL 4349409, at *10 (N.D. Ohio Sep. 30, 2024) (statements on "progress" were non-actionable puffery); *Pittman v. Unum Grp.*, 2020 WL 2846929, at *15 (E.D. Tenn. June 1, 2020), *aff'd*, 861 F. App'x 51 (6th Cir. 2021) ("broad, general statements" about "positive" results, statements such as "'we've made good progress' or 'we've been effective' are the kinds of statements that go directly to the speaker's optimistic opinion about the performance of the company"); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *9 & n.8 (S.D.N.Y. Mar. 30, 2021) (statements that the company "'continue[d] to make progress' on integration" were non-actionable puffery); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 n.14 (S.D.N.Y. Apr. 2, 2020) ("Statements about [the company]'s progress with respect to certain goals, including it being 'on track,' [] constitute [no]nactionable puffery.").

Several of these challenged statements further qualify as statements of opinion, including statements from the Individual Defendants such as: "I think we are through the majority of [Neogen's ERP integration]," and "we feel comfortable kind of where we are to have [shipping delays] fully resolved by the first quarter." *See* ¶¶ 198–99.[12] Statements beginning with phrases such as "'I think' or 'I believe,' … convey some lack of certainty" which a "reasonable person" would understand as an indicium of an opinion. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015); *Porter*, 2025 WL 2393087, at *23. Opinion statements are actionable only if the speaker (i) "did not hold the belief [] professed," (ii) "supplied … untrue" "supporting fact[s]," or (iii) omitted information that made the statement "misleading to an ordinary investor." *Omnicare,* 575 U.S. at 186–87; *see D.E.&J Ltd. P'ship v. Conaway*, 284

---

[12] *See also* ¶¶ 209–10.

F. Supp. 2d 719, 736 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005).  Here, Plaintiffs fail to muster any facts, let alone particularized facts, establishing that the Individual Defendants did not hold their opinions at the time they were made, or that the Individual Defendants lacked a basis to form such opinions.

**II.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD SCIENTER**

Plaintiffs' Section 10(b) claim is independently subject to dismissal for failure to plead scienter.  Under the PSLRA's heightened pleading standard, for each alleged misstatement and omission, Plaintiffs must "state with particularity facts giving rise to a *strong inference* that" each defendant "acted with the required state of mind"—*i.e.*, intent to deceive, manipulate, or defraud. *Tellabs*, 551 U.S. at 314 (emphasis added) (quoting 15 U.S.C. § 78u-4(b)(2)).  Such an inference exists "only if 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young*, *LLP,* 622 F.3d 471, 479 (6th Cir. 2010).  The scienter analysis is a "comparative evaluation" that weighs "not only inferences urged by the plaintiff, … but also competing inferences rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314.

Scienter can be established by either demonstrating (i) "knowing and deliberate intent to manipulate, deceive, or defraud," or (ii) "recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016).  To aid their analysis, courts in this Circuit look to a "non-exhaustive list of nine factors" that are "probative of securities fraud":

> (1) insider trading … (2) divergence between internal reports and external statements … (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery … (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not

informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.; Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001).

Here, Plaintiffs not only fail to plead the typical indicia of scienter, but also fail to offer *any* well-pled theory explaining the alleged fraud—never mind one that is at least as compelling as the opposing inference of non-fraudulent intent.   Defendants were navigating a complex transaction that required the successful execution of thousands of integration workstreams. Defendants provided accurate forward-looking assessments and updates as to the status of various integration projects and, moreover, were forthcoming about unexpected setbacks stemming from the Merger.   Neogen was simultaneously impacted by macroeconomic headwinds, turbulent currency markets, and dramatic shifts in U.S. trade policy, all of which was also disclosed to investors.  Ex. 23 at 1, 3.  Plaintiffs attempt to spin Neogen's disclosures as fraud.  Neogen's transparency, however, negates an inference of scienter.  *See, e.g., I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) ("The fact that the negative [disclosures] were made throughout the class period suggests an inference of honest and frank behavior on the part of Defendants."); *Kuyat*, 747 F.3d at 443 ("[D]isclosing adverse information to the public negates an inference of scienter.").

### A.    Plaintiffs Do Not Plead Intent Or Motive And Opportunity

Plaintiffs fail to plead *any* facts indicative of an intent, motive, or opportunity to commit fraud.  The best Plaintiffs can muster is the speculative allegation that the "costs of the Transition Services Agreements motivated Defendants to rush the integration."   ¶ 242.  But to "demonstrate motive, a plaintiff must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004).  Plaintiffs' allegation concerning the Transition Services Agreements amounts

30

to little more than a generalized assertion that Defendants advanced the Company's best interests to appear successful, which is plainly inadequate. *See Lim*, 2024 WL 4349409, at *18 ("[G]eneric motive allegations are typically unpersuasive, considering all corporations seek to portray themselves and their operations in a positive light.").

### B.    Plaintiffs' Recklessness Allegations Are Insufficient

"Recklessness is … highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Doshi*, 823 F.3d at 1039. "Before drawing an inference of recklessness, courts typically require multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." *Id.* The allegations in the Complaint do not come close to meeting this standard.

Plaintiffs plead that the alleged statements from FEs "provide compelling facts supporting Defendants' scienter." ¶ 237. But for the reasons discussed above, the allegations offered by the FEs are unreliable and substantively deficient. *See supra* pp. 12–22. "[G]eneralized statements cannot substitute for *specific* facts through which a factfinder can strongly infer that the [Individual] Defendants themselves knew of or recklessly disregarded the falsity of the [challenged] statements, especially because … the [FEs] are not identified as having *any* contact or interaction with any of the [Individual] Defendants." *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009).

Plaintiffs' handful of additional theories designed to establish scienter also fail.

***Core Operations*.** Plaintiffs' attempt to invoke the core operations doctrine by highlighting "the significance of the Merger" to Neogen is unavailing. The Sixth Circuit "has not addressed the viability of this doctrine" under the PSLRA. *Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *37 (E.D. Tenn. June 30, 2020). Courts in this circuit consider core-operations allegations, not as an independent means to show scienter, but rather "only as a supplementary

31

consideration that may bolster other well-pleaded facts." *Id.* Accordingly, while Plaintiffs assert that the Merger "was, by far, the most significant event in Neogen's history," that fact alone does not support a strong inference of scienter. ¶ 227. *See e.g.*, *Pittman*, 861 F. App'x at 55 ("the overall importance of [the] [Defendant's] reserves" did not "support an inference of fraudulent intent").

*Individual Defendants' Positions.* Plaintiffs plead that "the Individual Defendants held themselves out as highly knowledgeable about the integration" (¶ 229), were "member[s] of the Company's management team," and were "privy to and participated in the creation, development, and reporting of the Company's business, operations and prospects." ¶ 270. But Plaintiffs "cannot infer fraudulent intent merely from the [i]ndividual [d]efendants' positions in the Company and alleged access to information." *Lim*, 2025 WL 2965692, at *12 (citations omitted).

*Investment Analyst Commentary.* Plaintiffs' reliance on investment analyst commentary, which purportedly "cast[ed] doubt on Defendants' candor and credibility" is unavailing. ¶ 232. Questioning management's credibility is clearly insufficient to establish scienter. "[T]hat [a] third-party analyst published a report says nothing about [the Individual] [D]efendants' state of mind," nor can such analyst commentary "demonstrate an 'extreme departure from the [required] standards of ordinary care' needed to establish scienter on deliberate recklessness grounds." *Klobus v. Akero Therapeutics*, 2025 WL 2646877, at *7 n.7 (N.D. Cal. Aug. 15, 2025).

*Mr. Adent's Departure.* Plaintiffs' assertions concerning Mr. Adent's departure likewise fail to demonstrate scienter. "Plaintiffs offer no explanation for why his resignation … after the public disclosure[s] should be viewed with unusual suspicion." *Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1014 (S.D. Ohio 2004).

***Defendants' "Admissions."*** Plaintiffs' efforts to frame Defendants' statements from the end of (and after) the Class Period as evidence of scienter is unavailing for the reasons discussed above. *See supra* Point I.A.2.

***Corporate Scienter.*** Plaintiffs have failed to plead scienter on the part of any Neogen employee that could be attributed to the Company. *See supra* Point II; *In re Omnicare, Inc. Sec. Litig.,* 769 F.3d 455, 476 (6th Cir. 2014).

## III. PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD LOSS CAUSATION

Plaintiffs' Section 10(b) claim is independently subject to dismissal for failure to plead loss causation, which requires a "causal connection between the material misrepresentation and the loss." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342 (2005); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016). Here, Plaintiffs attempt to plead loss causation under a corrective disclosure theory—namely, "plaintiff alleges 'cause-in-fact on the grounds that the market reacted negatively to a corrective disclosure of fraud.'" *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384. Plaintiffs point to three alleged corrective disclosures, but fail to explain *how* these disclosures revealed the "truth" behind any of Neogen's prior statements.

Plaintiffs allege that the first "corrective disclosure" occurred on April 9, 2024, in the midst of the Class Period, when Neogen announced a downward revision of its earnings guidance. Plaintiffs allege that Neogen attributed the revision to "operational inefficiencies" following the exit of certain Transition Services Agreements, "backlog[s]," and shipping delays. ¶¶ 243–44. But such hiccups had already been disclosed to investors. *See supra* pp. 7–8. Moreover, those statements do not correct or say anything about CRM or ERP integration; rather, they repeat previously disclosed information concerning post-integration "inefficiencies."

33

Plaintiffs allege that the next corrective disclosure occurred on April 9, 2025, when the Company "reported disappointing financial results" and announced the departure of Mr. Adent. ¶¶ 247–48.  According to Plaintiffs, the Company's performance was impacted by "challenges [Neogen] [had] discussed with [its] sample collection production line" and "shipping delays." *Id.* But as Plaintiffs concede, "challenges" with the sample product line were previously disclosed. *Id.*  Moreover, none of those "challenges" concerned the successful migration of the sample product line from 3M's facilities to Neogen's facilities.  Nor does the departure of Mr. Adent "correct" any of the challenged statements.

Plaintiffs allege that the final corrective disclosure occurred on June 4, 2025 when Neogen announced the "expect[ed] EBITDA margin to probably be around the high teens," and explained that "the underlying processes to get the right inventory in the right place need to be improved" in order to address elevated inventory write-offs.  ¶¶ 251–52, Ex. 28 at 4–5.  But Neogen had already disclosed inventory challenges in prior quarters.  *See supra* pp. 7–10.  And any discussion of "inventory challenges" does not render any of the challenged ERP Statements, CRM Statements, or Sample Product Statements false or misleading.

## IV.    **PLAINTIFFS' SECTION 20(a) CLAIM FAILS**

Because Plaintiffs have failed to plead an underlying "primary violation" of Section 10(b), Plaintiffs' control person claim necessarily fails.  *See Lim*, 2025 WL 2965692, at *13.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed in its entirety and with prejudice.

Dated: February 10, 2026

Respectfully submitted,

/s/ John A. Neuwirth
John A. Neuwirth
Stefania D. Venezia
Tanner S. Stanley
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
john.neuwirth@weil.com
stefania.venezia@weil.com
tanner.stanley@weil.com

D. Andrew Portinga
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49503
Tel: (616) 831-1700
portinga@millerjohnson.com

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(b)(ii)

Pursuant to Local Rule 7.2(b)(ii), the undersigned certifies that the Defendants Neogen Corporation, John Adent, and David Naemura's Motion to Dismiss Plaintiff's Amended Complaint for Violations of the Federal Securities Laws complies with the 10,800-word limit set forth in Local Rule 7.2(b)(ii), having a total word count of 10,790 as generated using Microsoft Word.

Dated:  February 10, 2026                    /s/ John A. Neuwirth
                                             John A. Neuwirth