UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, et al.,

Plaintiffs,

v.

NEOGEN CORPORATION, et al.,

Defendants.
_______________________________/

Case No. 1:25-cv-802

Hon. Hala Y. Jarbou

**OPINION**

Plaintiffs bring this putative class action for securities fraud against Neogen Corporation, a publicly-traded company, and two of its senior officers: John Adent and David Naemura. Plaintiffs, who held Neogen common stock, allege that Defendants violated the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq*., and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. In short, Plaintiffs claim that Defendants made false or misleading statements about the progress of Neogen's integration of a business that it purchased from 3M Company, and that when the lack of progress finally became apparent to investors, Neogen's stock price declined. Before the Court is Defendants' motion to dismiss the complaint for failure to state a claim. For the reasons herein, the Court will grant the motion.

**I. BACKGROUND**

According to the complaint, Neogen's "food safety segment" makes and sells diagnostic test kits and software to detect "unwanted organisms or substances" in food. (Am. Compl. ¶ 40, ECF No. 31.) In 2021, this segment accounted for roughly half the company's revenue. Neogen

acquired 3M Company's food safety business in 2022, with the intent to become a "global leader in food security." (*Id.* ¶ 1.)

The $5.3 billion merger was a significant event for Neogen, as it would "double" the company's size and bring in additional revenue through the sale of product lines acquired from 3M. (*Id.*) Neogen intended to take over product lines that would complement its own products and create opportunities for "cross-selling" additional products to existing customers. (*Id.* ¶ 67.) The acquired product lines included 3M's products for "hygiene monitoring," "pathogen detection," "sample collection" (also called "sample handling"), and "indicator testing." (*Id.* ¶¶ 44–47.)

To be successful, the merger would require Neogen to integrate the "'back-office' IT and logistics functions" of the two businesses into one. (*Id.* ¶ 2.) Of particular importance from an IT standpoint were the customer resource management (CRM) system and the enterprise resource planning (ERP) system. (*Id.*) The CRM system managed sales and customer communications while the ERP system managed the supply chains, demand forecasting, order processing, order fulfillment, and accounting for the business. (*Id.*) In addition to setting up these systems, Neogen had to move the manufacturing and distribution of 3M's products into Neogen's own facilities.

To ensure a seamless transition, Neogen entered into transition services agreements with 3M whereby Neogen would pay 3M gradually increasing fees so that 3M would maintain the CRM and ERP systems of 3M's food safety business until Neogen could fully integrate those functions into its own systems. (*Id.* ¶ 2.) Neogen also agreed to pay 3M a percentage of net sales revenue from the sale of 3M products, as well as a "mark-up percentage" for the cost of manufacturing, so that 3M would continue to manufacture and distribute those products until Neogen could take on

those functions itself. (*Id.* ¶¶ 56–57.) Due to the fees associated with these agreements, delays in the integration process would impair Neogen's profitability.

The merger closed on September 1, 2022. (*Id.* ¶ 62.) Plaintiffs take issue with statements made by Neogen itself, Adent, Neogen's then-President and Chief Executive Officer (CEO), and Naemura, Neogen's then-Chief Financial Officer (CFO), from January 5, 2023, through June 3, 2025 (the "Class Period"). Plaintiffs contend that these statements painted a false or misleading picture of Neogen's progress in integrating the two businesses, defrauding investors like Plaintiffs.

Defendants purportedly told investors on multiple occasions that the integration process was on track, and later that some issues with the software or manufacturing integration had been resolved, when in fact those issues allegedly persisted. Plaintiffs contend that in 2024 and 2025, when Defendants finally disclosed details about these problems, Neogen's stock price plummeted. For instance, when Neogen reported order-fulfillment delays and disappointing earnings in April 2024, its stock price plunged 9 percent in a single day. (*Id.* ¶¶ 243–44.) Similarly, in April 2025, after Neogen announced that it would be terminating Adent, Adent and Naemura reported challenges with producing its sample collection products, as well as shipping delays for most products, causing the company's stock price to drop 29 percent in one day. (*Id.* ¶¶ 247–48.) And in June 2025, Naemura allegedly revealed that Neogen's production capabilities were still so impaired that it was assembling some products by hand, causing shipment delays, preventing the company from shipping inventory before it expired, and causing the company to incur "over $1 billion in financial charges." (*Id.* ¶¶ 111–12.) These revelations caused Neogen's stock price to decline further. (*Id.* ¶ 114.)

Count I of the amended complaint asserts violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 against all Defendants. Section 10(b) "forbids (1) the

'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of" Securities and Exchange Commission 'rules and regulations.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 15 U.S.C. § 78j(b)). Rule 10b–5 "forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharms.*, 544 U.S. at 341 (quoting 17 C.F.R. § 240.10b–5).

Count II of the amended complaint asserts violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Adent and Naemura. "When a primary violation of securities law is shown, that provision imposes joint and several liability on 'controlling persons.'" *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 947 (6th Cir. 2009).

Defendants seek dismissal of the foregoing claims, arguing that Plaintiffs have failed to adequately plead the necessary elements of their claims, such as fraud, scienter, and loss causation.

## II. STANDARD

### A. General Pleading Standards

A plaintiff's complaint must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred. *Id.* "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or a "formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555.

The Court is generally bound to consider only the complaint when resolving a motion to dismiss under Rule 12(b)(6) unless the Court converts the motion to one for summary judgment. *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016) (internal citations omitted).

**B. Heightened Pleading Standards for Federal Securities Fraud**

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, Plaintiffs must plead the following elements:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 489 (6th Cir. 2015) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

"Because Section 10(b) and 20(a) claims sound in fraud, this court must also impose the pleading requirements of Federal Rule of Civil Procedure 9(b) and determine whether the complaint alleges fraud with particularity." *Bondali*, 620 F. App'x at 488. In other words, Plaintiffs' complaint must "identify[] the statements or omissions alleged to be false or misleading

and detail[] the 'who, what, when, where, and how' of the alleged fraud." *Id.* at 489 (quoting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

In addition, the Private Securities Litigation Reform Act (PSLRA) requires complaints alleging securities fraud to satisfy "exacting pleading requirements." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The complaint must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)). The PSLRA expressly requires the complaint to "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." 15 U.S.C. 78u-4(b)(1). In addition, "with respect to each act or omission alleged to violate" the Exchange Act, the complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A) (emphasis added). To qualify as "strong," the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

## III. ANALYSIS

As indicated, the allegedly false or misleading statements relate to Neogen's progress in integrating the product lines it acquired from 3M. For ease of discussion, the Court will group the statements into the following topics: the CRM integration, the ERP implementation, and the company's manufacturing of the new product lines.

### A. CRM Integration

On January 5, 2023, Adent told investors that Neogen had "made significant progress" in the "coordination of our commercial efforts" by, among other things, "combin[ing] CRM systems on day two," such that "customers [were] responding positively to the new products and solutions

available to them." (Am. Compl. ¶ 164; *see* Q2 2023 Earnings Call Tr. (Jan. 5, 2023), ECF No. 34-10, PageID.595.)

Similarly, on January 11, 2023, Adent told investors:

> The second day of integration, we had combined our CRM systems. Now that's a big deal because in one common platform, we knew who the common customers were, what they were buying, who was calling on them, so what allowed us to do was in this first quarter is we have all the sales teams realigned, everybody knows who their customers are. Everybody knows who they're calling on. We've done all the cross training and we've identified what are the biggest opportunities for cross-selling within those customer bases.

(Am. Compl. ¶ 166; *see* JP Morgan Healthcare Conf. Tr. (Jan. 11, 2023), ECF No. 34-37, PageID.713.)

Plaintiffs allege that the CRM systems were not, in fact, combined under a common platform, and that Neogen's sales representatives did not know who the "common customers" were, what they were buying, or who was calling on them. (*Id.* ¶ 167.) FE-3,[1] a "Sales Development Executive" at Neogen from November 2021 through November 2023, asserts that the CRM systems were never combined during his tenure at the company. (*Id.* ¶ 120.) In other words, he could only access Neogen's legacy customer data in the CRM system, not 3M's customer data. (*Id.* ¶ 121.) Consequently, he had no way of identifying 3M's customers. (*Id.*) Because his supervisors had instructed him not to sell Neogen products to existing 3M customers, this lack of information caused him to waste time attempting to sell to customers who, he would eventually learn, were already customers of 3M.

Defendants argue that the fact that a single sales employee could not access 3M's data does not render Adent's statements false or misleading, implying that FE-3's experience may have been

---

[1] The complaint refers to individual former employees of Neogen and 3M as "FE-#" in order to preserve their anonymity.

unique. On the contrary, FE-3's assertion that he was instructed to not sell products to 3M customers indicates that such access was an expected part of the job of all sales representatives. This expectation is consistent with Adent's broad assertion that "all the sales teams" knew their customers, including "common" customers (i.e., customers of both Neogen and 3M). And the fact that FE-3 could not access that sort of information throughout his entire time at Neogen, much of which occurred months after Adent represented that the CRM systems were combined, suggests that other sales representatives would have experienced the same problem. Together, these facts suffice to indicate that Adent's statements were objectively false.

Defendants also focus on the absence of allegations regarding FE-3's contact with the ERP system. "[C]ourts may rely on anonymous sources in securities-fraud cases only 'if [the plaintiffs] plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged.'" *Lim v. Hightower*, No. 24-3960, 2025 WL 2965692, at *13 (6th Cir. Oct. 21, 2025) (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016)). But allegations about FE-3's contact with the ERP system are not necessary here because Adent's statements pertain to the CRM system, not the ERP system. Plaintiffs have pled sufficient facts to indicate that FE-3 had personal knowledge about whether Neogen's CRM system contained customer data from 3M's system. If Neogen's system could not access 3M customer data, as FE-3 asserts, it makes no sense to refer to the two systems as combined or to claim that Neogen's sales teams could identify the customers Neogen had in common with 3M.

Defendants also contend that Adent's statements were not false or misleading because combining the CRM systems was not the *end* of the integration process, and because Neogen also told investors that (1) it was still "in the early days of integration," (2) it "still [had] a number of

things to do," (3) some transition services agreements remained in place, and (4) it planned to collaborate with 3M to address "[p]roduction and backlog issues that materialize[d] between signing and closing." (Q2 2023 Earnings Call Tr., PageID.595.) But none of those statements have any particular relevance to whether Neogen had created a combined CRM system that allowed its sales agents to identify 3M customers. Indeed, the transition services agreements referenced by Adent on that particular occasion involved "the manufacturing and distribution of the acquired products," not the CRM system. (*See id.*) And even if combining the CRM systems was not the *end* goal of the transition process, it was an important milestone. The complaint alleges Adent made a false statement about reaching that milestone, which is sufficient to meet the misrepresentation element of a fraud claim.

Defendants also argue that these statements are not actionable because they are merely puffery or statements of opinion. "'Determinate, verifiable statement[s]' are actionable under securities laws while statements reflecting 'puffery' are not." *Oakland Cnty. Emps.' Ret. Sys. v. Sotera Health Co.*, No. 25-3311, 2026 WL 508962, at *4 (6th Cir. Feb. 24, 2026) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015)). "[V]ague statements not subject to verification by proof are generally deemed non-actionable puffery." *Id.* (quoting *City of Monroe Employees' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005)). "Statements of 'general optimism and in defense of [the company's] products' and those of 'self-praise and confidence in its future' constitute immaterial opinions." *Id.* (quoting *City of Monroe*, 399 F.3d at 671).

The assertion that Neogen had combined its CRM system with 3M's system, creating a "common platform" whereby all of Neogen's sales teams could identify customers associated with 3M, was neither puffery nor a statement of immaterial opinion. Rather, these statements asserted

propositions that could "be proven or disproven using standard tools of evidence." *City of Monroe*, 399 F.3d at 674. Either the sales representatives could identify the 3M customers using the CRM system or they could not. As such, these statements are actionable misrepresentations. In short, the Court is satisfied that the complaint alleges a false or misleading statement with regard to the CRM system.

On the other hand, Plaintiffs do not explain why it was false for Adent to claim that Neogen had identified the "biggest opportunities for cross-selling within th[e] customer bases." Even if Neogen's sales agents could not identify 3M customers in the CRM, that does not mean Neogen was unable to identify the "biggest opportunities" for cross-selling to its own customers. Moreover, that assertion is more akin to puffery than a disprovable claim. It is not clear what "biggest opportunities" means in this context.

Defendants also contend that, even if the complaint adequately alleges fraudulent statements, it fails to plead facts from which to make a strong inference that Defendants acted with the required state of mind. For "forward-looking statements," "actual knowledge of their false or misleading nature is required." *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). Otherwise, "[s]cienter may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Bondali*, 620 F. App'x at 489 (quoting *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)). "'Recklessness requires more than negligence'—it is 'akin to conscious disregard' and is 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *Lim*, 2025 WL 2965692, at *10 (quoting *Doshi*, 823 F.3d at 1039). "A court typically will not draw an inference of recklessness without 'multiple, obvious red flags' that demonstrate an 'egregious refusal to see the obvious, or to investigate the doubtful.'" *JRS*

*Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 23-5538, 2024 WL 2874575, at *10 (6th Cir. June 7, 2024) (quoting *Doshi*, 823 F.3d at 1039).

When evaluating scienter, the Court considers the allegations "holistically, including any documents incorporated into the complaint by reference and any matters of which [the Court] may take judicial notice." *JRS Partners*, 2024 WL 2874575, at *9. And the Court must "take into account 'plausible opposing inferences,' because an inference is only 'strong' if it is 'at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323–24).

Factors listed in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) can "aid" the Court's scienter analysis. *Lim*, 2025 WL 2965692, at *11. Those factors include the following:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552. This list is "not exhaustive." *Id.*

Here, there are no allegations suggesting that Neogen or its senior executives were aware or had reason to believe that the customer data from 3M was not integrated into one common CRM platform with Neogen's customer data. Although "allegations claiming that a named defendant was 'intimately aware' of information underlying misleading disclosures can support a strong inference of scienter," scienter cannot be inferred "simply by virtue of [Defendants'] senior positions within" Neogen. *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Global Holdings, Inc.*, 83 F.4th 514, 531 (6th Cir. 2023). In addition, even if integrating 3M's customer data was a

critical part of integrating 3M's business, and was therefore important to Neogen's overall business going forward, that fact does not suffice to establish scienter. "[T]hat executives are intimately familiar with a core component of their business does little to suggest fraudulent intent." *Id.* (quoting *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021)). Plaintiffs must allege "specific facts or circumstances suggestive of [Defendants'] knowledge." *Id.* (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 687–88, 693–94 (6th Cir. 2004)). But here, Plaintiffs do not allege that FE-3 or anyone else discussed the inability to access 3M customer data with Adent or other senior executives, that the issue was a topic of discussion in company meetings, or that Defendants egregiously refused to see what would have been obvious.

The *Helwig* factors do not aid Plaintiffs. Apart from a divergence between the facts asserted by a former employee and the statement by Adent about combined systems, the complaint does not allege any facts suggesting scienter, such as insider trading, later disclosure of inconsistent information, an ancillary lawsuit, bribery, or disregard of current information. Adent's general desire to protect his position or increase his compensation is not sufficient because "such a desire is shared by all corporate officers." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 927, 982 (6th Cir. 2018). Thus, the fraud claims fail as to the CRM integration statements.

**B. ERP Implementation**

Plaintiffs also claim Defendants made a number of false statements regarding the progress and success of Neogen's implementation of its new ERP system for the combined business. The Court will discuss the statements in groups according to the timeframes in which they were made because this division tracks the different types of representations that were made at various phases of the implementation process. It also allows the Court to compare the statements to the actual progress of the implementation at a given time, as alleged by Plaintiffs.

By way of overview, the merger closed in September 2022. Up to that point, Neogen had managed much of its supply chain on "pen and paper." (Am. Compl. ¶ 126.) But when acquiring 3M's product lines, Neogen decided to shift the management of its "supply chains, demand forecasting, ordering, fulfillment, . . . accounting," and other "back-office functions" to a software system called SAP, which is the same software that 3M had been using. (*Id.* ¶ 53 & n.4.) That new system went live in September 2023. (*Id.* ¶ 15.) Plaintiffs contest statements Defendants made about the progress toward preparing that system for implementation before its "go-live" date, as well as statements Defendants made about that system from October 2023 onward.

**1. Implementation "On Track" (March 2023 to July 2023)**

Initially, Defendants' statements touted the fact that the ERP implementation was "on track" or "on schedule." For instance, in March 2023, Adent stated that Neogen's "ERP implementation for the combined business is well underway with completion on schedule for the end of calendar year 2023." (Am. Compl. ¶ 168; Q3 2023 Earnings Call Tr. (Mar. 30, 2023), ECF No. 34-11.) That same day, Neogen reported that the "ERP upgrade" was "on track." (Am. Compl. ¶ 168; Fiscal Year 2023 Third-Quarter Results (Mar. 30, 2023), ECF No. 34-38, PageID.717.) Similarly, in June 2023, Adent predicted that its ERP implementation would be "done in nine months," which would allow Neogen to end its transition service agreement so that ordering and distribution of products would be "in house." (Am. Compl. ¶ 172.) The following month, July 2023, Neogen again reported that the ERP implementation was "on track" and Adent reported that the full integration of 3M's business was "proceeding according to plan." (*Id.* ¶ 175.)

Plaintiffs challenge Defendants' statements that the ERP implementation was "on track," "on schedule," "proceeding according to plan," or expected to be complete by the end of 2023 or early 2024. FE-5, Neogen's Director of Supply Chain Planning for the United States from September 2022 to August 2024, had previous experience putting an SAP system in place from

his time at 3M. (Am. Compl. ¶ 124.) That process required five years of work. Neogen attempted to do the same thing in about twelve months. For instance, 3M spent three to four years "cleansing the data" to input into SAP. (*Id.*) It also tested "scripts" to use with the software for many months before the go-live date. These scripts are "the detailed written instructions for the SAP system that spell out the exact outcomes that should result from specific user actions." (*Id.* ¶ 132.) By contrast, Neogen wrote its scripts and tested them for only a month before the go-live date in September 2023. And instead of "cleansing" 3M's data to make sure that it would be consistent with Neogen's data, FE-5 was instructed to simply put the 3M data into the new system. (*Id.* ¶ 126.) He claims that "management" and his "superiors" ignored his warnings about the lack of adequate script testing and data cleansing. (*Id.* ¶¶ 125–26.)

Similarly, FE-1, a Production Planning Analyst at Neogen involved in the SAP implementation, believed that writing and testing scripts was critical for a successful implementation of SAP. Throughout his time at Neogen, which ended in June 2023 (before the go-live date), he attended weekly meetings with "personnel at the director level," including Neogen's Vice President of Food Safety, Jerome Hagedorn. (*Id.* ¶ 133.) At these meetings, there was regular discussion that Neogen could not write the scripts for its processes. Due to these constraints, FE-1 believes it would have been impossible for the system to go live in September 2023.

Plaintiffs have not plausibly alleged fraud regarding Defendants' initial statements that the ERP integration was on track or on schedule. Indeed, it is not clear that Defendants' statements were false or misleading when made. They appear to be statements of opinion about "inactionable soft information" that are not fraud because they "do not concern facts that can be verified." *See Lim*, 2025 WL 2965692, at *8. "[L]iability does not attach to mere corporate puffery or statements

of corporate optimism." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009). Even if there were significant challenges in preparing the SAP system for a smooth implementation on the short timeline attempted by Neogen, those challenges alone would not necessarily mean that the integration was not on track or on schedule. *See In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *15 (N.D. Cal. Mar. 21, 2018) ("Depending on the 'plan,' the 'track' could mean zero progress, or negative progress, following a giant leap forward at a later point.").

Plaintiffs compare this case to *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, No. 2:19-CV-3347, 2021 WL 4397946 (S.D. Ohio Sept. 27, 2021), in which the defendants told investors than an integration progress was "on plan and going very well," and that the "business was performing very well and as expected." *Id.* at *2. But internal reports showed that "there were hundreds of millions of dollars in obsolete inventory and there was an internal 'dark period' where Defendants could not track any Cordis inventory for approximately a year." *Id.* at *16. The court concluded that the defendants' statements were actionable because they represented that the company "had progressed to a point that made it reasonably likely for [the company] to complete the integration process by a certain time." *Id.* at *12. But under the circumstances, it was objectively untrue that the integration was "on track and going well." By contrast, Defendants did not represent that the ERP integration would be complete within a particular timeframe at a moment when it was clear that the system could not function. Nor did they indicate that the system was performing well. Instead, several months *before* the go-live date for the SAP system, they predicted that integration would occur on schedule. Plaintiffs do not allege facts from which to plausibly infer that those predictions were false or misleading when made.

For similar reasons, *In re Akorn, Inc. Securities Litigation*, 240 F. Supp. 3d 802 (N.D. Ill. 2017) is inapposite. There, company executives represented that the process of integrating another company was "on track" even though the company's accounting system was incapable of accurately processing rebates and chargebacks. *Id.* at 817. But here, Neogen had not yet implemented its ERP system in the first half of 2023, and was not close to doing so, so there is no objective basis for concluding that the implementation was not on track.

Plaintiffs also rely on *Extreme Networks*, in which executives represented that an integration process was "on track," but in that case the executive simultaneously told employees that the integration plan was still "to be determined," contradicting his public statements. *Extreme Networks*, 2021 WL 4397946, at *17. Those circumstances are not present here.

**2. "Fully Operational," "Fully Integrated," with Inefficiencies (October 2023 to June 2024)**

In October 2023, after the SAP system went live, Defendants reported that the new ERP system was now functioning, but with some inefficiencies that would delay order processing and the shipping of products. Adent and Naemura claimed that Neogen's ERP system was "fully operational" and "processing orders and shipping products"; the company had just completed an "initial go-live" of the system in September. (*Id.* ¶¶ 179–80.) Adent reported that the "[i]mplementation has generally gone well"; the company could still "do all the functions, nothing stopped." (*Id.* ¶ 180.) But Adent cautioned that Neogen was "not as efficient yet on the new system as we were on the old." (Q1 2024 Earnings Call Tr. (Oct. 10, 2023), ECF No. 34-15, PageID.613.) Consequently, there was "an elevated level of open orders" in the company's food safety business. (*Id.*)

On the same date, Naemura described himself and Adent as "fully immersed" in the "ERP implementation," which would eventually enable the company to exit some of the transition

services agreements with 3M, but that "inefficiencies" mentioned by Adent would cause a backlog in open orders. (*Id.*, PageID.614.) Adent subsequently clarified that he believed Neogen would be "completely independent" from 3M in the third quarter of 2024, but that Neogen had "significant work ahead" before it could exit the transition services agreements. (*Id.*, PageID.615.)

In January 2024, Adent reported that Neogen had "initiated" an exit from the transition services agreements, "successfully completed the initial phases of the integration of two additional product lines," and "remain[ed] on track" to exit all the transition services agreements, other than the agreement for the manufacture of Petrifilm.[2] (Am. Compl. ¶ 184; Q2 2024 Press Release (Jan. 9, 2024), ECF No. 34-40, PageID.723.) He also reported that Neogen had "implemented SAP," the company's new ERP software, which "then doubled the size of the business by bringing all the 3M products into [Neogen's] distribution network." (Am. Compl. ¶ 82.) The new software allowed the company to "take the order, pick the order, bill the order, talk to the customer, [and] collect the money. . . in-house." (*Id.* ¶ 187; JP Morgan Healthcare Conf. Tr. (Jan. 11, 2024), ECF No. 34-41, PageID.727.)

In April 2024, Adent reported that Neogen had completed its exit from the transition services agreements for "back-office functions and distribution." (Am. Compl. ¶ 190.) That same day, Neogen reported that it had "[f]ully integrat[ed] all back-office and distribution services" (*Id.* ¶ 191; Q3 2024 Earnings Presentation (Apr. 9, 2024), ECF No. 34-36, PageID.710), though it cautioned that "inefficiencies" from integration "persisted." (Q3 2024 Earnings Presentation, PageID.709.) In an earnings call, Adent reiterated that there were "inefficiencies" in the company's operations due to the integration, and that these inefficiencies "have negatively affected

[2] Petrifilm was one of 3M's indicator-testing products. (Am. Compl. ¶ 47.) Because Neogen had to build a new plant to manufacture Petrifilm, that product was subject to its own transition services agreement "that had a much longer term" than the other agreements. (*Id.* ¶ 58 n.5.) As a result, investors did not expect Neogen to take over the manufacture of Petrifilm during the Class Period. (*Id.*)

the rate at which we're able to meet end user needs and ship products to customers." (Q3 2024 Earnings Call Tr. (Apr. 9, 2024), ECF No. 34-17, PageID.623.) In addition, the inefficiencies had "contributed to an extended period with a higher-than-usual backlog of open orders . . . when our products have not been readily available." (*Id.*)

In June 2024, Adent acknowledged a "shipping issue . . . with ERP," but he noted there had been "progress" on that issue and asserted that the company had put "the right resources there . . . to help fix that"; he expected to have it "fully" resolved by the end of the first quarter of 2025, so that sales teams would not be "worried" about "when's the product coming." (Am. Compl. ¶ 198; William Blair Growth Stock Conf. Tr. (June 4, 2024), ECF No. 34-4, PageID.567.)

Plaintiffs take issue with Defendants' statements that the ERP system was "fully operational" and "fully integrated." According to FE-5, "immediately after" the ERP system went live in September 2023, Neogen "could not ship product, . . . could not fulfill orders, [and] had no idea where product was in the warehouse." (Am. Compl. ¶ 127.) Also, customers were sent products but were never billed for them or were billed "ten times what they should have paid." (*Id.* ¶ 127.)

FE-3, who sold products using the CRM system, was allegedly aware of problems with the ERP system because customer orders were not properly transmitted to the warehouse for shipping. (*Id.* ¶ 139.) And the CRM system would show that products were in stock when that was not the case, suggesting that the ERP system was not functioning properly. (*Id.*) Weeks after submitting orders, he would discover from his customers that they never received the kits they ordered. (*Id.*) He heard from customers several times a week that they did not receive their orders. (*Id.*) Likewise, FE-4 regularly heard from customers that their orders were not being filled after the ERP system went live in September 2023. (*Id.* ¶ 141.)

Because of these failures in the order-fulfillment process, Neogen allegedly had to fill many orders manually instead of using the SAP system, which led to a three-month delay in shipping orders. (*Id.*) FE-2, a Neogen sales representative, says that there were months-long delays in order fulfillment for two particular products that persisted during his entire time there, which ended in January 2024. (*Id.* ¶ 142 & n.12.) FE-2 contends that "problems with the integration and SAP" were "regularly" discussed during meetings with supervisors and other top executives, including at "quarterly all hands meetings" with Adent and Chief Scientific Officer Jason Lilly present. (*Id.* ¶ 143.)

FE-7 was Neogen's Senior Director of Global Capex Products, Engineering and Facilities until December 2024. (*Id.* ¶ 137 n.10.) He states that the ERP rollout had numerous "problems" that continued through December 2024, when he left the company. (*Id.* ¶ 138.) For example, the ERP system was supposed to "allocate raw materials for manufacturing based on orders received." (*Id.* ¶ 149.) But SAP would provide inaccurate information about the materials that were available in the warehouse. (*Id.*) It would also report that materials or products were in stock and available at the warehouse when that was not true. (*Id.*)

The primary problem with Plaintiffs' challenge to these statements is that Defendants repeatedly disclosed "inefficiencies" in the new ERP system that resulted in order backlogs and shipping delays, which is consistent with the issues reported by the former employees. And Defendants continued reporting inefficiencies and shipping delays through June 2024, at least nine months after the ERP system went live in September 2023. Defendants did not represent that the rollout was flawless. Though FE-5 reports that the ERP system could not ship products or fulfill orders immediately after it went live in September 2023, Plaintiffs do not allege that the system was *incapable* of performing these functions in or after October 2023, when Defendants began

reporting that the system was "fully operational." Instead, Plaintiffs allege facts indicating that the system operated with errors (*see* Am. Compl. ¶ 138 (alleging that the ERP system "still had a lot of problems" in October 2023); *id.* ¶ 142 (alleging "regular problems creating orders and being able to fulfill those orders" in October 2023 to February 2024) (cleaned up)), which aligns with Defendants' public representations that there were inefficiencies in the new system. Thus, it is not clear why Defendants' statements were materially false or misleading.

Even if Plaintiffs' allegations satisfy the misrepresentation element of a fraud claim, they fail to show scienter. Defendants' repeated reports of inefficiencies that caused shipping delays and problems in order fulfillment undermine an inference that they acted with the required state of mind when reporting on the status of the ERP integration. *See Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 443 ("[C]ourts have concluded that disclosing adverse information to the public negates an inference of scienter."). Indeed, the primary effects of the ERP problems alleged by Plaintiffs are that the company suffered inventory backlogs and could not fill and ship orders on a timely basis, yet Defendants repeatedly disclosed those problems. (*See, e.g.*, Q1 2024 Earnings Call Tr. (Oct. 10, 2023), ECF No. 34-15, PageID.617 (discussing that Neogen was "shipping a little bit slower" due to ERP implementation); Q2 2024 Earnings Call Tr. (Jan. 9, 2024), ECF No. 34-16, PageID.621 (discussing "backlog of open orders" following launch of ERP system); Q3 2024 Earnings Call Tr. (Apr. 9, 2024), ECF No. 34-17, PageID.623 (discussing "inefficiencies" in "system implementation" leading to negative impact on ability to "meet end user needs and ship products to customers" and creating "higher-than usual backlog of open orders"); William Blair Growth Stock Conf. Presentation (June 4, 2024), ECF No. 34-22, PageID.694 (noting "ERP-related order fulfillment challenges" that the company was "on track to resolve"); Q4 2024

Earnings Call Tr. (July 30, 2024), ECF No. 34-27, PageID.665 (discussing "lower order fulfillment rates").)

Also, Plaintiffs' allegations about the nature and extent of the ERP problems are somewhat vague, making it difficult to infer that Defendants would have been aware of them or acted with the required intent to deceive. For instance, FE-7 alludes to "problems" with the ERP system that persisted until December 2024, particularly its ability to properly allocate and stock raw materials based on orders received (Am. Compl. ¶ 149), but FE-7 does not indicate how prevalent these issues were or what impact they had on the company that Defendants failed to disclose. Similarly, FE-2 generically refers to "problems with the integration and SAP" that were discussed at company meetings, without specifying what problems were discussed. (*See id.* ¶ 143.) To the extent FE-2 is referring to delays in order fulfillment (*see id.* ¶ 142), Defendants disclosed those problems. Thus, Plaintiffs have not pled sufficient facts to make a strong inference that Defendants intentionally misled investors about the progress of the ERP integration through June 2024.

**3. Distribution and Shipping Inefficiencies "Effectively Resolved" (July 2024)**

In July 2024, Defendants began claiming that some of the remaining issues with the ERP system had been resolved. Neogen's press release that month reported that "[s]hipping performance" had "improved" such that shipping was "no longer a constraint." (Am. Compl. ¶ 202.) "[A]ll former 3M Food Safety products, outside of Petrifilm, and supporting services [had been successfully] integrated into Neogen" (*id.* ¶ 206), though some "[d]istribution inefficiencies from recent integration activities [had] continued" during the last quarter (Q4 2024 Presentation (July 30, 2024), ECF No. 34-19, PageID.631). Adent reported that "distribution inefficiencies" stemming from SAP and the "new warehouse management system" had "now effectively been resolved." (Am. Compl. ¶ 203.) Apart from building a new facility to produce Petrifilm, Adent declared that "3M Food Safety operations have now been combined with Neogen." (*Id.* ¶ 206.)

Plaintiffs challenge the statements that Neogen's "shipping performance" had "improved" such that it was "no longer a constraint," and that "distribution inefficiencies" stemming from SAP and the "new warehouse management system" had "now effectively been resolved." (Am. Compl. ¶¶ 148, 203.) Plaintiffs allege these statements were not true because, according to FE-5, he had "approximately $8 million worth of back orders for sample handling products" when he left the company in August 2024, whereas his usual amount of back orders was less than $10,000. (*Id.* ¶ 148.) However, Plaintiffs do not plausibly explain how a backlog in orders for only one type of product was the consequence of defects in the ERP system that still persisted in July 2024, rather than a consequence of the accumulated "inefficiencies" disclosed by Defendants *before* that time, or of other problems plaguing the company. Indeed, elsewhere in the complaint, Plaintiffs allege issues stemming from failures in the machinery Neogen used to manufacture the sample handling product line acquired from 3M (*see* Am. Compl. ¶¶ 146–48), which is a separate issue that is unrelated to the ERP integration and the SAP "warehouse management system." In fact, in July 2024, Adent reported that Neogen was still in the process of "ramping up" production of sample handling product lines to "full production levels," meaning its production was below what was required. (*See id.* ¶ 207.) Similarly, Plaintiffs themselves allege that, as of August 2024, Neogen's sample handling machinery was only capable of producing a fraction of the amount necessary to meet demand (*see* Am. Compl ¶ 148 ("[I]f Neogen needed to manufacture 10,000 sample collection products per month, they were only capable of manufacturing 500 such products per month.")), which would explain the backlog in orders for those products experienced by FE-5. Thus, Plaintiffs have not adequately alleged why Defendants' statements in July 2024 were false or misleading.

**4. Implementation Complete (September 2024 to January 2025)**

Over the next several months, Defendants indicated that the ERP system implementation was complete. In September 2024, Naemura declared that the company's "integration [was] on track," that "improvement in order fulfillment rates [was] sustained," and that "challenges" with "shipment operations" in 2024 "are behind us here in 2025." (*Id.* ¶ 209.) Similarly, in October 2024, Adent stated that "system-related issues in our distribution center that impacted our order fulfillment rates were resolved and the business was not constrained by shipping." (*Id.* ¶ 213.) He attributed lower profit margins experienced by the company to "lower total volumes" and "higher costs in the area of shipping and distribution." (Q1 2025 Earnings Press Release (Oct. 10, 2024), ECF No. 34-43, PageID.731.) In a separate earnings call that day, he reiterated that "ERP-related challenges that we've been experiencing in our primary distribution center have been resolved and we no longer are constrained by shipping." (Am. Compl. ¶ 214; Q1 2025 Earnings Call Tr. (Oct. 10, 2024), ECF No. 34-21, PageID.640.)

Later, when asked on December 4, 2024, whether the ERP implementation was complete, Adent implied that it was, stating that the company did not intend to make "any ERP changes for the rest of the year." (Am. Compl. ¶ 216.) He touted the fact that Neogen had completed an "ERP conversion" within 18 months. (*Id.*) And in January 2025, Adent stated that Neogen had "discrete initiatives underway to drive improvements and efficiency of our fully integrated shipping and distribution operations." (*Id.* ¶ 219.) He also claimed that the "ERP implementation, which allowed [Neogen] to exit the transition service agreements with 3M, is complete and all the related shipping delays that we had 3 quarters ago are behind us." (*Id.* ¶ 221.)

To support their contention that these statements by Defendants were false or misleading, Plaintiffs rely on FE-7's assertion that there were "mechanical failures" in the machine acquired from 3M to make sample handling products, and that those problems persisted in 2024. (*See id.*

¶¶ 208, 215.) But these mechanical failures are not plausibly tied to the ERP system (which was based on SAP software rather than a machine acquired from 3M) or to any shipping and distribution issues related to that system, which is what Defendants were discussing in their statements. Plaintiffs also rely on FE-5's assertion that the ERP system was a "colossal failure" when it first went live in September 2023 because the system could not track products (*id.* ¶¶ 123, 126, 129), but that assertion does not shed any light on the status of the ERP implementation in late 2024 or early 2025. In fact, FE-5 retired in August 2024, so he would not have known its status in September 2024.

As additional support for the falsity of the statements in this section, Plaintiffs rely on what they characterize as "corrective disclosures" by Defendants beginning in April 2025. On April 9, 2025, Naemura reported that the company's financial results from the previous quarter had been negatively affected by "shipping delays" for "most [of Neogen's] Food Safety product categories." (*Id.* ¶ 104.) Neogen also announced that it was ousting Adent as CEO.

At first blush, Naemura's statements about ongoing shipping delays appear to contradict Adent's December 2024 assertion that shipping delays were "no longer a constraint" for Neogen. In 2024, however, Adent attributed the shipping delays to the ERP system and to issues at the company's distribution center. He claimed that these particular delays were no longer a constraint. Plaintiffs do not allege any facts from which to infer that those same issues caused the shipping delays reported by Naemura in the first few months of 2025. Indeed, Plaintiffs do not allege any facts about what caused the shipping delays in 2025. Consequently, the Court cannot infer that Defendants knowingly or recklessly misrepresented the status of the ERP system in 2024.

Neogen purportedly revealed more details on June 4, 2025, when Naemura explained that "the underlying processes to get the right inventory in the right place need to be improved," and

that the company struggled with "sustaining consistent uptime of the automated processes," causing the company to "produce a significant amount of products manually." (*Id.* ¶ 112.) The result was "an elevated level of inventory write-offs" that were "a little larger" in the fourth quarter than the third quarter. (*Id.*) Neogen also announced a "nine-step improvement plan" that would require a "year or two" to complete. (*Id.* ¶ 113.)

Plaintiffs point to the improvement plan as evidence that the ERP implementation had gone awry, but the plan itself contains only one "step" that is even potentially related to the ERP system: "Complete 3M [Food Safety Division] integration with improved execution." (Targeted Improvement Plan, ECF No. 37-25, PageID.658.) Beneath that "step" are two bullet points, neither of which suggest that the ERP system continued to experience significant problems in 2024 or 2025:

- Q3 production ramp of sample collection achieved, shifting focus to cost/productivity
- Petrifilm plant standup progressing on track, focused on project governance and de-risking

(*Id.*, PageID.658.) The first bullet point concerns the manufacturing of sample collection products only, not the ERP system for Neogen's entire business. The second bullet point concerns only the new facility to manufacture Petrifilm, not the ERP system.

Plaintiffs argue that Naemura's statement that the company needed to improve the "processes" to "get the right inventory in the right place" effectively conceded that there was "a total breakdown in the Company's demand forecasting and inventory planning processes" that were managed by Neogen's ERP system. (Am. Compl. ¶ 158.) But Plaintiffs provide no facts to support this conclusion. They rely on suppositions by FE-5 and FE-7 that "the massive inventory write-offs Defendants disclosed in June 2025 must have resulted from the flawed SAP

implementation" (*id.* ¶ 149), but those employees left the company in August and December 2024, respectively, before Neogen experienced the inventory issues reported by Naemura in June 2025.

It is not even clear that Naemura was referring to the ERP system. Plaintiffs simply speculate that he was. And the full context of his statement suggests that factors other than the ERP system were at play, including "load[ing] inventory" due to supply chain issues:

> [A]s we came out of fiscal 2024, we had gone through a period of kind of supply constraint, and we've kind of remedied that. And over the course of fiscal 2025 have loaded inventory into our new larger global footprint. I think what we're seeing is the underlying processes to get the right inventory in the right place need to be improved, and we're working on that. But the result has been an elevated level of inventory write-offs that we've seen beginning in Q3 and then actually being a little larger in Q4.

(William Blair Growth Stock Conf. Tr. (June 4, 2025), ECF No. 34-28, PageID.671.) Indeed, an analyst reviewing the situation opined that the inventory write-off was the result of multiple factors, only one of which might have involved the company's ERP system:

> The write-off of inventory comes from the compounding impact of: 1) a buildup of inventory last year as the company emerged from supply chain issues and looked to build some safety inventory, 2) protocols that were not properly established to ensure the right products were shipped at the right time, and 3) the recent stand-up of a new SAP system that added another layer of complexity to all these moving pieces.

(Am. Compl. ¶ 116 (emphases omitted).) Plaintiffs' speculation that the inventory write-offs in 2025 were caused by failures in the ERP system is not adequate to allege a fraud claim. And it does not provide a strong inference of scienter as required by the PSLRA. *See Lim*, 2025 WL 2965692, at *13 ("[T]hese confidential witnesses' vague statements—all made in hindsight—about their personal beliefs do not support an inference of scienter.").[3]

[3] Coincidentally, Plaintiffs allege other facts cutting against their speculation that the ERP system's demand forecasting and inventory planning processes were not functioning properly. They allege that Neogen's management routinely overestimated the amount of revenue the company could generate after acquiring 3M's food safety business. According to Plaintiffs, "Neogen was projecting the combined business to be a double-digit growth business without any plan or explanation of how it would get there." (Am. Compl. ¶ 150.) But FE-6, Neogen's Senior Director of Global Marketing and Operations for the Food Safety Division from September 2022 to January 2024, did not "feel

In short, for all the foregoing reasons, the disclosures in 2025 do not buttress Plaintiffs' assertion that Defendants committed fraud when discussing the ERP implementation.

**5. "Good Progress" (April 2025)**

According to a press release in April 2025, Adent reported that Neogen "continued to make good progress on the integration," noting that the company had "made significant improvements in our sample collection production," such that production had reached "prior throughput levels at the end of the quarter." (Am. Compl. ¶ 224; Neogen Press Release (Apr. 9, 2025), ECF No. 34-23, PageID.648.) Plaintiffs contend that this statement about good progress was false because the company had already started to see an elevated level of inventory write-offs due to what Plaintiffs contend was the ERP system's failure to manage inventory. But the statement about "good progress" in the overall integration is immaterial puffery. *Cf. Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (finding defendant's statements that it was "devoting 'substantial resources' to its problems, with 'improved results,' as well as its boasts that it was taking a 'leading role' and making 'progress' toward compliance" were "precisely the sorts of statements . . . deemed puffery and found immaterial as a matter of law") (quoted in *Oakland Cnty. Emps.' Ret. Sys.*, 2026 WL 508962, at *5).

Moreover, the statement about improvement is supported by Adent's specific assertion that Neogen had increased the levels at which it was producing the sample handling products.

---

like [he] ever saw a convincing playbook of how to realize that." (*Id.*) And according to FE-3, who was with Neogen until November 2023, the "executive management through the C-Suite would make up the numbers they wanted" when projecting future sales. (*Id.* ¶ 153.) FE-3 would spend "weeks" preparing sales projections, and management "would then change the numbers, and the numbers were always higher, never lower." (*Id.*) If these forecasts were used for inventory planning, then the allegedly flawed process for creating these forecasts provides another possible alternative explanation for the excess inventory in 2025, one that rests on an error of human judgment rather than an error in the ERP system.

Thus, Plaintiffs have not adequately alleged a viable claim for securities fraud as to this statement, or as to the other statements pertaining to the ERP implementation.

**C. Manufacturing Integration**

Taking over 3M's food safety business required Neogen to build or modify existing facilities and to import 3M "equipment and manufacturing processes" into those facilities. (Am. Compl. ¶ 58.) As indicated above, Petrifilm was a special case. "Neogen was not expected to take over manufacturing of Petrifilm during the Class Period" because it had to build an entirely new manufacturing plant in Lansing, Michigan, to make that product. (*Id.* ¶ 58 n.5.)

Plaintiffs allege that Neogen experienced difficulties when taking over the manufacturing of 3M products, and that those issues were particularly acute with respect to 3M's sample handling products. (*Id.* ¶ 144.) 3M had manufactured those products at a plant in South Dakota. In January or February 2024, Neogen took 3M's manufacturing equipment from that plant and moved it to Neogen's facility in Kentucky, with little preparation for using it. (*Id.* ¶ 145.) According to FE-7, it took Neogen "six months just to figure out how to hook the machine up and get it up and running." (*Id.*)

By the summer of 2024, the "machine was running but it kept failing." (Am. Compl. ¶ 146.) There were "a lot of mechanical failures." (*Id.*) When FE-7 visited the facility around that time, "he would often see a manual line set up instead of the machine being used." (*Id.*) In other words, sometimes "the products were being filled and packed by hand, by human laborers, instead of by the machinery, massively slowing down production." (*Id.*) He regularly told his supervisor, a "Senior VP who reported directly to Adent," about these issues. (*Id.* ¶ 147.)

According to FE-5, by August 2024, the machines for manufacturing sample handling products were only capable of making 500 such products per month, yet Neogen apparently needed to manufacture up to 10,000 such products per month to meet customer demand. (*Id.* ¶ 148.)

Plaintiffs contend that Defendants only began to reveal the full truth about Neogen's manufacturing struggles in July 2025, when Naemura disclosed, with respect to sample handling products, that Neogen had "struggle[d] with sustaining consistent uptime of the automated processes, which is causing us to produce a significant amount of products manually." (Q4 2025 Earnings Call Tr. (July 29, 2025), ECF No. 34-29, PageID.673.) That "elevated level of manual work" had "caus[ed] [Neogen] to incur cost for expensive temporary labor and excessive scrap rates." (*Id.*, PageID.674.) Naemura reported that the company's "inconsistent execution in [its] startup of sample collection production," as well as market conditions, caused it to "incur a $598 million non-cash charge." (*Id.*, PageID.675.) Similarly, in October 2025, Naemura reported that the company had seen "an elevated level of sample collection production inefficiencies," including difficulties with "machine uptime," leading to increased labor costs and "finished goods scrap." (Q1 2026 Earnings Call Tr. (Oct. 9, 2025), ECF No. 34-30, PageID.679, 682.) These inefficiencies and additional costs meant that the company was "selling the product at a loss currently." (*Id.*, PageID.682.)

**1. "On Track" (June 2023)**

In June 2023, many months before Neogen moved the sample handling machinery, Adent represented that the overall integration was "on track." (Am. Compl. ¶ 171.) He also predicted that, "over the course of the next nine months," the company would have "three of the four [3M] manufacturing lines of the key product lines in-house." (*Id.*)

Plaintiffs claim that the foregoing statements were false because Neogen "did no preparation whatsoever" to manufacture 3M's sample handling product line. (Am. Compl. ¶ 174.) But Plaintiffs' claim about the "on track" statement, as applied to the manufacturing integration, fails for reasons like those discussed above with regard to the ERP implementation. That statement is not objectively verifiable.

As to Adent's prediction that Neogen would be manufacturing most of the 3M products in house within nine months, there are no facts in the complaint from which to plausibly infer that Defendants had reason to believe Neogen would not be able to reach this target. Thus, Plaintiffs have not alleged a falsehood or scienter.

**2. "Completed Initial Phase of Relocation" (January 2024 to April 2024)**

In January 2024, Adent asserted that Neogen had "initiated the exit of [its] transition services agreements, successfully completed the initial phases of the integration of two additional product lines and remain[ed] on track to exit all transition agreements outside of Petrifilm manufacturing[.]" (Am. Comp. ¶ 184.) He also represented that Neogen had "successfully completed the first phase of the relocation of the former 3M pathogen and sample handling product lines into Neogen facilities" and that Neogen expected to complete the "final relocation" in the fourth quarter, i.e., by the end of June 2024. (*Id.* ¶ 185.) And in April 2024, Adent asserted that Neogen had "completed the relocation of the pathogen detection product line and the initial phases of the relocation of the sample handling product line, which we expect to complete in the fourth quarter." (*Id.* ¶ 190.) He also touted the fact that Neogen had completed "the first two of our four-phase relocation of the former 3M sample handling product line." (*Id.* ¶ 191.)

Plaintiffs do not adequately allege what was false about these statements. Plaintiffs allege that Neogen was unable to get the sample handling machinery running until about June 2024 and was still producing some products manually in 2025; however, Defendants did not represent that the manufacturing integration was complete in January or April 2024. Rather, Defendants asserted that the "first" or "initial" phase of the relocation was complete, which necessarily implies that the full process was *not* complete. Indeed, Adent explained that the "remaining two phases expected to be completed by the end of the fiscal year," with "production beginning in Q1 [2025]," i.e., in mid to late 2024. (Q3 2024 Earnings Call Tr. (Apr. 9, 2024), ECF No. 34-17, PageID.623.) These

statements are entirely consistent with Plaintiffs' allegations that Neogen moved the sample handling machinery from 3M's plant to Neogen's facility in about January 2024, and that this machinery began running in June or July of 2024.

**3. "Brought in" and "Completed Relocation" of Sample Handling (June to July 2024)**

In June 2024, Adent stated that Neogen had "brought in sample handling," that "pathogen detection . . . is now in-house," and that "[h]ygiene monitoring is done." (Am. Compl. ¶ 194.) The following month, Neogen represented that "[a]ll former 3M Food Safety products, outside of Petrifilm, and supporting services [were] integrated into Neogen." (Q4 2024 Earnings Call Presentation (July 30, 2024), ECF No. 34-19, PageID.633; *see* Am. Compl. ¶ 206.) More specifically, pathogen detection and hygiene monitoring products were "[f]ully integrated." (Q4 2024 Earnings Call Presentation, PageID.632.) But as to sample handling products, though the "[r]elocation was complete," Neogen was still "ramping up to full production levels." (*Id.*) Adent reiterated this same point, stating that Neogen had "finished relocating the former 3M sample handling product lines in our facility," and that Neogen was "now in the process of ramping up to full production levels," which it "expect[ed] to be at the end of the month." (Am. Compl. ¶ 207.)

Plaintiffs contend that these statements were false or misleading because the machinery used to manufacture the sample handling products operated with mechanical failures, requiring Neogen to assemble some products by hand. However, Plaintiffs implicitly acknowledge that Neogen had, in fact, "brought in" the manufacturing of the sample handling product to its own facility because Plaintiffs allege that "by summer 2024 the machine was running," though "it kept failing." (Am. Compl. ¶ 146.) The machinery's persistent failures do not render Defendants' statements false; to the contrary, they are consistent with Defendants' representations that Neogen had relocated the product line but was still "ramping up" to full production, which means it was

not yet producing those products at full capacity. Thus, it is not clear why Defendants' statements were false or misleading, let alone materially so.

**4. "Ramping Up" Production (September to October 2024)**

At an investor conference in September 2024, Neogen again stated that, while two other product lines were "fully integrated," Neogen's sample handling production was still "ramping up" following the relocation of equipment from 3M to Neogen's facility. (Wells Fargo Healthcare Conf. Presentation (Sept. 5, 2024), ECF No. 34-34, PageID.699.) At that conference, Naemura stated that the "well-documented challenges with our shipment operations" in 2024 "are behind us in 2025." (Am. Compl. ¶ 209.) When Naemura was asked whether Neogen was "past the most significant integration challenges," Naemura agreed, noting that Neogen had "stood up a new distribution facility," extracted itself from 3M's logistics and distribution network, implemented SAP, and brought in "two more additional product lines on the manufacturing." (Am. Compl. ¶ 210; Wells Fargo Healthcare Conf. Tr. (Sept. 5, 2024), ECF No. 34-20, PageID.636.)

In October 2024, Adent stated that Neogen had "completed the relocation of the former 3M sample collection product line" and expected to reach "normal production levels in the third quarter [of fiscal year 2025]." (Am. Compl. ¶ 214.) He noted that the company was still "in the process of ramping up our production" and that it had not "been able to fully keep up with end user demand," which "weighed on . . . sample collection sales in the quarter." (Q1 2025 Earnings Call Tr. (Oct. 10, 2024), ECF No. 34-21, PageID.640.) That same day, Naemura disclosed that the company's revenue growth in the previous quarter was "partially offset by a decline in sample collection" because the company "fell behind demand during the process of ramping up production in our own facility." (*Id.*, PageID.641.)

Plaintiffs contend that Neogen's integration-related challenges were not "behind it" in September 2024, as evidenced by the fact that the company was assembling some sample handling

products manually due to machine failures. But in context, Naemura was referring to the "well-documented challenges" stemming from *ERP-related shipping* issues that Neogen had reported in previous quarters (*see, e.g.,* William Blair Growth Stock Conf. Tr. (June 4, 2024), ECF No. 34-4, PageID.566 ("We're on track to solve kind of the shipping issue we're having with ERP."); Q3 2024 Earnings Call Tr. (Apr. 9, 2024), ECF No. 34-17, PageID.623 (asserting that "[system-related] inefficiencies have negatively affected the rate at which we're able to meet end user needs and ship products to customers")); he was not referring to the challenges with manufacturing the sample handling products. The evidence of ongoing manufacturing issues did not make it false for him to assert that the company had overcome the ERP-related shipping challenges.

Plaintiffs also contest Naemura's assertion that Neogen's "most significant integration challenges" were behind it. But that statement was simply an unverifiable opinion that hinges on how one defines "most significant." Importantly, he did not represent that the entire integration was complete, or that the company had reached full production for manufacturing sample handling products.

Plaintiffs further argue that the sample handling manufacturing was not "ramping up" in or after September 2024, but Plaintiffs provide no facts to support this conclusory assertion. Plaintiffs do not allege any details about Neogen's sample handling production levels after August 2024, when FE-5 says that Neogen was producing only 500 products a month.[4] Neogen could have been increasing its production levels while still dealing with the mechanical failures described above. Moreover, Defendants repeatedly disclosed that it was not producing those products at full capacity, and that it "fell behind" customer demand, which impaired its revenue. These disclosures undermine an inference of scienter.

[4] FE-5 left the company in August 2024. (Am. Compl. ¶ 148.)

Plaintiffs point to the statements by Naemura in July and October 2025 regarding Neogen's inability to maintain consistent "uptime," which required it to incur additional labor costs because it had to produce some sample handling products manually. But those statements speak to Neogen's ability to manufacture its sample handling products effectively and efficiently using its machinery, not to its overall production levels. In fact, by October 2025, Naemura reported that Neogen had reduced its back orders to "almost a normal level" compared to a few months earlier, which suggests that its overall output had returned to normal levels, even though it was still experiencing inefficiencies and relying on manual labor to maintain those levels. (*Id.*) Thus, the statements in 2025 do not establish that the earlier statements in 2024 about "ramping up" production or the expectation to reach "normal production levels" were false or misleading.

**5. "Improving Efficiency," "Majority of Integration Work Complete" (December 2024)**

In December 2024, Adent told investors that the integration was still "on track," that three of the four product lines acquired from 3M were being manufactured in Neogen's facilities, that Neogen was "manufacturing and improving the efficiency of those businesses," and that "the majority of the integration work [is] behind us." (Am. Compl. ¶ 217.)

Plaintiffs argue that the "majority" of the integration work was not "behind" the company and that Neogen was not "manufacturing and improving [the] efficiency" of its sample handling product line because, as Naemura later disclosed in June 2025, the company was still "produc[ing] a significant amount of products manually." (*See* Am. Compl. ¶ 12.) But as discussed above, Defendants' statements that the overall integration was "on track" and that the "majority" of the integration work had been completed are general statements of opinion that defy objective assessment. It is not clear what "track" the company had in mind for the 3M integration; the fact that it could not produce one of its new product lines at full capacity does little to suggest that the

company had not completed most of that integration. Thus, Plaintiffs have not plausibly alleged that these statements were false or misleading, or that Defendants acted with the requisite state of mind when making them.

Plaintiffs also contend that Neogen was not improving the efficiency of its business because the machine it used to produce the sample handling products continued to malfunction. But that malfunction alone does not plausibly suggest that Neogen was not improving the efficiency of the entire food safety business it had acquired from 3M. And at any rate, Adent's general statement about improving the company's efficiency is inactionable puffery. *See Carvelli*, 934 F.3d at 1321.

**6. "Ramping Up," "Product Lines Operational" (January to April 2025)**

On January 10, 2025, Adent stated that the company had "discrete initiatives underway to drive improvements and efficiency of our fully integrated shipping and distribution operations," that "the process of ramping up is continuing," that "[a]ll of the product lines are operational," and that the company was "going to be able to bring those capacity rates back up by the end of the third quarter." (Am. Comp. ¶ 219.) Adent noted that the company was changing its expectations in revenue due, in part, to the "longer ramp-up period" in "sample collection production." (Q1 2025 Earnings Call Tr. (Jan. 10, 2025), ECF No. 34-22, PageID.645.) In response to questions, he clarified that the company was manufacturing at "half" the "output" compared to "historic" levels. (*Id.*, PageID.646.) He believed that the first quarter revenue impact resulting from challenges in the production of sample handling products was "about $4 million to $5 million," and that it had "grown a little bit to $6 million" in the second quarter, but he expected production to be "at 100%" in the third quarter. (*Id.*) A few days later, Adent reported that he expected "sample collection production . . . to return to normal levels next month." (Am. Compl. ¶ 221.)

Plaintiffs assert that these statements were false or misleading because Neogen had not "driven improvements and efficiency" in its shipping and distribution operations, its product lines were not all operational, it was not "ramping up" production of the sample handling products, and it would not be able to "bring those capacity rates" back up by the end of the third quarter.

As discussed in the previous sections, however, Plaintiffs provide no facts to support its assertion that Neogen was not ramping up production of the sample handling product line, that this product line was not "operational" (in the sense that the company was not producing and selling products), or that the company could not achieve full production levels over the next few months. In addition, Adent's general statements about driving improvements and efficiency are merely puffery. Furthermore, it is difficult to see why these statements would have been misleading, or to infer any fraudulent intent by Defendants, when Adent affirmatively disclosed that the company's production output was half of what it had been in the past, and that this reduced output had adversely impacted the company's revenue.

Plaintiffs argue that Defendants had no objective basis for believing that sample handling production would return to normal levels the following month. But the PSLRA contains a safe harbor for "forward-looking" statements "if they are either (1) accompanied by meaningful cautionary language or (2) not made with 'actual knowledge' of falsity." *Oakland Cnty. Emps. Ret. Sys.*, 2026 WL 508962, at *6 (quoting 15 U.S.C. § 78u-5(c)). "The PSLRA defines a 'forward-looking' statement as, among other things, 'any statement of the assumptions underlying or relating to' a company's financial statements, future plans, or future economic performance." *Id.* (quoting § 78u-5(i)(1)). Adent's statements about future production levels relate to future plans and future economic performance, so they are forward-looking. Consequently, Plaintiffs must

plead facts from which to infer that Defendants had "actual knowledge" of any falsity in these statements in January 2025. Plaintiffs have failed to do so.

Indeed, three months later, in April 2025, Adent reported that, while "[i]t took longer than we had originally anticipated, . . . the relocated product lines are now producing at the prior levels." (Q3 2025 Earnings Call Tr. (Apr. 9, 2025), ECF No. 34-24, PageID.651.) Plaintiffs allege no facts suggesting those levels were not attained in April 2025. Instead, as discussed above, Plaintiffs rely on statements by Defendants in July and October 2025, which concern the company's struggles with production *efficiency* and the high cost of producing the sample handling products due to reliance on labor to compensate for machine problems. Those later statements do not suggest that any representations about the overall levels at which Neogen was producing its products were false or misleading.

* * *

For the reasons discussed above, Plaintiffs have failed to allege the necessary elements of a fraud claim under Section 10(b) or SEC Rule 10b-5, which means the Court must dismiss Count I of the amended complaint. And because Plaintiffs have not adequately alleged an underlying violation of the securities laws, the Court will also dismiss Count II of the amended complaint. *See Doshi*, 823 F.3d at 1045 ("Because Livonia's complaint alleges no primary violation of the securities laws, its § 20(a) control-person claims were properly dismissed.").

## IV. CONCLUSION

For the reasons stated, Plaintiffs fail to state a claim. Consequently, the Court will grant Defendants' motion and dismiss the complaint. An order and judgment will issue.

Dated: August 10, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE